IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JANE P.H. DOE, a minor, by and through her parents and natural guardians, JOHN K.H. DOE and JANE J.H. DOE<br><br>_Plaintiff,_<br><br>v.<br><br>ROBLOX CORPORATION ; SNAP, INC.; and DOES 1-50,<br><br>_Defendant._ | Civil Action No. 2:25-cv-5709<br><br>**Jury Trial Demanded** |

## CIVIL ACTION COMPLAINT

Plaintiffs John K.H. Doe and Jane J.H. Doe, as the parents and natural guardians of minor, Jane P.H. Doe, minor ("Plaintiff"), brings this action against Roblox Corporation ("Defendant Roblox") and Snap, Inc. ("Defendant Snap") (collectively, "Defendants") to recover damages arising from the severe injuries Plaintiff suffered because of Defendants' respective conduct in creating, designing, marketing, and distributing their mobile- and web-based products, Roblox and Snapchat (the "products"), and alleges as follows:

## INTRODUCTION

1.     This action seeks to hold Defendants accountable for the reckless facilitation of the creation and distribution of child sexual abuse material ("CSAM") and sexual exploitation of Plaintiff, an eleven (11) year-old child at the time Plaintiff was victimized. The heinous acts against Plaintiff were the result of tortious conduct by Defendants in failing to warn parents and child

1

users of the dangers of their products and in failing to design products intended for children that were safe.

2.      With their pervasive misrepresentations about safety, Defendants lure parents into believing their products provide a safe and appropriate place for children to play. In reality, and as Defendants well know, due to the negligent design of their products, children are easy prey for pedophiles. This predatorial hunting of children on Defendants' products is known to Defendants. However, Defendants have intentionally, recklessly, and/or negligently failed to design a safe product by failing to implement safety features to protect children and failing to provide proper product warnings to parents or child users, such as Plaintiff, of the dangers of known pedophiles using the platform for the creation and distribution of CSAM and sexually explicit images and videos of children.

3.      The reason for Defendants' unlawful conduct is simple: Defendants prioritize growing the number of users of their products over child safety. As one former Roblox employee explained in describing the company's approach to child safety, "You have to make a decision, right? You can keep your players safe, but then it would be less of them on the platform. Or you just let them do what they want to do. And then the numbers all look good and investors will be happy."[1] Snap has taken the same approach to child safety on its product. Defendants' prioritization of growth over the safety of children has devastated the lives of children who use their products, including Plaintiff.

4.      As an eleven (11) year-old child, Plaintiff was an avid user of Roblox and Snapchat. Plaintiff's parents allowed Plaintiff to use Defendants' products only because Plaintiff's parents trusted Defendants' representations that their products were safe for children to use. Plaintiff's

---

[1] *Roblox: Inflated Key Metrics for Wall Street and a Pedophile Hellscape for Kids*, Hindenburg Research (Oct. 8, 2024), https://hindenburgresearch.com/roblox/.

family learned the truth only after it was too late. In 2024, they discovered that Defendants' defectively designed products, with the lack of safety features or warnings, enabled a child predator to identify, groom, coerce, and extort Plaintiff into sending him sexually explicit images and videos of herself.

5.      Plaintiff has suffered unimaginable harm. Plaintiff's innocence has been snatched from her forever. Tragically, what happened to Plaintiff is far from an isolated event. Indeed, Plaintiff is just one of countless children whose lives have been devastated because of Defendants' misrepresentations, defectively designed products, and failures to warn parents of child users of the known dangers associated with their products. This action, therefore, is not just a battle to vindicate Plaintiff's rights; it is a stand against Defendants' systemic failures to protect society's most vulnerable from unthinkable harm in pursuit of financial gain over child safety.

## PARTIES

6.      Plaintiff Jane P.H. Doe, a minor, and parents and natural guardians, John K. H. Doe and Jane J. H. Doe, are citizens and residents of the State of Ohio, with a principal place of residence in Logan County.

7.      Plaintiff has suffered profound and life-altering personal injuries, caused directly and proximately by Defendants' wrongful conduct. These injuries include, but are not limited to, mental suffering, emotional distress, psychological trauma, depression, anxiety, PTSD and other irreparable harm. Plaintiff has also endured humiliation, shame, fear, and a profound loss of trust, safety, and innocence. These harms include the deprivation of a normal and healthy childhood, the erosion of her sense of self-worth, and a significant loss of enjoyment of life. These injuries are severe, permanent, and continuing, leaving Plaintiff with lifelong consequences and ongoing emotional and psychological suffering.

8.     Plaintiff was a minor at the time of using Defendants' products and, as such, lacked the legal capacity to enter into any legally binding contract or agreement. To the extent Defendants claim any contract has any effect on Plaintiff's rights in this action, such an assertion is legally erroneous, invalid, and unenforceable, including because Plaintiff disaffirms any such contract, including any forced arbitration clause and any delegation clause on and contract.

9.     Defendant Roblox is a Nevada corporation registered to do business in the Commonwealth of Pennsylvania as a foreign business corporation with its registered agent located in Dauphin County.

10.     Defendant Roblox owns, operates, controls, produces, designs, maintains, manages, develops, tests, labels, markets, advertises, promotes, supplies, and distributes the Roblox product. Roblox is widely available to consumers throughout the United States, including in this jurisdiction.

11.     Defendant Snap is a Delaware corporation registered to do business in the Commonwealth of Pennsylvania as a foreign business corporation with its registered agent located in Dauphin County.

12.     Defendant Snap owns, operates, controls, produces, designs, maintains, manages, develops, tests, labels, markets, advertises, promotes, supplies, and distributes the Snapchat product. Snapchat is widely available to consumers throughout the United States, including in this jurisdiction.

13.     The true names or capacities, whether individual, corporate, or otherwise, of Defendants DOES 1 through 50, inclusive, are unknown to Plaintiff who is therefore ignorant of their true names and sues said Defendants by such fictitious names. Plaintiff believes and alleges that each of the Defendants designated herein by fictitious names is in some manner legally

responsible for the events and happenings herein referred to and caused damages proximately and foreseeably to Plaintiff as alleged herein.

## JURISDICTION AND VENUE

14.    This Court has specific jurisdiction over Plaintiff's action pursuant to 28 U.S.C. § 1332(a) as the amount in controversy exceeds the jurisdictional threshold, exclusive of costs, is between citizens of different states, and because the Defendants each have certain minimum contacts with the Commonwealth of Pennsylvania such that the maintenance of the suit in this district does not offend traditional notions of fair play and substantial justice, and because the injuries and damages alleged herein arise directly out of, and are related to, Defendants' contacts and activities in the Commonwealth of Pennsylvania.

15.    There is specific jurisdiction over the Defendants pursuant to Pennsylvania's long arm statute, 42 Pa.C.S. § 5322(a)(1)-(4), because they have both transacted business in the Commonwealth and supplied services or things in the Commonwealth.

16.    This Court has general jurisdiction over Defendants Roblox and Snap under 42 Pa.C.S. § 5301(a)(2)(ii) and pursuant to *Mallory v. Norfolk Southern Railway Co.*, 600 U.S. 122 (2023), as both Defendants are registered to do business in Pennsylvania.

17.    Venue is proper in the United States District Court of the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(c)(2) and 28 U.S.C. § 1391(d) as Defendants reside within this judicial district and are subject to the Court's personal jurisdiction in this judicial district.

## FACTUAL ALLEGATIONS: ROBLOX

18.    Launched in 2006, Roblox is an interactive online gaming product that creates a new category of human interactions. Users can play myriad games on Roblox referred to as

"experiences." There are currently more than 6.7 million[2] experiences within the Roblox ecosystem. Defendant Roblox has complete control over the platform hosting the experiences, including but not limited to, warnings associated with the experiences, age verification, age restrictions for each experience, policies and rules regarding inappropriate conduct, monitoring for inappropriate conduct, handling and facilitation of reports of complaints by users, etc.

19.    Roblox is easily accessible, including to children as young as six (6) years old. It is free to download and play and is available on gaming consoles, computers, tablets, and cellular devices. An account can easily be set up by a child in a matter of minutes without a parent.

20.    Roblox is designed to be an interactive experience, allowing and encouraging users to communicate and interact with each other in real time. Gameplay interactions, user hubs, direct messaging, and voice chat all promote social interactions between and among users. Roblox's co-founder and CEO David Baszucki has explained that his vision is for Roblox to bring about "the next phase of human interaction," which he also has described as "a new category of human coexperience."[3] Defendant Roblox has similarly explained that it "operates a human co-experience platform . . . where users interact with each other to explore and develop immersive, user generated, 3D experiences."[4]

21.    Defendant Roblox designed its product for young children. Defendant Roblox has marketed its product not only as the "#1 gaming site for kids and teens"[5] but also as an educational experience for children. Defendant Roblox claims that it provides "new gateways into learning"— from "chemistry to physics to robotics and more, Roblox experiences bring concepts to life in

[2] Roblox, *Home Page*, https://corp.roblox.com/ (last visited October 1, 2025).
[3] David Baszucki, Co-founder and CEO of Roblox, *The CEO of Roblox on Scaling Community-Sourced Innovation*, Har. Bus. Rev., The Magazine (Mar.-Apr. 2022), https://hbr.org/2022/03/the-ceo-of-roblox-on-scaling-community-sourced-innovation.
[4] Roblox Corp., 10-Q (Quarterly Report) (Mar. 13, 2021).
[5] Roblox, *What Is Roblox*, http://web.archive.org/web/20170227121323/https://www.roblox.com/ (archived Feb. 27, 2017).

ways that immerse learners and motivate exploration, play, and deep thinking."[6] These offerings, according to Defendant Roblox, include "high-quality, standards-aligned, immersive educational experiences designed by curriculum experts."[7]



*Roblox webpage – "A New Era of Engaged Learning"*

22.     Roblox's popularity among children exploded during the pandemic when the product was flooded with millions of new users as children were confined to their homes. By September 2020, roughly 31.1 million people from around the world, more than half of them under 13, were on Roblox daily, making it the world's biggest recreational zone for kids.[8]

23.     That growth has continued unabated. In Roblox's 2024/2025 Annual Report, the company reports an average of 82.9 million daily active users, with 20% under 9 years of age; 20% from 9-12 years of age; 16% from 13-16 years of age; and 44% at 17 years of age or over.[9]

24.     Today, Roblox is the most downloaded online game globally, and based on 2023 statistics, the average user spends 2.4 hours a day using the product.[10]

---

[6] Roblox, *A New Era of Engaged Learning*, https://corp.roblox.com/education (last visited May 5, 2025).
[7] *Id.*
[8] Roblox Corp., *SEC filings as of September 30, 2020*,
https://www.sec.gov/Archives/edgar/data/1315098/000119312520298230/d87104ds1.htm (last visited October 1, 2025).
[9] Roblox Corp., *Roblox Corporation 2025 Proxy Statement and 2024 Annual Report,* 199 (May 29, 2025),
https://s27.q4cdn.com/984876518/files/doc_financials/2024/ar/Roblox-2025-Proxy_2024-AR-1-1.pdf .
[10] BackLinko, *Roblox User and Growth Stats You Need to Know*, https://backlinko.com/roblox-users#average-daily-

25.     As noted, individuals who wish to play Roblox must first create an account. It is extremely easy to "SIGN UP AND START HAVING FUN!" Users are only required to provide a birthdate, username, and password.

26.     Users of any age can create an account. There is no age minimum. Further, Defendant Roblox does not require users to verify their age upon sign-up. As such, users can easily represent that they are younger or older than their actual age, making it so, for example, that child predators can pose as children.



*Roblox Sign-Up Screen*

27.     Although Defendant Roblox states that children are to have parental permission before signing up for an account, Defendant Roblox does not have any safety features in place to prevent children from creating their own accounts and playing on Roblox without any parental permission. Indeed, Defendant Roblox does nothing to confirm or document that parental

usage-on-roblox/ (last visited May 5, 2025).

permission has been given, no matter how young a child is. Nor does Defendant Roblox require a parent to confirm the age given when a child signs up to use Roblox.

28.    Defendant Roblox has access to biometric age and identity verification software that requires the user to take a photo of a government issued ID along with a real time selfie photo that is then verified through artificial intelligence. However, while Defendant Roblox utilizes this software for other purposes, Defendant Roblox intentionally does not utilize this feature when new accounts are created. As such, Defendant Roblox also still relies on self-reported birthdays for age verification, and its product is intentionally and/or recklessly designed to allow users to create accounts using fake birthdays, allowing adults to pose as children and allowing children to easily circumvent the more restrictive controls for account users under the age of 13.

29.    After creating an account, all users are assigned a default player avatar—a character that represents the individual user within certain games.



*Example Default Avatar on Roblox*

30.    Users can then play in any of the millions of "experiences" on the product which are much like video games. These games are sorted into different genres/categories, such as Sports, Role-Playing Games, Fighting, First Person Shooters, Fashion, Horror, Comedy, Military, and Naval. The games recommended to a user will vary based on the age the user entered when generating their account and Defendant Roblox's algorithm that recommends games to the user.



*Examples of Games Available on Roblox*

31.    Prior to November 2024, when a child created an account, the default setting was for parental protections to be turned off. As a result, if a child made their own account and listed their age as 13 or older, then any "experience" was available to that child.

32.    Further, until November 2024, Defendant Roblox's default setting for its product allowed adults to easily communicate with children. Adult strangers could "friend" and chat with a child of any age via direct (*i.e.*, private) message and invite a child to a private server or other "experiences" on the platform. And after entering an experience, users could chat with other users in the experience, whether or not they are friends. That is, the option to disable chat with strangers in experiences was turned off by default.

33.    Now, under Roblox's default settings, adults cannot directly message children under 13, outside of "experiences." However, messaging can still be done from within the "experiences," as well as voice chatting. Further, children under 13 can still receive friend requests from within the "experiences." As such, despite these recent changes, Defendant Roblox's defective product continues to make children highly vulnerable to predators.

34.    Defendant Roblox generates revenue, in part, by selling users a platform-exclusive currency called "Robux," which must be purchased using real-world currency before exchanging "Robux" or digital content in the closed digital economy. Robux can be purchased in a single

transaction, or a user may subscribe to receive Robux on a recurring basis with a Roblox Premium membership. Defendant Roblox also offers Robux gift cards that anyone can purchase and send to any user.

35.     Children frequently become obsessed with purchasing or otherwise obtaining Robux to buy items for their avatars and to spend in their favorite experiences on Roblox. In Defendant Roblox's Avatar Store, for example, the company sells "rare" items at astronomical prices, such as a type of hair for an avatar, which children seek to purchase to keep up with or outdo their peers on Roblox. As a result, children often tell others, including strangers, that they will do "[a]nything for Robux."[11]

36.     Defendant Roblox's success and continued growth has hinged on its constant assurances to parents that its product is safe for children.[12] The company has done so throughout its history and in every forum possible—on its website, through public promises of its highest executives, in news articles, on podcasts, and on and on.

37.     Over the years, Defendant Roblox has repeatedly represented that its product is safe for children and has misrepresented the safety controls it has in place. As early as 2007, Defendant Roblox's website assured parents that Roblox is an "online virtual playground . . . where kids of all ages can safely interact, create, have fun, and learn."[13]

38.     From 2008 to 2016, Defendant Roblox's website continued to promise parents, "[w]e take every precaution possible to make sure kids are protected from inappropriate and offensive individuals as well as from indecent and distasteful content."[14]

---

[11] Olivia Carville & Cecilia D'Anastasio, *Roblox's Pedophile Problem*, Bloomberg Businessweek (Jul. 23, 2024), https://www.bloomberg.com/features/2024-roblox-pedophile-problem/.
[12] Kerry Breen, Experts users warn about explicit content on popular gaming platform Roblox, Today.com (Oct. 20, 2021), https://www.today.com/parents/roblox-experts-users-warn-aboutinappropriate-content-t235027.
[13] Roblox, *Frequently Asked Questions (FAQs)*, https://web.archive.org/web/20071105104643/http://www.roblox.com/Parents/FAQs.aspx (archived Nov. 5, 2007).
[14] Roblox, *Keeping Kids Safe*,

39.    Defendant Roblox also assured parents that it has a zero- tolerance policy for "swearing and obscenities, messages and content of a sexual or violent nature, and any sort of aggressive or threatening communication," and "immediately suspended or permanently expelled" any offenders, which was not accurate.[15]

40.    Indeed, Defendant Roblox has consistently sought to paint Roblox as "family friendly" and safe for children of all ages. In 2017, Defendant Roblox began declaring that it "take[s] kids' safety and privacy very seriously" and "strive[s] to continually develop new and innovative technologies that will protect the safety of our community while allowing players to imagine, create, and play together in a family- friendly environment."[16]

41.    Defendant Roblox similarly has advertised its product as "a safe, moderated place to meet, play, chat, and collaborate on creative projects."[17]



*Excerpt from Roblox Parent's Guide in 2017*

https://web.archive.org/web/20080501101437/http://www.roblox.com/Parents/KeepingKidsSafe.aspx (archived May 1, 2008); *see also* Roblox, *Information for Parents*,
https://web.archive.org/web/20160131063648/http://corp.roblox.com/parents (archived Jan. 31, 2016).
[15] *Id.*
[16] Roblox, Parents' Guide, https://web.archive.org/web/20170716032712/https://corp.roblox.com/parents/ (archived Jul. 16, 2017).
[17] Id.

42.    Again in 2023, Defendant Roblox assured parents that it "continually develop[s] cutting-edge technologies to ensure that the Roblox platform remains a safe and fun space for players all over the world."[18]  Defendant Roblox claimed that the company was "dedicated to working together with parents and digital safety experts to promote a family-friendly environment that allows all players to imagine, create, and play online."[19] Defendant Roblox emphasized that it is "committed to ensuring that Roblox is a safe and fun place for everyone."[20] According to Defendant Roblox, it "goes above and beyond to foster an environment where people of any age can create, play, learn, and imagine safely. We've kept children's privacy and safety top-of-mind when designing our platform, especially through the implementation of advanced text filters that block inappropriate language or other unsafe content."[21]

43.    Defendant Roblox's website today contains similar assurances. It claims, "Safety is in our DNA: when Dave Baszucki and Erik Cassel launched Roblox in 2006, they spent a few hours each day with the community, helping to ensure that Roblox was a safe and welcoming environment. Safety was their top priority, and they made constant improvements in their moderation, both for content and for communication on the platform."[22]

44.    According to the current website, Defendant Roblox "won't allow language that is used to harass, discriminate, incite violence, threaten others, or used in a sexual context."[23] It touts

---

[18] Roblox, For Parents, https://web.archive.org/web/20230405060048/https://corporate.roblox.com/parents/ (archived Apr. 5, 2023).
[19] *Id.*
[20] Roblox, *Roblox FAQ*, https://web.archive.org/web/20230328011957/https://corporate.roblox.com/faq/ (archived Mar. 28, 2023).
[21] Roblox, *Roblox & User Data FAQ*, https://en.help.roblox.com/hc/en-us/articles/4406238486676-Roblox-User-Data-FAQ (last visited October 1, 2025).
[22] Roblox, *Safety Comes First on Roblox*, https://web.archive.org/web/20250513161835/https://corp.roblox.com/safety-civilityresources?section=news&article=safety-comes-first-on-roblox  (archived May 13, 2025).
[23] Roblox, *Safety Features: Chat, Privacy & Filtering*, https://en.help.roblox.com/hc/en-us/articles/203313120-Safety-Features-Chat-Privacy-Filtering (last visited October 1, 2025).

a "stringent safety system and policies," which includes its "expertly trained team with thousands of members dedicated to protecting our users and monitoring 24/7 for inappropriate content"; its "safety review of every uploaded image, audio, and video file, using a combination of review by a large team of human moderators and machine detection before they become available on our platform"; and its chat filters for inappropriate content, which "are even stricter" for children under 13 and "include any potentially identifiable personal information, slang etc."[24]

45.    These misleading promises and assurances are not confined to Defendant Roblox's website. They are repeated in statements by the company's highest executives, including in direct response to concerns raised by parents.

46.    For example, in 2009, a blogger wrote about blocking Defendant Roblox because he doubted its safety for his children. CEO David Baszucki responded to the blogger reassuring him that Defendant Roblox flags "obviously offensive content" and removes it, and if "something is marginal, but gets flagged as inappropriate," Roblox "investigate[s] immediately."[25]

47.    In a 2013 *Wired* interview, when asked whether a parent should be concerned about whom his child was chatting with in-game, Baszucki declared, "We take every precaution possible to make sure kids are protected from inappropriate and offensive individuals as well as from indecent and distasteful content," taking a sentence verbatim from Roblox's webpage for parents.[26]

48.    Tami Bhaumik, Defendant Roblox's current Vice President of Civility & Partnerships, has doubled down on these promises in statements to parenting magazines, news

---

[24] Roblox, *Safety & Civility at Roblox*, https://en.help.roblox.com/hc/en-us/articles/4407444339348-Safety-Civility-at-Roblox (last visited October 1, 2025).
[25] Eric Frenchman, *Revisiting Roblox*, Pardon My French (Oct. 5, 2009),
https://pardonmyfrench.typepad.com/pardonmyfrench/2009/10/revisiting-roblox.html.
[26] Tony Sims, *Interview with David Baszucki, Founder & CEO of Roblox*, Wired (Feb. 7, 2013),
https://www.wired.com/2013/02/roblox/.

outlets, and podcasts— all aimed at persuading parents to let their children use Roblox. She also has contacted international online safety experts in an effort to sell Roblox's safety story.

49.    As recently as 2024, Bhaumik told *Parents Magazine* that "[w]e have a responsibility to make sure our players can learn, create, and play safely. This continues to be our most important priority and that will never change."[27]

# Parents

In response to safety concerns, Roblox notes that the platform was designed for kids and teens from the beginning, and they're committed to making safety a priority. "We have a responsibility to make sure our players can learn, create, and play safely," notes Tami Bhaumik, Vice President of Civility & Partnerships at Roblox. "This continues to be our most important priority and that will never change."

50.    Such statements by Bhaumik date back years. In 2018, Bhaumik told the *Washington Post* that Defendant Roblox "focus[es] on making sure that everything is done in a safe and appropriate way."[28] That year, she also claimed to another newspaper that Defendant Roblox's "safety team reviews every uploaded image, video, and audio file used within our games to make sure they are safe and age appropriate."[29] She also boasted that Defendant Roblox has "created extensive parental controls for our games and a detailed Roblox Parent's Guide that provides information to parents to help create a Roblox experience that's best for their child."[30]

---

[27] Maressa Brown, *Is Roblox Safe for Kids? Here's What the Experts Have to Say*, Parents Magazine (Apr. 29, 2024), https://www.parents.com/kids/safety/internet/is-roblox-safe-forkids/.
[28] Hayley Tsukayama, *Roblox, an Online Kids Game, Explains How a Hack Allowed a Character's Virtual 'Rape'*, Wash. Post. (Jul. 17, 2018), https://www.washingtonpost.com/technology/2018/07/17/roblox-an-online-kids-game-explains-how-hack-allowed-characters-virtual-rape/.
[29] Chris Pollard, *Danger to Kids Police Warn that Children as Young as Five-Years-Old are Seeing Naked Lego-Type Characters Having Sex on Roblox App*, The Sun (Jan. 29, 2018), https://www.thesun.co.uk/news/5445444/roblox-app-children-danger-sex-warning/.
[30] *Id.*

51.     In 2019, while presenting on a "Digital Civility Panel," Bhaumik emphasized that "[w]e make sure there's a safe environment," citing Defendant Roblox's "tremendous reporting system" and "incredible moderation and CS team that reacts very, very quickly."[31] On that same panel—and in contradiction to Defendant Roblox's representation that it had always taken "every precaution possible" to protect children, Bhaumik conceded that "digital civility did not exist at Roblox a year and a half ago and we established this and made it a movement within our company."[32] She added later, "It's still very early days for us. This whole digital civility focus for Roblox is still there, we're just still establishing it."[33]

52.     In a 2022 video interview about safety on Roblox, Bhaumik asserted that Defendant Roblox's "number one priority" is "to create a safe, civil, and inclusive community" and that "[s]afety and civility has always been baked into everything that we do."[34] That year, on a podcast, she also bragged about Defendant Roblox's purported safety protections, including "thousands of human moderators on the front lines" and "machine learning that is constantly taking a look at chat filters."[35] With these and other measures, she exclaimed, "[a]ny sort of bad actor that comes onto the platform is dealt with swiftly" and "[w]e remove any content that's reported to us within minutes."[36] However, these statements do not reflect reality.

---

[31] YouTube, Digital Civility Panel (Oct. 23, 2019),
https://www.youtube.com/watch?v=XoUs1Js7WG0&list=PLcKphP00N1_kCLjvcOWdwbegJkNS L-CuL&index=6.
[32] *Id.*
[33] *Id.*
[34] Video Interview with Tami Bhaumik, Roblox's VP of Digital Civility & Partnerships (2022),
https://www.facebook.com/bedford.sheriff/videos/roblox-how-to-help-kids-use-itsafelyrobloxs-vp-of-digital-civility-partnerships/1338989609901259/.
[35] YouTube, Into the Metaverse, Podcast: EP.21: Tami Bhaumik (Roblox) - Building a Safe & Resilient Metaverse,
https://www.youtube.com/watch?v=LT5_bBOYS9A.
[36] *Id.*

53.    In 2023, Matt Kaufman, formerly the Chief Systems Officer for Defendant Roblox, was appointed Chief Safety Officer, at which point he too began peddling Defendant Roblox's child safety narrative.

54.    In a 2024 blog post on Defendant Roblox's website, Kaufman asserted that "Roblox has spent almost two decades working to make the platform one of the safest online environments for our users, particularly the youngest users. Our guiding vision is to create the safest and most civil community in the world."[37] According to Kaufman, "For users under 13, our filters block sharing of personal information and attempts to take conversations off Roblox, where safety standards and moderation are less stringent."[38] A few months later, he added, "Safety is and always has been foundational to everything we do at Roblox."[39]

55.    In a later blog post, Kaufman touted Defendant Roblox's "track record of putting the safety of the youngest and most vulnerable people on our platform first."[40]

56.    Kaufman also recently told *NPR* that "any time anything happens to a child that puts them at risk is one too many."[41]

57.    Defendant Roblox's public statements and promises that it has made over the years and continues to make to date are carefully crafted to paint the picture of a digital playground that is safe and appropriate for children. When parents, the press, or child advocates raise questions

---

[37] Matt Kaufman, Chief Safety Officer, *Driving Civility and Safety for All Users*, Roblox (Jul. 22, 2024), https://corp.roblox.com/newsroom/2024/07/driving-civility-and-safety-for-all-users.
[38] *Id.*
[39] Matt Kaufman, Chief Safety Officer, *Major Updates to Our Safety Systems and Parental Controls*, Roblox (Nov. 18, 2024), https://corp.roblox.com/newsroom/2024/11/major-updates-to-our-safety-systems-and-parental-controls.
[40] Matt Kaufman, Chief Safety Officer, *Scaling Safety and Civility on Roblox*, Roblox (Apr. 4, 2024), https://corp.roblox.com/newsroom/2024/04/scaling-safety-civility-roblox.
[41] Scott Tong & James Perkins Mastromarino, *Roblox Chief Safety Officer on New Safety Features, Past Cases of Child Abuse on the Platform*, WBUR (Nov. 18, 2024), https://www.wbur.org/hereandnow/2024/11/18/roblox-safety-features.

and concerns, the company's highest executives respond with comforting promises of safety that are empty, patently false, and do not reflect reality.

58.    This campaign of reassurance masks the truth about Defendant Roblox's defective product. Far from creating a safe place for children, Defendant Roblox negligently and recklessly designed, built, and maintains a defective product that lacks safety features to protect children from predators and fails to warn parents and child users of the known dangers of predators utilizing the product for the facilitation of the generation and distribution of CSAM. The end result is that Defendant Roblox, through its defective product and its failure to warn, provides the perfect place for pedophiles to access vulnerable children.

59.    Yet another factor contributing to the defective design of Roblox is Defendant Roblox's failure to require age-appropriate designations on experiences. Defendant Roblox has intentionally and/or recklessly and/or negligently designed its product without requiring age-appropriate designations on experiences in an effort to increase the number of uses per experience for the purpose of increasing revenue. Instead, the option "All Ages (Suitable to everyone)" can be assigned to any experience, giving children access to highly inappropriate experiences such as "Escape to Epstein Island"—a title that directly references one of the locations where for years Jeffery Epstein trafficked minors and other non-consenting individuals so he and others could sexually and physically abuse them. The experiences in the "All Ages" category also include a litany of instances of players mimicking sexual acts and avatar items rife with sexual content and innuendos. Further, the vast majority of experiences are designated as "Suitable to everyone," making it so that Defendant Roblox's purported age restriction safeguards are entirely eviscerated, a fact which Defendant Roblox well knows.



*Age Restrictions Options and Experience Example*

60.    Because of Defendant Roblox's defective product design, children are exposed to graphic sexual material and the existing safety features are woefully inadequate. For example, Defendant Roblox's chat filtering feature is designed to filter inappropriate content and personal information on accounts aged 12 and younger but is less restrictive for accounts aged 13 and above. However, these filters are easily bypassed by obscuring text with alphanumeric combinations (*e.g.*, "D1DDY P13NS"). Not only does this permit a workaround for explicit language, but it also allows players to circumvent filters to request and provide links to external chat services.

61.    While the experiences on Roblox are created by developers, the tools used by these developers are ones that Defendant Roblox designs, controls, and makes available to the developers. Defendant Roblox's tools, which include scripting capabilities, 3D modeling systems, and other software, supply the infrastructure needed to create content for the Roblox product. Defendant Roblox has control over the manner in which these tools are used and has the ability to place limitations and restrictions on them. Instead, however, over the years, Defendant Roblox has provided grossly insufficient safety controls and safeguards. The results are deplorable.

62.    Roblox exercises substantial control over the design and creation of Roblox experiences. Roblox offers intense in-person programs or workshops for intermediate to expert level developers. These programs are specifically designed to engage, supervise, direct and train

developers and designers to build more experiences for the Roblox platform. They specifically target "experienced developers who have demonstrated proficiency and have a deep understanding of Roblox's systems and game development process."[42]

63.    Roblox's Accelerator Program, officially in operation from 2015 to 2022, was a 12-week, on-site training to intermediate to expert level developers and creators, who were paid up to $13,000 USD by Roblox. This program trained anywhere between 40 to 50 participants a year under the direct supervision and direction of Roblox engineers for the sole purpose of creating, developing, and designing experiences.

64.    The Accelerator Program was full-time and participants were expected to attend meetings between 10am and 6pm, Monday through Friday. Prior to COVID-19 the meetings were held at the Roblox headquarters in San Mateo, California. After COVID-19, the Accelerator Program moved to remote attendance.

65.    The Roblox Accelerator Program was discontinued on November 7, 2022, and replaced by other similar programs such as Roblox Game Fund, which ran from approximately 2021 until 2023, when it was replaced with the Creator Fund.

66.    The Roblox Incubator program was similar to the Accelerator Program but targeted more advanced developers and projects that, "...affect the platform in a fundamental way that provides an improved developing ground for all Roblox developers."[43] In the Incubator program participants would be given tasks or specific game creations to build under the direction and guidance of Roblox.

---

[42] 2blox2quit, *2019 Accelerator / Incubator Spring Application*, Roblox Creator Hub (June 19, 2018 1:46 PM), https://devforum.roblox.com/t/2019-accelerator-incubator-spring-application/137644 (last accessed Sep. 30, 2025).
[43] *Id.*

67.    The difference between the Accelerator program and the Incubator program was that the Incubator program looks to build or advance the overall Roblox platform, while the Accelerator program was focused on a particular experience.  Under both programs, Roblox experiences, features, systems, data, and designs were created under the guidance, supervision, and control of Roblox.  Some of the most popular experiences were created and designed through these programs.

68.    Both programs functioned as a "revolving door" through which developers and creators worked under the training, direction, and supervision of Roblox. Through these programs, Roblox  was the collaborator or investor, providing creative input and financial and structural support to  developers and creators, who, in turn, funnel enormous engagement and revenue back to Roblox.

69.    On July 19, 2021, Roblox announced the Roblox Game Fund, later rebranded the Creator Fund in March 2024, which provides funding to participants of the programs up to $500,000 per project.  Roblox is not only in control of the design and creation of the experiences and features, but Roblox also funds the design and creation process.

70.    By way of example, the owner of Fullflower Studio LLC, founded in 2020 by Anne Shoemaker and Luke Weber, participated in the Roblox Accelerator three times before founding the company. Weber, better known as "stickmasterluke," is both a Roblox developer and a paid Roblox employee. The couple incorporated Fullflower Studio shortly after Roblox insiders sold-off shares ahead of the company's 2021 public listing. Shoemaker has said she "came into some money" in 2020 that allowed her to staff up the studio. While the company's success appears legitimate, the timeline and insider access raise questions—including how a Roblox employee, like Luke Weber, could profit personally from game development while still employed by Roblox, simultaneously benefitting from an Accelerator program in which his fiancée Shoemaker

participated. The Fullflower Studio highlights the incestuous reality between Roblox and supposedly "independent" third-party developers and creators.

71.     Luke Weber has a long, successful relationship with Roblox.  As early as 2011, Venture Beat featured Weber as a young up-and-coming developer,[44] and by 2019 some reports placed Weber as the second-richest Robux holder behind only Roblox Corporation themselves. Weber's most popular experience is Natural Disaster Survivor, which was created on or about March 8, 2008, prior to Weber becoming a Roblox employee and prior to founding Full Flower Studio. Since 2008, Natural Disaster Survival has registered over 3.8 billion visitors. While Weber is still an employee of Roblox, Weber has continued to update the Natural Disaster Survival experience, with the last updated date shown as September 24, 2025. Indeed, many of Roblox's most popular and unsafe experiences are created by current Roblox employees or parties related to Roblox, such that Roblox exercises substantial control over, and is responsible for, both the tools used to create an experience and the content of an experience itself.

72.     Roblox also uses other programs such as Developer Exchange and Creator Rewards to exercise control over the creation of experiences.

73.     As early as 2010, Defendant Roblox had already devolved into hosting and promoting sexually explicit content. Defendant Roblox's scripting language, which allows developers to manipulate avatar activity and interactions any way they want, was deployed to create scenarios where avatars engaged in simulated sexual activity.[45]

---

[44] Dean Takahaski, *18-year-old's games get 10M plays in Roblox game world,* GAMESBEAT (August 22, 2011 1:00 PM), (https://web.archive.org/web/20221209224753/https://venturebeat.com/games/18-year-olds-games-get-10m-plays-in-roblox-game-world/ (archived August 17, 2025).
[45] *See, e.g.*, YouTube, *How to Do Roblox Sex Glitch*, https://www.youtube.com/watch?v=Zz97Q1SQE_k; *see also* YouTube, *Roblox Sex?*, https://www.youtube.com/watch?v=hyqCHG6nUYI.

74. This simulated sexual activity pervades the Roblox product, as Defendant Roblox well knows. There have been numerous reports of children's avatars being raped by other users' avatars. For example, in 2018, a seven (7) year-old girl's avatar was violently raped by two male avatars *on a playground* in a Roblox experience, which was witnessed by the girl's mother.[46] In describing the aftermath of this traumatic experience, the girl's mother explained, "I never in my wildest dreams would've ever imagined that I would have to talk with my seven-year-old about rape."[47]

75. Defendant Roblox's defective product also hosts a staggering number of experiences centered on simulated sexual activity. For instance, children can play in "condo games"— predatory digital environments, including houses, where users can remove their avatars' virtual clothing, revealing nudity, and engage in disturbing simulated sexual activities with other Roblox users.[48] They can also play games like "Public Bathroom Simulator Vibe," which allows access to users as young as nine years old and enables users to simulate sexual activity in virtual bathrooms,[49] as well as virtual strip clubs, where child avatars perform sexually explicit acts, like giving lap dances to patrons.[50]

76. A recent investigative report also exposed a multitude of other exploitative experiences on Roblox that recklessly trivialize and gamify serious criminal conduct, including rape. The report confirmed that Defendant Roblox actively hosted over 600 "Diddy" games, with

---

[46] Savannah Levins, *North Carolina Mom Outraged After Roblox Game Depicts Violent Acts, Including Rape*, WFMYNews2 (June 30, 2018), https://www.wfmynews2.com/article/news/local/2-wants-to-know/north-carolina-mom-outraged-after-roblox-game-depicts-violent-acts-including-rape/83-569498171.
[47] *Id.*
[48] EJ Dickson, *Inside the Underground Strip-Club Scene on Kid-Friendly Gaming Site Roblox*, Rolling Stone (Sep. 12, 2021), https://www.rollingstone.com/culture/culture-features/roblox-virtual-strip-clubs-condo-games-sex-1197237/.
[49] *Roblox: Inflated Key Metrics for Wall Street and a Pedophile Hellscape for Kids*, Hindenburg Research (Oct. 8, 2024), https://hindenburgresearch.com/roblox/.
[50] Dickson, *supra* note 47.

titles like "Survive Diddy," "Run from Diddy Simulator," and "Diddy Party," which appear to recreate reported incidents involving the music mogul Sean Combs, publicly known as "Diddy." Diddy was recently federal indicted and is undergoing trial for sex trafficking of minors and other grievous criminal charges regarding allegations surrounding reports about "freak-off" parties—events which, according to multiple lawsuits and media reports, allegedly involved forced drug use, violent assaults, and the sex trafficking of minors, including victims as young as 10 years old.[51]



*Examples of Roblox Games Modeled after Diddy's Sex Trafficking Ventures*

77.    This report also revealed that Defendant Roblox was actively hosting more than 900 Roblox accounts displaying variations of convicted sex trafficker Jeffrey Epstein's name, such as "JeffEpsteinSupporter," whose account Defendant Roblox knowingly knew was interacting with children on its servers.[52]  Defendant Roblox also hosted on its severs games like "Escape to Epstein Island," which, again, is a title that directly references one of the locations where for years Jeffery Epstein trafficked minors and other non-consenting individuals so he and others could sexually

---

[51] Hindenburg Research, *supra* note 45.
[52] *Id.*

and physically abuse them. Defendant Roblox has knowingly and recklessly designed, hosted, and enabled an online platform marketed to children with rampant, sexually exploitative experiences.

78.    As such, Defendant Roblox's product is defective in myriad ways, including but not limited the lack of an actual age verification process, Defendant Roblox's failure to ensure age appropriate "experiences," Defendant Roblox's defective monitoring, and Defendant Roblox's failure to warn parents and children of the dangers associated with the product, including but not limited to the product's sexploitation dangers.

79.    Defendant Roblox is fully aware that grossly inappropriate, sexually explicit, and dangerous experiences pervade its product, and it allows them to continue to exist unchecked, despite the ability to control and/or eliminate them. Leaked internal Roblox documents reveal that Defendant Roblox not only actively monitored this type of content, but it also made decisions such as "[h]ow big of a 'bulge'" was acceptable, and, with the introduction of layered clothing for avatars (*i.e.*, allowing avatars to wear multiple layers of clothing), and whether players could be nude.[53] By allowing this type of content to exist and be easily accessible, Defendant Roblox designed a product with a panoply of games simulating sexual activity, such as condo games and virtual strip clubs.

80.    The effects of these games on children are devastating. Playing video games with explicit sexual content normalizes exploitative and predatory behavior, blurring the lines of what is acceptable in real life. This is particularly harmful for children, who are still developing their understanding of social norms and morality. When such behavior is depicted as humorous, exciting, or rewarded within a game, young players can internalize the idea that harassment or

---

[53] Joseph Cox & Emanuel Maiberg, *Leaked Documents Reveal How Roblox Handles Grooming and Mass Shooting Simulators*, Vice (Aug. 1, 2022), https://www.vice.com/en/article/leaked-documents-how-roblox-moderates-content-mass-shootings-grooming/.

sexual exploitation is harmless or even acceptable. This environment makes children susceptible to being groomed by predators and promotes grooming by giving predators sexually explicit tools in an environment intended and marketed to young children.

81.    Studies support this connection. One study found that playing games with sexualized content was linked to increased rates of sexual harassment toward female targets, suggesting that such exposure desensitizes players to the real-world consequences of these actions. Another study showed that playing mature-rated games was associated with higher rates of risky sexual behavior years later, highlighting the long-term impact of exposure to sexualized or exploitative content.[54]

82.    The interactive nature of games amplifies this effect. Unlike passive media, video games require players to actively participate in behaviors, including those that simulate harassment or exploitation, reinforcing the perception that such actions are normal or desirable. This environment not only desensitizes children but also makes them more likely to replicate these actions in real-world interactions and susceptible to grooming techniques.

83.    The dangerous content on Roblox is not limited to online games. The recent investigative report discussed above found that a basic search for "adult" in Roblox revealed a group with 3,334 members "openly trading child pornography and soliciting sexual acts from minors."[55] And tracking these members unearthed additional Roblox groups engaged in the same criminal conduct, including one massive group with 103,000 members.[56] Yet, Defendant Roblox negligently and/or recklessly failed to implement any age restrictions on these criminal groups or remove them entirely, leaving them accessible to all users.[57]

---

[54] Jay G. Hull, et al., *A Longitudinal Study of Risk-Glorifying Video Games and Behavior Deviance*, J. Pers. Soc. Psychol. 2014 August; 107(2): 300–325, doi:10.1037/a0036058.
[55] Hindenburg Research, *supra* note 45.
[56] *Id.*
[57] *Id.*



*Public Chat Wall for a Group Named "Adult Studios," Where Users Openly Solicited Child Sexual Abuse Material*

84.     Defendant Roblox is knowingly and/or recklessly hosting, enabling, and facilitating the creation and distribution of CSAM. Defendant Roblox's product has been negligently and/or recklessly designed to facilitate the creation and distribution of CSAM by providing tools and software designed to make virtual sex videos between avatars on Roblox. These videos are clearly marked with the .rbxl file extension—Defendant Roblox's proprietary file format—establishing that this content was created within the Roblox product. Moreover, on XVideos, a pornographic website, Roblox users seek out other users to simulate sexual acts within seemingly innocuous games, like Brookhaven, which is one of Defendant Roblox's most popular experiences and is available to all users, regardless of age.[58]

85.     In sum, the online product that Defendant Roblox designed, hosts, and enables contradicts its representations of providing a safe product for minor children, demonstrating Defendant Roblox's blatant disregard for the safety of its youngest users, and revealing the company's prioritization of user engagement over its fundamental duty to protect young users.

---

[58] *Id.*

86.     For many years, Defendant Roblox, through its defective product, has knowingly and/or recklessly served as a conduit for child sexual predators seeking to find, groom, abuse, and exploit children. The defective design of the Roblox product creates an environment where children are susceptible to being groomed by predators without any monitoring, warnings or safeguards.  Defendant Roblox, through its defective product, knowingly and/or recklessly invites predators to have unsupervised access to tens of millions of children and allows predators to freely move between inappropriate sexualized content and popular games to identify and target vulnerable children. Defendant Roblox's failure to design a safe product for children knowing predators are utilizing it demonstrates reckless indifference to the fundamental obligation not to create and foster an environment that places children at significant risk of sexual exploitation and abuse.

87.     These systematic patterns of exploitation and abuse on the defective Roblox product follow a predictable and preventable sequence that Defendant Roblox has known about and facilitated for years: a predator misrepresents his or her age to other users on the product, cosplaying as a fellow child, methodically befriends the vulnerable young victim, and then strategically manipulates the child to move the conversation to other products, such as Snapchat or Discord.

88.     As the recent *Bloomberg Businessweek* article titled *Roblox's Pedophile Problem* put it, "These predators weren't just lurking outside the world's largest virtual playground. They were hanging from the jungle gym, using Roblox to lure kids into sending photographs or developing relationships with them that moved to other online platforms and, eventually, offline."[59] This conduct by predators is being done openly on Roblox.

---

[59] Carville & D'Anastasio, *supra* note 10.

89.     Roblox, in effect, serves as an initial access point to children for predators. The defective product creates the ideal grooming environment for predators providing predators with easy access to young children and all the tools to make grooming easy in an unsupervised environment. Media reports have repeatedly highlighted that Roblox "is being used as a first point of contact for predators."[60] The children, due to their underdeveloped brains and the overly sexualized content on Roblox, are more trusting and naïve, and do not recognize the danger of providing their usernames on other sites, which Defendant Roblox is monitoring and provides no warning to children or their parents about these dangers.

90.     Once on another product, predators escalate their exploitation and abuse by soliciting explicit material, like nude photos or videos of children doing sexually inappropriate acts, all of which constitute CSAM or child pornography. And while the ultimate solicitation of explicit photos or other criminal acts may occur on other products, Roblox serves as the critical facilitator that enables these predators to first identify, target, groom, and gain the trust of young victims through its product's defective design and inadequate safety measures.

91.     Defendant Roblox's defective product and unregulated profit-driven virtual currency system exposes vulnerable children to sexual exploitation and abuse by predators who trade or extort Robux in exchange for explicit photos from children. Defendant Roblox knowingly and/or recklessly permits predators to offer children Robux often in exchange for these explicit photos or demand Robux to avoid publicly releasing previously provided explicit photos, directly tying Defendant Roblox's profits to the sexual exploitation of children and child sexual abuse material. Defendant Roblox's defective product, manipulative reward systems, and social

---

[60] National Center on Sexual Exploitation, *The Dirty Dozen List '24: Roblox, A Mainstream Contributor to Sexual Exploitation*, https://endsexualexploitation.org/roblox/ (last updated Dec. 4, 2024).

dynamics, is intentionally designed to exploit children's developmental vulnerabilities, creating psychological pressures that predators weaponize for extortion.

92.    Despite full awareness that Robux is being used to facilitate the generation of unlawful child sexual abuse material, Defendant Roblox negligently and/or recklessly fails to warn children or parents of the known dangers of predators utilizing the product to gain access to children, and Defendant Roblox directly profits financially by providing a platform that facilitates the generation and distribution of child sexual abuse material.

93.    Despite full awareness of how its product exploits children, Defendant Roblox continues to profit from these tactics by collecting transaction fees on Robux exchanges. Its reckless indifference to the consequences of its deliberately engineered defective product highlights Defendant Roblox's prioritization of profit over the safety and well-being of its child users.

94.    Defendant Roblox's defectively designed product negligently and/or recklessly permits predators to threaten children with false claims about possessing and potentially releasing explicit photos and coercing young victims into complying with criminal demands. Defendant Roblox monitors all online interactions between users. Defendant Roblox's monitoring is defective, because it is negligently and/or recklessly designed to permit and not flag interactions involving blackmail, threats, demands, or exchanging photos or Robux between and/or among users.

95.    As a result of Defendant Roblox's defective monitoring, predators openly engage in predatory grooming where these predators employ immediate blackmail tactics, and the predators make no attempt to ingratiate themselves with the children but instead threaten them from the outset. The predator will often threaten to post nude photos of others online and claim that the

child victim is the person depicted unless the child complies with the predator's demands. This conduct is done openly on Defendant Roblox's defective product and is known to Defendant Roblox. Indeed, Defendant Roblox's monitoring software and human monitors are trained to not flag this conduct.

96.     Regardless of how the initial grooming relationship begins on Roblox, the predators also often attempt to make in-person contact with the child with the intention of sexually assaulting the child. All conversations and interactions between the predator and the child on the Roblox product are done openly and monitored by Defendant Roblox's defective monitoring system. Through numerous well-documented and publicized cases, Defendant Roblox has long been aware of the systemic exploitation that its product enables and facilitates. For years, countless children have been sexually exploited and abused by predators they met on Roblox.

97.     The dangerous progression from Defendant Roblox's online product to real-world sexual violence reveals the devastating consequences of the company's defective product. Defendant's product is designed to allow predators easy access to children and to use the product to groom and lure children from virtual contact to physical meetings, leading to harassment, kidnapping, trafficking, violence, and sexual assault of minors, all instances of which these children suffer as a direct result of Defendant Roblox's actions and inactions.

98.     Through numerous well-documented and publicized cases, Defendant Roblox has long been aware that its defective product has enabled and facilitated the systemic sexual exploitation and abuse of children. For years, countless children have been sexually exploited and abused by predators as a result of the defective design of Defendant Roblox's product.

99.     Many predators do not even hide their intentions, roaming Roblox with usernames like "@Igruum_minors," "@RavpeTinyK1dsJE," and "@EarlBrianBradley"—a reference to one

of the most prolific pedophiles ever, who raped and molested hundreds of children. Defendant Roblox is aware of these usernames, but its defective product does not flag them or shut them down. Instead, Defendant Roblox negligently and/or recklessly permits these users to roam the virtual online world openly and interact with young, unsuspecting children without any warnings or precautions.



*Results from an Account Search for "earlbrianbradley"*

100. Defendant Roblox's systematic endangerment of children has been publicly condemned by leading advocacy organizations. The National Center on Sexual Exploitation ("NCOSE") has consistently named Roblox to its "Dirty Dozen" list—an annual campaign exposing companies that facilitate, enable, or profit from sexual exploitation. NCOSE blasts Roblox for "treat[ing] child protection like a game."[61] According to NCOSE, "[u]ntil basic child protection standards are met, Roblox remains too high risk for kids."[62]

101. Parent reviews of Roblox on sites like *Common Sense Media* also document disturbing incidents of naked avatars, sexting, simulated sexual assault, and adult predators.[63]

---

[61] *Id.*
[62] *Id.*
[63] Common Sense Media, *Parent Reviews of Roblox*, https://www.commonsensemedia.org/website-reviews/roblox/user-reviews/adult (last visited October 1, 2025).

102.  The harm from this child abuse and exploitation extends beyond the initial victims. Through the design of its defective product and inadequate safeguards, Defendant Roblox has created an abusive ecosystem where former victims—children who were once exploited on Roblox—become teenage perpetrators who then prey upon younger users, making today's victims tomorrow's perpetrators. Indeed, researchers have repeatedly confirmed this victim-victimizer pipeline: when children are exposed to and victimized by sexual content, they are more likely to become desensitized teenagers and adults who then exploit younger users in the same ways.[64]  In effect, Defendant Roblox contributes to this "raising of" predators who perpetuate the cycle of exploitation.

103.  The magnitude of the harm caused by Defendant Roblox is devastating. Yet rather than warn parents, Defendant Roblox minimizes these dangers through repeated misleading public statements. Defendant Roblox's Chief Safety Officer, Matt Kaufman, attempting to deflect attention from serious safety failures, told NPR, "I think we're losing sight of the tens of millions of people where Roblox is an incredibly enriching part of their life."[65]  And while Kaufman publicly claims that "any time anything happens to a child that puts them at risk is one too many,"[66] Defendant Roblox simultaneously admitted to investors that it was "unable to prevent all such [inappropriate] interactions from taking place."[67]  This calculated contradiction between public messaging and private admissions—telling parents that even one incident is unacceptable while

---

[64] James RP Ogloff, et al., *Child Sexual Abuse and Subsequent Offending and Victimisation: A 45 Year Follow-Up Study*, Trends & Issues in Crime & Criminal Justice, No. 440 (Jun. 2012), https://www.aic.gov.au/sites/default/files/2020-05/tandi440.pdf; M. Glasser, et al., *Cycle of Child Sex Abuse: Links Between Being a Victim and Becoming a Perpetrator*, British J. Psychiatry, 179, 6, 482-494 (Dec. 2001), https://doi.org/10.1192/bjp.179.6.482.
[65] Scott Tong & James Perkins Mastromarino, *Roblox Chief Safety Officer on New Safety Features, Past Cases of Child Abuse on the Platform*, WBUR (Nov. 18, 2024), https://www.wbur.org/hereandnow/2024/11/18/roblox-safety-features.
[66] *Id.*
[67] Roblox Corp., S-1 (Securities Registration Statement) (Nov. 19, 2020).

simultaneously acknowledging to investors that abuse is inevitable—exposes Defendant Roblox's strategy of prioritizing public relations through hollow and misleading public statements over its fundamental duty to protect children.

104.  The reason that Defendant Roblox is overrun with harmful content and predators is simple: Defendant Roblox prioritizes user growth, revenue, and profits over child safety. For years, Defendant Roblox has knowingly prioritized these numbers over the safety of children through the actions it has taken and decisions it has made to increase and monetize users regardless of the consequences.

105.  From its inception, Defendant Roblox has focused on growth above all else, which has meant deliberately targeting, exploiting, and capitalizing on the underdeveloped child market, positioning itself as a place where kids can learn and play games in a safe environment. Recognizing that children have more free time, underdeveloped cognitive functioning, and diminished impulse control, Defendant Roblox has exploited their vulnerability to lure them to its defective and unsafe product.

106.  Defendant Roblox's business model allowed the company to attract significant venture capital funding from big-name investors like Kleiner Perkins and Andreessen Horowitz, putting enormous pressure on the company to prioritize growing and monetizing its users. To do so, Defendant Roblox made deliberate decisions to prioritize increasing user statistics at any cost, including putting children at risk. For example, while other products verified the ages of children and restricted access if a child fell below a certain age, Defendant Roblox welcomed and encouraged children of any age, implementing no age-verification safeguards and making signing up for an account easy enough for a six (6) year-old to do, which allowed even the youngest and most vulnerable to join.

107. In 2021, riding the explosive growth in users generated by the pandemic and the pandemic-driven enthusiasm for technology stocks, Defendant Roblox went public at a valuation of $41 billion USD, which brought new pressures. To satisfy the scrutiny and demands of public market investors, Defendant Roblox, like many unprofitable companies, prioritized rapid growth in revenue and user engagement metrics—like new user acquisition, daily active users, and average hours spent on the product—on the theory that profitability would follow once the business achieved sufficient scale and operating costs decreased as a percentage of revenue.

108. In pursuit of growth, Defendant Roblox deprioritized safety measures even further so that it could report strong numbers to Wall Street. For instance, Defendant Roblox executives rejected employee proposals for parental approval requirements that would protect children on the platform. Employees also reported feeling explicit pressure to avoid any changes that could reduce platform engagement, even when those changes would protect children from predators.[68]

109. As one former Roblox employee explained, "You're supposed to make sure that your users are safe but then the downside is that, if you're limiting users' engagement, it's hurting our metrics. It's hurting the active users, the time spent on the platform, and in a lot of cases, the leadership doesn't want that."[69] That same employee added, "You have to make a decision, right? You can keep your players safe, but then it would be less of them on the platform. Or you just let them do what they want to do. And then the numbers all look good and investors will be happy."[70]

110. By limiting safety measures, Defendant Roblox not only increased its users but also reduced the company's safety expenses as a percentage of its revenue—a key metric for Wall Street, which views trust and safety costs as detrimental to Defendant Roblox's stock performance.

---

[68] *Id.* (square brackets in the original).
[69] *Id.*
[70] *Id.*

Barclays, for example, identified its "downside case" for Defendant Roblox's stock as "additional safety investments due to its younger demographic . . . becom[ing] a drag on [earnings] margins."[71] Barclays also wrote that it viewed increased safety costs as a "negative" in Defendant Roblox's quarterly earnings.

111. During earnings calls for investors, Defendant Roblox frequently addresses questions from analysts about how trust and safety expenditures will evolve over time. Defendant Roblox's answers reveal that the company is hyper-focused on reducing its trust and safety expenses as a percentage of its revenue, showing that the company is not investing as much proportionally in trust and safety as the company continues to grow and attract millions of additional users.

112. For example, on Defendant Roblox's 2023 fourth quarter earnings call, an analyst praised the "really high level of efficiency" seen in the numbers for infrastructure and trust and safety expenditures and then asked how those figures would evolve over time.[72] In response, Mike Guthrie, Defendant's CFO, emphasized the company's goal of reducing expenses, stating, "cost to serve is the metric that we use and it's the metric that the [infrastructure] team owns . . . *they're working hard to drive that down ...* like you said, it's about 11% now. Ultimately, with higher efficiency, more use of artificial intelligence, we see that as a high single-digit number over the next few years."[73] He added, "we still think there's more to do there."[74]

113. At other times, Guthrie has reassured investors stating, "look for trust and safety [costs] to scale below linear as we grow"[75] and that Defendant Roblox was "quite happy with" trust and safety costs growing "at a lower rate than our bookings growth."[76]

---

[71] Ross Sandler, Trevor Young & Alex Hughes, *Back on Track Following the 1H Hiccup*, BARCLAYS (Aug. 1, 2024).
[72] Roblox Corp., Q4 2023 Earnings Call (Feb. 7, 2024).
[73] *Id.* (emphasis added).
[74] *Id.*
[75] Roblox Corp., Q4 2022 Earnings Call (Feb. 15, 2023).
[76] Roblox Corp., Q3 2022 Earnings Cal (Nov. 8, 2023).

114. Similarly, in the second quarter of 2024, CEO Baszucki highlighted that, "[i]mportantly, our infrastructure and trust and safety expenditures were 8% lower year-on-year."[77]

115. Once public, Defendant Roblox also decided to try to attract more adult users to its product — which it had historically touted as the "#1 gaming site for kids and teens."[78] With the market for underage users near saturation, Defendant Roblox shifted its growth strategy to attracting older users.

116. In its public offering filings, Defendant Roblox identified "age demographic expansion" as a key strategy, explaining that it planned to develop experiences and content that appealed to older users.[79] For Defendant Roblox, "aging up" had benefits beyond user growth—it was also more profitable. Older users offered a distinct financial advantage. While children spend more hours on Roblox, they do not "monetize" as well because they are more constrained in their ability to spend. In contrast, older users, who "have more direct control over their spend" and "monetize better," are far more lucrative—an outcome that Defendant Roblox said it predicted when it started to target older users.[80]

117. Defendant Roblox's executives repeatedly emphasized their strategy of "aging up" the product to attract older users. At the company's inaugural conference with an investment bank in September 2021, Defendant Roblox's CFO, Michael Guthrie, noted that Defendant Roblox had achieved "very good penetration of nine-to twelve-year-olds," and was focused on adding users over the age of 13.[81] One plan was to "improve the search algorithms such that older users were finding older content," or content tailored to their age-related demographic.[82]

[77] Roblox Corp., Q2 2024 Earnings Call (Aug. 1, 2024).
[78] Roblox, *What Is Roblox*, *supra* note 4.
[79] Roblox Corp., S-1 (Securities Registration Statement) (Nov. 19, 2020).
[80] Roblox Corp., Q2 2022 Earnings Call (Aug. 10, 2022).
[81] Roblox at Goldman Sachs Communicopia Conference (Sep. 9, 2021), https://ir.roblox.com/events-and-presentations/events/event-details/2021/Goldman-Sachs-Communicopia/default.aspx.
[82] *Id.*

118.    And at its annual Developer Conference, CEO David Baszucki encouraged developers to create experiences for older audiences, explaining that Defendant Roblox was rolling out features designed to appeal to older users, including use of real names, screen capture and sharing capabilities, video calls, and relaxed chat moderation.[83] These decisions, while framed as growth strategies, reflected Defendant Roblox's willingness to compromise safety, creating new vulnerabilities and more dangerous circumstances for children in its pursuit of a more profitable, older user base.

119.    Defendant Defendant's executives consistently highlighted progress with the company's "aging up" strategy on every quarterly earnings call after this until the second quarter of 2023, when CEO Baszucki declared that Defendant Roblox had achieved its goal: "We're no longer talking about aging up. We are a platform for all ages."[84] He also revealed that developers had started to "build specific 17- plus experiences."[85] This progress was praised by Wall Street investment banks, who noted that aged-up experiences were a promising indicator of "potential sustainable growth tailwinds for Roblox," reinforcing the company's pivot toward maximizing profitability.[86]

120.    These targeted attempts to expand Roblox's user base further demonstrate Roblox's close relationship with and control over developers and creators.

121.    Despite Defendant Roblox's deliberate targeting of older users, it failed to implement any meaningful restrictions on contact between adult and child users or limit the mature content and experiences it solicited from developers to attract older audiences. When asked by an equity research analyst about aged-13-and-up experiences for older users, CEO Baszucki admitted,

---

[83] Roblox Developers Conference 2023 Keynote (Sep. 8, 2023), https://www.youtube.com/watch?v=CwLThCghzA4.
[84] Roblox Corp., Q2 2023 Earnings Call (Aug. 9, 2023).
[85] *Id.*
[86] Benjamin Black, et al., *Bookings Back on Track*, Deutsche Bank (Nov. 4, 2024).

"I want to highlight, right now, *we don't have any only 13-and-up experiences*. We have 28% of the top 1,000 experiences having a majority of 13 plus [users], but *those are still experiences that are open to all ages.*"[87] Similarly, despite urging developers to build experiences intended for users aged 17 and older, Defendant Roblox did not implement any access limitations for younger users.[88] Even investors recognized the connection between older users and the increased risks for children, questioning how Defendant Roblox planned to prevent inappropriate content from reaching younger users.

122.    Not only did Defendant Roblox seek to increase adult users while knowing the risks that strategy posed to children, but it also sought to encourage relationships between users. At Defendant Roblox's 2023 Developers Conference, CEO Baszucki revealed Defendant Roblox's strategy to facilitate "real-life relationships" between users — *i.e.*, dating. While he deliberately avoided the word "dating," he then announced plans to build a product to support it: "I'm not going to use the D word but subsequent[] real-life relationships is going to happen, okay? And we're going to build a platform to support that."[89]

123.    By the next year, in 2024, Baszucki explicitly acknowledged this strategy. He first acknowledged that online dating is "edgy" but then mocked his own safety team's concerns about the dangers — "the policy and safety told me [dating and real-life relationships] isn't within our current policy right now" — to which the audience shared in laughter.[90]

124.    In short, for years, Defendant Roblox has negligently and/or recklessly sacrificed child protection—a longstanding issue for the company—in pursuit of growth and profit. This

---

[87] Roblox Corp., Q3 2021 Earnings Call (Nov. 9, 2021) (emphasis added).
[88] Roblox Corp., Q4 2022 Earnings Call (Feb. 15, 2023).
[89] Roblox Developers Conference 2023 Keynote (Sep. 8, 2023), https://www.youtube.com/watch?v=CwLThCghzA4.
[90] Roblox Developers Conference 2024 Keynote (Sep. 6, 2024),
https://www.youtube.com/watch?v=HwbcWc2CwnM.

systematic subordination of child safety to business objectives reflects Defendant Roblox's continued choice to maximize its business goals while knowingly exposing children to preventable dangers through its product.

125.    Defendant Roblox's pursuit of growth and profit over child safety is reflected in numerous actions it took or did not take and decisions it made related to the design and safety of its product. Had Defendant Roblox acted differently, the harm suffered by countless children, including Plaintiff, would not have occurred.

126.    Defendant Roblox negligently and/or recklessly designed its product so that anyone can easily communicate with children, creating a virtual world where predators can use it to freely target and groom children. Until November 2024, adult strangers could "friend" and chat with children of any age via direct messages and chat with them in an experience through direct messages even if they were not friends. While Defendant Roblox offered some adjustable parental controls for users under the age of 13, these children could bypass those controls simply by creating an alternate account identifying as a 13+ year-old user. By negligently and/or recklessly designing its product this way, Defendant Roblox stripped parents of basic protective options to prevent adult strangers from communicating with their children.

127.    This practice contrasts sharply with other gaming products like Nintendo, which use preprogrammed dialogue options to tightly control user interactions.[91] By adopting a similar approach, Defendant Roblox could have significantly reduced—if not eliminated—the grooming and child abuse facilitated by its product because predators would not have been able to solicit any personal information or send any coercive or sexually suggestive messages.

---

[91] Carville & D'Anastasio, *supra* note 10.

128.    Defendant Roblox further endangered children by negligently and/or recklessly introducing voice calls in November 2023. Called "Roblox Connect," this virtual call feature allows users to have a conversation through their avatars in real time. Concerns were immediately raised about this feature. For example, one user emphasized, "This is a bad idea Roblox, and especially on your platform because this is where most predators are coming from, and it makes it way easier for predators to prey on children."[92]

129.    As Defendant Roblox contemplated and rolled out Roblox Connect, it knew that this feature would drastically increase the risk to children on its product. That is because another company implemented a similar feature with disastrous consequences. Omegle was a chat website that operated from 2009 to 2023. Omegle allowed users, including children, to engage in anonymous chats with strangers. In March 2010, Omegle introduced a video-chat feature. Despite efforts to monitor for mature and sexual content, the website became infamous for exposing minors to explicit material, predators, and exploitation. Omegle's failure to protect users led to numerous incidents, including criminal cases involving child sexual abuse material. In November 2023, the same month Defendant Roblox launched Roblox Connect, Omegle announced that it would cease operations. In shutting down, its founder highlighted the site's misuse: "[T]here can be no honest accounting of Omegle without acknowledging that some people misused it, including to commit unspeakably heinous crimes."[93] And he thanked one survivor for "opening my eyes to the human cost of Omegle."[94] Nevertheless, Defendant Roblox negligently and/or recklessly introduced voice calls the same month that Omegle shut down.

---

[92] Josh Taylor, *Roblox Under Fire After Adding Controversial Voice Call Feature*, Dexerto (Nov. 15, 2023), https://www.dexerto.com/roblox/roblox-under-fire-after-adding-controversial-voice-call-feature-2384564/.
[93] Elizabeth Napolitano, *Omegle Shuts Down Online Chat Service Amid Legal Challenges*, CBS News (Nov. 9, 2023), https://www.cbsnews.com/news/omegle-shut-down-chat-service-legal-challenges-lawsuits/?ftag=YHFa5b931b.
[94] Joe Tidy, *Omegle: 'How I Got the Dangerous Chat Site Closed Down'*, BBC (Nov. 22, 2023), https://www.bbc.com/news/technology-67485561.

130.    Defendant Roblox has negligently and/or recklessly failed to implement simple age and identity verification measures that would have protected children, including Plaintiff, using Defendant Roblox's product. For example, despite having software that can verify the age and identity of new users, Defendant Roblox instead allows users to create accounts without providing their name or email address — a policy that enables predators to easily create multiple anonymous accounts with different ages.

131.    Defendant Roblox has negligently and/or recklessly failed to implement basic screening measures, such as utilizing the biometric age and identity verification software it already has in its possession, before allowing users to set up accounts on the product, which would ensure that known predators are not permitted on the product.

132.    Defendant Roblox has negligently and/or recklessly failed to utilize its biometric age and identity verification software to ensure and require that accounts for minors are created and set up by adults at the time new accounts are created.

133.    Defendant Roblox has negligently and/or recklessly failed to utilize its biometric age and identity verification software to ensure and require that newly created accounts for minors have the consent, approval and permission of an adult or guardian.

134.    Defendant Roblox has negligently and/or recklessly failed to utilize its biometric age and identity verification software to ensure and require that any changes to the settings of accounts issued to minors are made by a legal adult.

135.    Defendant Roblox negligently and/or recklessly failed to require children under 13 to provide their names and email addresses and obtain parental approval — a fundamental protection against predators — but refused to do so. This decision allowed the company to bypass certain protections that are mandated by federal law and designed to protect children. The

Children's Online Privacy Protection Act ("COPPA") prohibits companies like Defendant from collecting, using, or disclosing the personal information of children under 13 without verifiable parental consent. COPPA was enacted because Congress recognized the heightened vulnerability of children on the internet. As the Federal Trade Commission ("FTC") noted the limited capacity of children to "understand fully the potentially serious safety and privacy implications" of sharing their personal information.[95] More recent international regulations are stricter. For example, the European Union's General Data Protection Regulation (GDPR) requires verifiable parental consent for children under 16.[96]

136.    The FTC has outlined clear and acceptable methods for obtaining verifiable parental consent. These include: (a) providing a form for parents to sign and return; (b) requiring the use of a credit card or online payment that notifies parents of each transaction; (c) connecting parents to trained personnel via video conference; (d) offering a staffed toll-free number for parental verification; (e) asking knowledge-based questions to confirm identity; and (f) verifying a parent's photo-ID by comparing it to a second photo using facial recognition technology.[97]

137.    Yet instead of implementing safeguards to comply with COPPA, Defendant chose to bypass these protections altogether. Defendant Roblox intentionally avoids requesting a name or email address during sign-up to sidestep the requirement of verifiable parental consent. In fact, former employees revealed that Defendant Roblox considered requiring verifiable consent but ultimately resisted its implementation out of fear that such requirements might drive users away.[98]

---

[95] Federal Trade Commission, *Privacy Online: A Report to Congress* (1998), https://www.ftc.gov/sites/default/files/documents/reports/privacy-online-report-congress/priv-23a.pdf.
[96] Art. 8 GDPR; *see also* Consent to Use Data on Children, EU Agency for Fundamental Rights (https://fra.europa.eu/en/publication/2017/mapping-minimum-age-requirements-concerning-rights-child-eu/consent-use-data-children). Note that member states can lower the cutoff to 13, 14 or 15 if they choose.
[97] Federal Trade Commission, *Complying with COPPA: Frequently Asked Questions*, July 2020, https://www.ftc.gov/business-guidance/resources/complying-coppa-frequently-asked-questions.
[98] Hindenburg Research, *supra* note 45.

Consequently, creating a Roblox account is alarmingly easy, requiring less than sixty seconds and no meaningful oversight — a choice that prioritizes growth over the safety of its youngest users.[99]

138.    Another easy-to-implement feature that would have improved safety is adding pop-up safety notices within chats and games to warn users about their behavior or the dangerous behavior of others. But Defendant Roblox's executives also rejected this change.[100]

139.    Additionally, although Defendant Roblox knew that predators routinely operate dozens of Roblox accounts at the same time, the company chose not to implement basic blocking of digital identifiers — both the unique network addresses that track internet connections (Internet Protocol or IP addresses) and the permanent hardware identification numbers assigned to devices (Media Access Control or MAC addresses) that could prevent predators from creating multiple accounts.

140.    Defendant Roblox negligently and/or recklessly failed to require adult users to verify phone numbers, which would create significant barriers to predators creating multiple accounts, despite knowing that this enables bad actors to easily create numerous anonymous accounts to target children.

141.    Defendant Roblox negligently and recklessly failed to require users to verify their age by uploading a picture of either their or their parents' ID, a practice that many other applications employ. Doing so would have restricted the content available to young users and prevented predators from easily mispresenting their age, which is often their approach in targeting

---

[99] Scott Tong & James Perkins Mastromarino, *Roblox Attempts to Bar Child Predators as Short Sellers Target the Popular Game Platform*, WBUR (Oct. 21, 2024), https://www.wbur.org/hereandnow/2024/10/21/roblox-child-predators-safety.
[100] Carville & D'Anastasio, *supra* note 10.

and grooming children. As one father told the press after seeing other users solicit his avatar for sex, "There is nothing to stop adults going on there and pretending they're kids."[101]

142.    Defendant Roblox negligently and recklessly failed to implement restrictions on communications between adult accounts and children's accounts, something that many other platforms have done. It could also have restricted adult accounts from sending Robux to children's accounts, a feature that sexual predators frequently use to lure children.

143.    Defendant Roblox negligently and recklessly failed to create a separate, gated platform for children that excludes adults. By utilizing the facial recognition software, it already has, Defendant Roblox could easily create a space for children to enjoy Roblox games with very few, if any, adults present. Many digital service companies have adopted separate platforms for children, including, for example, Amazon and Netflix.

144.    Defendant Roblox negligently and recklessly failed to place a higher age rating on its product in the iOS App Store and other online stores, to signal to parents that Roblox presented risks for children.

145.    Defendant Roblox negligently and recklessly failed to provide clear warnings to parents about the presence of sexual predators on the platform, so that parents could make an informed decision about allowing their child on the platform and/or educate their child on how to stay safe on the platform.

146.    Defendant Roblox negligently and recklessly failed to provide clear warnings to children about the presence of sexual predators on the platform and instructed children on how to stay safe on the platform.

---

[101] Carl Stroud, *Horrified Dad Found Sick Messages from Paedo Predator in His Eight-Year Old Son's Roblox iPad Game*, The Sun (Feb. 15, 2017), https://www.thesun.co.uk/news/2872376/horrified-dad-found-sick-messages-from-paedo-predator-in-his-eight-year-old-sons-roblox-ipad-game/.

147.    Despite this negligent and reckless conduct, Defendant Roblox aggressively markets and promotes itself as an "industry leader" when it comes to child safety.[102] Central to this self-serving narrative is its "accomplishments" of investing in artificial intelligence ("AI") and machine learning systems supposedly designed to scan and monitor all communications on the product and prevent the sharing of inappropriate content and personally identifiable information.[103]

148.    Yet this technology has proven grossly inadequate and insufficient to protect children. For example, Defendant Roblox's filters have inexplicable omissions. While Defendant Roblox blocks certain words, like "Snap" and "Snapchat," to supposedly prevent off-product communications, it allows workarounds such as the use of the ghost emoji ( 👻 ), which is widely recognized as a symbol for Snapchat, or alternative spellings, like "Snappy" or "apchat." Similarly, while the word "Discord" is blocked, users can bypass this filter by using the disc emoji ( 💿 ) or typing variations, like "iscord" or "cord."[104] That Defendant Roblox selectively blocks the words "Snap," "Snapchat," and "Discord" reveals that Defendant Roblox is fully aware of the dangers of off-product inappropriate communications yet chooses not to close these loopholes. And while Defendant Roblox prevents users from sharing phone numbers in numerical format, it does nothing to stop users from spelling out the numbers.[105]

149.    Defendant Roblox intentionally and/or knowingly has ineffective safeguards in place, allowing experiences that have been removed to be reuploaded almost immediately from a new account, perpetuating the cycle of explicit and harmful content. External groups have

---

[102] Roblox Corp., Q1 2021 Earnings Call (May 11, 2021).

[103] Roblox, *Safety Features: Chat, Privacy & Filtering*, https://web.archive.org/web/20240714130904/https://en.help.roblox.com/hc/en-us/articles/203313120-Safety-Features-Chat-Privacy-Filtering (archived Jul. 14, 2024).

[104] Edwin Dorsey, *Problems at Roblox (RBLX) #5*, The Bear Cave (Oct. 17, 2024), https://thebearcave.substack.com/p/problems-at-roblox-rblx-5.

[105] *Id.*

capitalized on Defendant Roblox's weak moderation by guiding predators to these reuploaded games, with Fast Company easily identifying 150 Discord groups dedicated to exploiting Defendant Roblox's lack of enforcement.[106]

150.    Beyond Defendant Roblox's deliberately ineffective technology, the company also employs a woefully inadequate number of human moderators to analyze and manage content on its platform. With only about 3,000 moderators, Defendant Roblox pales in comparison to platforms like TikTok, which, despite having only three times the number of users, employs more than ten times the number of moderators at 40,000.[107] Defendant Roblox attempts to justify this disparity by claiming "[y]ou really can't judge the quality of these moderation systems by the number of people."[108] But the reality tells a different story. Defendant Roblox's moderators, many of them overseas contractors, report being overwhelmed by an unmanageable volume of child safety reports, making it impossible to address all concerns effectively and leaving countless safety issues unresolved.[109]

151.    Even the safety data that Defendant Roblox touts is flawed and only underscores the growing dangers created by the company's defective product. For example, Defendant Roblox proudly points to its low percentage of reports to the National Center for Missing and Exploited Children ("NCMEC") — the leading U.S. nonprofit organization tasked with preventing child exploitation and assisting in the recovery of missing children. Defendant Roblox claims that it accounts for less than .04% of reports made to NCMEC. But this data is entirely self-reported and therefore depends on Defendant Roblox's deliberately ineffective content moderation and safety

---

[106] Burt Helm, *Sex, Lies and Video Games: Inside Roblox's War on Porn*, Fast Company (Aug. 19, 2020), https://www.fastcompany.com/90539906/sex-lies-and-video-games-inside-roblox-war-on-porn.
[107] Carville & D'Anastasio, *supra* note 10.
[108] Scott Tong & James Perkins Mastromarino, *Roblox Chief Safety Officer on New Safety Features, Past Cases of Child Abuse on the Platform*, WBUR (Nov. 18, 2024), https://www.wbur.org/hereandnow/2024/11/18/roblox-safety-features.
[109] Carville & D'Anastasio, *supra* note 10.

team. This self-reported data to NCMEC, flawed and limited as it is, also reveals a disturbing trend: Defendant Roblox's reports about suspected child sexual exploitation have surged over the years, from 675 reports in 2019 to 13,316 reports in 2023.[110]

152.    Defendant Roblox also boasts that just "0.0063% of [its] total content was flagged as violating" policies.[111] But Defendant Roblox itself controls the systems responsible for identifying and flagging violative content.[112] These lower percentages are thus a reflection not of safety but of Defendant Roblox's efforts to minimize the appearance of problems through its own inadequate reporting and enforcement mechanisms. By hiding behind self-serving metrics and refusing to take meaningful action, Defendant Roblox has fostered an environment where children are subjected to irreparable harm while the company continues to reap financial rewards.

153.    And the very existence of Defendant Roblox's trust and safety "data" on inappropriate communications to train its AI systems contradicts its claim that "one is too many" when it comes to the sexual exploitation of children. This data exists only because countless instances of abuse, exploitation, and predatory interactions have already occurred. Defendant Roblox's reliance on this data to train its AI systems exposes the reality that its so-called safety measures are not designed to prevent these atrocities. Instead of creating a secure environment where such harm never occurs and ensuring that such interactions never happen in the first place, Defendant Roblox uses the suffering and trauma of children as the foundation for its trust and safety systems. This cycle underscores the company's prioritization of optics over genuine protection, leaving its youngest users at the mercy of its neglect.

---

[110] Scott Tong & James Perkins Mastromarino, *Roblox Attempts to Bar Child Predators as Short Sellers Target the Popular Game Platform*, WBUR (Oct. 21, 2024), https://www.wbur.org/hereandnow/2024/10/21/roblox-child-predators-safety.
[111] Vikki Blake, *Roblox Reported Over 13,000 Incidents to the National Center for Missing and Exploited Children in 2023*, GamesIndustry.biz (Jul. 23, 2024), https://www.gamesindustry.biz/roblox-reported-over-13000-incidents-to-the-national-center-for-missing-and-exploited-children-in-2023.
[112] *Id*.

154.    Defendant Roblox's own developers even admit that Roblox is unsafe for children.[113] Online forum discussion posts are replete with developers writing that they would not allow their own children to use the platform, citing pervasive issues with Defendant Roblox's child safety policies. Many of these posts highlight the platform's systemic failures and suggest straightforward changes Defendant Roblox could implement to create a safer environment but has consistently ignored, for example:

a.    "Unfortunately, it is worse now due to Roblox's moderation being so abysmal and Roblox being a far more widespread platform. Creeps flock aplenty when before the creep:kid ratio was much much lower… Roblox has no interest in actually fixing the issues so long as the bad press doesn't end up viral."[114]

b.    "No. Roblox is not safe for children. The amount of NSFW [Not Safe for Work] I see on this platform on a daily basis is unbelievable. I'm surprised COPPA [Children's Online Privacy Protection Rule] hasn't taken any action."[115]

c.    "I believe they need to automatically rate these games for older audiences, if not, you know, removing them entirely. I could keep going on about this issue, but it's just beating a dead horse at this point."[116]

d.    "Roblox got banned for bad moderation; Turkey banned it to 'protect children,' and they are not wrong. The amount of visits from 10 of these games is, in summary, 100 million+. I don't want to know how many of these children have seen nudity or even developed a p*rn addiction. But that is a big problem with Roblox doing almost nothing to prevent it."[117]

155.    These statements, coming from individuals familiar with Defendant Roblox's operations, paint a picture of an environment rife with neglect, where harmful content flourishes, predators thrive, and Defendant Roblox repeatedly fails to act even in the face of widespread and urgent warnings.

---

[113] Edwin Dorsey, *Problems at Roblox (RBLX) #5*, The Bear Cave (Oct. 17, 2024), https://thebearcave.substack.com/p/problems-at-roblox-rblx-5.
[114] *Id.*
[115] *Id.*
[116] *Id.*
[117] *Id.*

156.    Only after years of mounting pressure, Defendant Roblox recently announced changes to its child safety features. These changes were prompted not by the years of police reports and widespread media coverage but by a scathing report published by a well-known short seller accusing the platform of being a "pedophile hellscape for kids."[118] Released on October 8, 2024, the report sparked public outrage, detailing many of the issues described above that Defendant Roblox had long ignored.

157.    A little more than a month later, Defendant Roblox announced a series of alleged changes, including removing the ability to message others outside of experiences for under 13-year-old users;[119] giving parents a separate dashboard where they can monitor a child's Roblox account; viewing the child's friend list; setting spending control; managing screen time;[120] preventing games from using chalkboard writings where people could get around the censoring of communications;[121] and implementing restrictions to stop under 13-year-old users from accessing new Roblox games that are awaiting maturity ratings.[122]

158.    These changes could all have been implemented years ago. None of them involve any new or groundbreaking technology. Defendant Roblox only implemented these changes when concern reached such a critical mass to sufficiently threaten its stock price.

159.    Further, these changes are little more than window dressing — too little, too late, and woefully inadequate. Most fundamentally, Defendant Roblox *still allows* adults to contact and

---

[118] Hindenburg Research, *supra* note 45.

[119] *Roblox Tightens Messaging Rules for Under-13 Users Amid Abuse Concerns*, Reuters (Nov. 18, 2024), https://www.reuters.com/technology/roblox-tightens-messaging-rules-under-13-users-amid-abuse-concerns-2024-11-18/.

[120] Robert Booth, *Roblox to Give Parents More Control Over Children's Activity After Warnings Over Grooming*, The Guardian, (Nov. 18, 2024), https://www.theguardian.com/technology/2024/nov/18/roblox-to-hand-parents-more-control-over-their-childrens-activity.

[121] *Id.*

[122] *Id.*

message children. Defendant Roblox only banned user-to-user messaging for users under the age of 13 *outside of experiences*. Predators can still message children on public chats while playing games; indeed, Defendant Roblox has left child predators' blueprint for finding children on the product intact since predators have always found children by playing games they know that children will frequent.[123]

160.    Defendant Roblox also failed to address core issues like the product's lack of age verification and refusal to require parental consent to make an account. Defendant Roblox did not commit to hiring more content moderators, nor did it implement any sort of identity check to prevent registered sex offenders from making accounts.

161.    In fact, recently, in April 2025, a research firm in the U.K. demonstrated just how easy it still is for predators to find and groom children and move the conversation to another products, such as Snapchat or Discord.[124] Because Roblox still allows adult users to message children *in games*, predators can use the public chat functions in games to groom child users and ask for their usernames on other platforms. And, for chat within games, Defendant Roblox's default settings for children under the age of 13 is to allow "everyone" to chat with these children, seamlessly facilitating predators' access to children.[125] The key findings from this report included that "[a]dults and children can chat with no obvious supervision" and that "[t]he safety controls

---

[123] In an interview with BBC News, a reporter confronted Baszucki with a series of experiences that her 11-year-old son was recommended. One of these included "Late Night Boys and Girls Club RP," which had a maturity rating of "mild." In this experience, players would still be permitted to message each other in the game. Zoe Kleinman, *Gaming Empire: The Roblox Story,* BBC News (March 17, 2025). https://www.youtube.com/watch?v=LQztK0MCUAc.
[124] Revealing Reality, *A Digital Playground: The Real Guide to Roblox* (Apr. 13, 2025), https://think.revealingreality.co.uk/roblox-real-guide.
[125] Parental Controls Overview, Roblox, https://en.help.roblox.com/hc/en-us/articles/30428310121620-Parental-Controls-Overview (last accessed May 10, 2025).

that exist are limited in their effectiveness and there are still significant risks for children on the platform."[126]

162.     Further, just as Defendant Roblox rolled out these changes, it simultaneously introduced a new "Party" feature in an attempt to counteract any potential loss in user engagement.[127] Because Defendant Roblox knew that users often turned to other products like Discord or Snapchat to communicate while playing games and because Defendant Roblox knew that its safety changes would reduce key user engagement metrics, it sought to capture that traffic (and revenue) and replace any loss of engagement with the Party feature. While the Party feature is currently only available for users aged 13 and older, such limitations are hollow without utilizing the age verification software that Roblox already possesses. And the fact that Defendant Roblox has stated that it is exploring making such a feature available to younger users demonstrates that, far from prioritizing safety, Defendant Roblox's real focus is protecting its bottom-line.[128]

163.     Defendant Roblox has also engaged in a deceptive public relations campaign using ostensibly independent online safety organizations to influence the narrative around these changes. For instance, Defendant Roblox has leveraged its ties to groups like the Family Online Safety Institute ("FOSI"). An online parenting magazine favorably quoted Stephen Balkam, FOSI's CEO, as endorsing Defendant Roblox's new features as a win for child safety.[129] What the article omitted, however, is that Defendant Roblox's own Vice President of Civility and Partnerships, Tami Bhaumik, serves as FOSI's board chair — an obvious conflict of interest.[130] This calculated

---

[126] Revealing Reality, *supra* note 150.
[127] Rebecca Ruiz, *Roblox's New Party Feature Makes Discord Obsolete*, Mashable (Dec. 2, 2024), https://mashable.com/article/roblox-party-discord.
[128] *Id.*
[129] Anna Halkidis, *What Roblox's Latest Changes Mean for Your Kids' Online Safety*, Parents (Nov. 18, 2024), https://www.parents.com/roblox-new-parental-controls-8747405.
[130] *FOSI Welcomes Roblox Vice President as New Board Chair*, FOSI (Oct. 12, 2022), https://www.fosi.org/about-press/fosi-welcomes-roblox-vice-president-as-new-board-chair/.

relationship exposes how Defendant Roblox manipulates public perception by using seemingly independent safety organizations as mouthpieces to shape the narrative in its favor.



*Stephen Balkam's LinkedIn post revealing his connection to Roblox in a post praising Roblox's changes.*[131]

164.    Most recently, in April 2025, Defendant Roblox repeated this same deceptive playbook of bragging about new safety features that, in reality, are glaringly deficient. This update included three new features: first, allowing parents to block children from playing specific games; second, granting parents the power to block people on their child's friends list; and third, giving parents visibility into the games that their child spends the most time in.[132]

165.    None of these parental controls address the underlying deficiency with Roblox that facilitates grooming and predation on children—adult access to and communication with children.

---

[131] Stephen Balkam's Post, LinkedIn, https://www.linkedin.com/posts/stephenbalkam_what-robloxs-latest-changes-mean-for-your-activity-7264409332950220801-WCDF (last visited Jan. 6, 2025).

[132] Matt Kaufman, *New Tools for Parents to Personalize Their Child's Experience on Roblox*, ROBLOX (Apr. 2, 2025), https://corp.roblox.com/newsroom/2025/04/new-parental-controls-on-roblox.

Without allowing parents to see who their child is messaging and what the messages say, parents lack the information necessary to determine which accounts to block on their child's friend list. A list of the top twenty games that a child plays does not tell a parent which games children are having inappropriate interactions and communications in. Moreover, blocking specific games is ineffective when, as discussed above, inappropriate games are re-posted as soon as they are taken down. Indeed, barely a week later, the U.K. research firm discussed above demonstrated just how easy it is for adults to continue to find children, groom them, and then move the communications off Roblox, even after Defendant Roblox announced these safety updates.[133]

166.    Defendant Roblox's deceptive playbook would not be complete without a misleading public relations campaign, where industry-funded safety "experts" praise Roblox's safety update. For example, Defendant Roblox's press release announcing these updates quotes Larry Magid, the CEO of ConnectSafely, as saying, "Roblox has consistently provided parents with tools that enable their children to enjoy the platform, while helping protect them against online risks. These new friend- and experience-blocking tools provide parents with even more ways to help ensure their children are using it safely. Safety, fun, and adventure are not mutually exclusive."[OB1] What the press release did not say is that ConnectSafely—a non-profit ostensibly focused on educating people about internet safety—is funded by tech companies and lists Defendant Roblox as one of its "supporters."[134]

---

[133] *A Digital Playground: The Real Guide to Roblox.*
[134] ConnectSafely, *Supporters*, https://connectsafely.org/about-us/supporters/ (last accessed May 10, 2025).



*ConnectSafely's list of supporters on its website.*

167.    A few weeks later, Magid was quoted again in praise of Roblox, this time in a *Newsweek* article championing Roblox as a "trusted playground" for kids: "I would put them very high up on the list of companies that seem to care. They actually have a vice president of civility. It's unheard of to have somebody at that level of the company that focuses on civility. They really work very hard to make it a friendly, comfortable, civil environment for young people."[135] Again, this article made no mention of Magid's organization's financial ties to Roblox.

168.    FOSI CEO Stephen Balkam was also quoted in the *Newsweek* piece, claiming that Roblox was "top-of-class" for its safety features and even repeating Roblox's own party line that safety is "part of [Roblox's] DNA."[136] Again, this article omitted FOSI's ties to Roblox, financial and otherwise, thereby deceptively pushing a narrative of Roblox as a "safe" product for kid.

## FACTUAL ALLEGATIONS: SNAPCHAT

169.    Defendant Snap's main product, Snapchat, is a social media product that allows users to send and receive photos and short videos, form groups to share content, and track other users' locations and affairs via a live map. Users can also send private messages via voice, video, or text. Snapchat is best known for the self-destructiveness of its pictorial messages—once a photo

---

[135] Katherine Fung, *How Roblox Became a Trusted Playground for Millions of Kids*, Newsweek (Apr. 23, 2025), https://www.newsweek.com/how-roblox-became-trusted-playground-millions-kids-2057601.
[136] *Id.*

has been viewed by the recipient, it "disappears." Similarly, text messages are visible only for a limited period and disappear after a matter of hours or days. The ephemeral nature of a "Snap" is reflected in Snapchat's logo, a ghost.

170.    Snapchat was founded in 2011 by three college students, who specifically sought to appeal to the youth market by creating a product that deleted photos by default. The fundamental goal behind this feature was to prevent the existence of embarrassing social media posts, which could come back to haunt users when they applied to college or for jobs.[137] Snapchat caught on quickly and was initially most popular among high-school students who used the product during class to "pass notes," which Defendant Snap saw reflected in its server data: "peaks of activity during the school day and dips on the weekends."[138]

171.    By 2015, Pew Research Center found that 41% of all teens age 13-17 used Snapchat,[139] and by 2017, a study by the Associated Press-NORC Center for Public Affairs Research found that a staggering 75% of teens used the product.[140] In 2023, the company itself reported that it reached 90% of the 13-24-year-olds in the United States.[141]

172.    Although various regulations prevent data tracking on users under the age 13, it was and is widely known that Snapchat has a sizable child user base as well.[142] For example, in 2023, researchers at Harvard and Boston Children's Hospital estimated that Snapchat had 2.9

---

[137] Evan Spiegel, *Let's chat.*, SNAP (May 10, 2012), https://newsroom.snap.com/lets-chat.
[138] *Id.*
[139] Amanda Lenhart, *Teens, Social Media & Technology Overview 2015*, PEW RESEARCH CENTER (Apr. 9, 2015), https://www.pewresearch.org/internet/2015/04/09/teens-social-media-technology-2015/.
[140] Instagram and Snapchat are Most Popular Social Networks for Teens, AP-NORC CENTER AT THE UNIVERSITY OF CHICAGO (Dec. 27, 2017), https://apnorc.org/wp-content/uploads/2020/02/Teens_Social_Media_Topline_final.pdf.
[141] Investor Presentation, SNAP (Apr. 2023), https://investor.snap.com/events-and-presentations/presentations/default.aspx.
[142] KJ Dell'Antonia, *Are Your Children Using Snapchat?*, N.Y. TIMES (Jul. 2, 2013), https://archive.nytimes.com/parenting.blogs.nytimes.com/2013/07/02/are-your-children-using-snapchat/ ("In theory, the app is limited to users over 13; in practice, "an overwhelming number of the 100 million photos shared every day are from teenagers and tweens[.]").

million users under the age of 13 in the United States.[143] Defendant Snap has deliberately targeted this population, telling advertisers that "Snapchat Works for Gen Z" and that the product "delivers on the emotions that Gen Z seeks and it does so consistently" in all areas of the product.[144]

173.    Creating a Snapchat account is extremely easy. Although Snapchat's terms of service limit usage to users ages 13 years and older, Defendant Snap does not employ any age verification measures and instead only asks users to enter their birthdate (before 2013, users were not asked to supply their date of birth). In fact, Defendant Snap executives themselves admitted, in a hearing before the United Kingdom Parliament in 2019, that the Snapchat interface could not prevent users from lying about their ages upon creating accounts.[145] And, for every year since Defendant Snap's initial public offering, it has admitted to investors that its age-demographic data could be "incomplete or inaccurate" and thus "differ from our users' actual ages" because users self-report their dates of birth.[146] Indeed, Defendant Snap's own executives expressed misgivings about representing that Snapchat actually verifies ages, as "any child who knows how to type a fake birthday can create an account."[147]

174.    Until late 2022, Snapchat did not have any parental control features, meaning that parents had no control over or visibility into their children making accounts public, adding strangers as friends, or sharing their live locations on Snap Map, an interface that shows users' real time locations on a map. In 2022, Snapchat created "Family Center," which allowed parents to see

---

[143] Amanda Raffoul et al., *Social Media Platforms Generate Billions of Dollars in Revenue from U.S. Youth: Findings from a Simulated Revenue Model*, PLOS ONE (Dec. 27, 2023), https://pmc.ncbi.nlm.nih.gov/articles/PMC10752512/pdf/pone.0295337.pdf.
[144] What Does Gen Z Want From Brands?, SNAP INC., https://perma.cc/LCM9-69NH.
[145] Isobel Asher Hamilton, *Snapchat Admits its Age Verification Safeguards Are Effectively Useless*, BUSINESS INSIDER (Mar. 19, 2019), https://www.businessinsider.com/snapchat-says-its-age-verification-safeguards-are-effectively-useless-2019-3.
[146] Snapchat S-1, EDGAR, https://www.sec.gov/Archives/edgar/data/1564408/000119312517029199/d270216ds1.htm.
[147] Plaintiffs' Amended Complaint 19, *New Mexico v. Snap Inc.*, No. D-101-CV-2024-02131 (1st Jud. D.C. N.M. Oct. 10, 2024), https://nmdoj.gov/wp-content/uploads/2024-10-01-SNAP-NM-Amended-Complaint_Redacted.pdf.

their child's full list of Snapchat friends and the accounts the child had communicated with over the past seven days.[148] Parents, however, were blocked from accessing children's messages, including images they had sent or received, and had no control over whether a child shared their live location on Snap Map. Furthermore, these parental controls did not include any control over what content children saw in the "Discover" section of the product, which routinely included inappropriate articles about alcohol, porn, and adult-only video games.[149]

175.     Like Defendant Roblox, Defendant Snap's success and continued growth have hinged on its constant, false assurances to parents that its product is safe for children. Defendant Snap claims that safety has always been central to its product since the company's founding in 2011, since Snapchat was designed for personal communications between friends, not broadcasting.[150] According to the company, "Snapchat is built to help people share their full range of emotions and bring them closer to those who matter most, even when they're far away."[151] Snapchat "strengthens relationships," according to Jennifer Stout, Defendant Snap's Global Vice President of Global Public Policy.[152]

176.     Defendant Snap misleadingly promises parents that Snapchat is safe for children to use. For example, Defendant Snap's website states, "We take our responsibility to help protect teens on Snapchat extremely seriously."[153] Snap tells parents, "We prohibit any activity that

---

[148] Sarah Perez, *Snapchat Officially Introduces Parental Controls Through a New 'Family Center' Feature*, TECHCRUNCH (Aug. 8, 2022), https://techcrunch.com/2022/08/08/snapchat-officially-introduces-parental-controls-through-a-new-a-family-center-feature/.
[149] *Id.*; Sarah Perez, *YouTube and Snapchat Were Asked to Defend Their Apps' Age Ratings in Senate Hearing*, TECHCRUNCH (Oct. 26, 2021), https://techcrunch.com/2021/10/26/youtube-and-snapchat-were-asked-to-defend-their-apps-age-ratings-in-senate-hearing/.
[150] Snapchat Safety Center, SNAP INC., https://values.snap.com/safety/safety-center (last accessed Apr. 5, 2025).
[151] Snap Safety Milestones, SNAP INC. (Aug. 8, 2024), https://assets.ctfassets.net/kw9k15zxztrs/2REJfs8ovicIregDy1WRCe/1f0966fd9b380db16af0b4dad44e2154/Snap_Safety_Timeline.pdf.
[152] Testimony of Jennifer Stout, Subcommittee on Consumer Protection, Product Safety, and Data Security (Oct. 26, 2021), https://www.commerce.senate.gov/services/files/0AACA9BA-49C8-4AC3-8C2E-E62ACC3F73BC.
[153] *Tools and Resources for Parents*, SNAPCHAT, https://parents.snapchat.com/parental-controls (last accessed Jan. 6, 2025).

involves sexual exploitation or abuse of a minor, including sharing child sexual exploitation or abuse imagery, grooming, or sexual extortion (sextortion), or the sexualization of children. We report all identified instances of child sexual exploitation to authorities, including attempts to engage in such conduct."[154] Similarly, Defendant Snap claims to "prohibit promoting, distributing, or sharing pornographic content, as well as commercial activities that relate to pornography or sexual interactions (whether online or offline)."[155] And Defendant Snap promises parents it has "zero tolerance for people who violate our rules by committing severe offenses, such as causing serious physical or emotional harm to another Snapchatter. If we discover this type of behavior, we immediately disable their accounts and apply measures to prevent them from getting back on Snapchat."[156] Defendant Snap also claims that it "escalates emergencies to law enforcement and work[s] to support their investigations."[157]

177.    Defendant Snap has repeatedly sought to portray Snapchat as "different" from other social media products and their associated risks to children. For example, one Snapchat ad campaign is entitled, "Less Social Media. More Snapchat," and claims, "Our goal is to provide a healthy and safe environment for all Snapchatters – and especially the youngest members of our community. We designed our platform differently to prioritize real friendships and prevent unwanted contact and we offer extra safeguards for teen Snapchatters."[158] A website dedicated to this campaign states, "But Snapchat is not social media. It never was. In fact, it was built as an antidote to social media."[159]

---

[154] Community Guidelines, SNAP INC., https://values.snap.com/privacy/transparency/community-guidelines (last accessed Jan. 6, 2025).
[155] *Id.*
[156] Safeguards for Teens, SNAP INC., https://parents.snapchat.com/safeguards-for-teens?lang=en-US (last accessed Apr. 5, 2025).
[157] *Id.*
[158] *Less Social Media. More Snapchat.*, SNAP INC. (Feb. 2, 2024), https://newsroom.snap.com/less-social-media-more-snapchat.
[159] Moresnapchat.com (last accessed Jan. 6, 2025).

178.    Defendant Snap's Head of Global Platform Safety, Jacqueline Beauchere, also sought to distinguish Snapchat by claiming that the product "doesn't facilitate connections with unfamiliar people like some social media platforms."[160] Jennifer Stout, Snap's Vice President of Global Public Policy, testified at a Senate subcommittee meeting that, compared to traditional social media, "Snapchat was a decidedly different platform that was private, that was safe."[161] And even CEO Evan Spiegel told employees that "while our competitors are connecting pedophiles . . . we know that Snapchat makes people happy."[162]

179.    Defendant Snap specifically and misleadingly assures parents that its product is built on safety. Stout also testified at the Senate subcommittee hearing that, "From the start . . . we prioritized privacy and safety." In her written statements, she added that Snapchat "tak[es] into account the unique sensitives and considerations of minors when we design products."[163] And Beauchere, Defendant Snap's Head of Global Platform safety, wrote in a blog post that "Snap applies privacy-by-design principles when developing new features . . . meaning safety is considered in the design phase of our features – no retro-fitting or bolting on safety machinery after the fact."[164]

180.    Defendant Snap claims that safety is built into Snapchat because accounts for under-18-year-olds are set to private by default, and other features, like Snap Map, are also off by default.[165] Stout also told the Senate subcommittee that because, "with respect to grooming, this is

---

[160] Meet Our Head of Global Platform Safety, SNAP INC., https://values.snap.com/news/meet-our-head-of-global-platform-safety (last accessed Apr. 4, 2025).
[161] Testimony of Jennifer Stout, Subcommittee on Consumer Protection, Product Safety, and Data Security.
[162] *Snapchat's Evan Spiegel Takes Shots at Facebook, Instagram in a Leaked Memo: 'Social Media is Dead'*, BENZINGA (Jan. 10, 2024), https://www.benzinga.com/news/24/01/36571122/snapchats-evan-spiegel-takes-shots-at-facebook-instagram-in-a-leaked-memo-social-media-is-dead.
[163] Testimony of Jennifer Stout, Subcommittee on Consumer Protection, Product Safety, and Data Security (Oct. 26, 2021).
[164] Snap, Meet Our Head of Global Platform Safety, https://values.snap.com/news/meet-our-head-of-global-platform-safety (last visited June 24, 2025).
[165] Additional Protections for Teens on Snapchat, SNAP INC., https://values.snap.com/privacy/teens (last accessed Apr. 5, 2025).

an area where we spend a tremendous amount of time and resources to try to prevent," Snap does not allow open profiles or browsable pictures.[166] In fact, regarding harassment, Stout told Senator Richard Blumenthal that "as a platform that reaches so many young people, we see this as a responsibility to get in front of this issue and do everything we can to stop it."[167]

181.    Likewise, according to Defendant Snap's Family Safety Hub, launched in 2022, Snapchat claims to offer "extra protections for teens to help keep the focus on connecting with close friends, preventing unwanted contact from strangers, and providing age-appropriate content experience."[168] These protections include supposedly preventing communication between users unless they are friends on Snapchat or an existing contact in their phone, and sending teen users regular reminders to check their privacy settings.[169]

182.    Although Defendant Snap assures parents that it has zero tolerance for content or conduct that endangers children and that its product is built on safety, the company, in fact, has created and maintains an environment in which the sexual exploitation of children is rampant and thriving due to the defective nature of its product and the failure to warn parents and child users of the dangers of predators using its product for the generation and distribution of CSAM. The result has been devastating, with countless children suffering irreversible harm.

183.    From the beginning, the very same ephemerality of photos that Defendant Snap claims facilitates "real connections" between people has been leveraged for sexual exploitation. In fact, one co-founder has said that the idea for the product came from a desire to facilitate sexting via disappearing photos.[170] Because Defendant Snap claims that images self-delete after opening,

---

[166] Testimony of Jennifer Stout, Subcommittee on Consumer Protection, Product Safety, and Data Security.
[167] *Id.*
[168] Safeguards for Teens, SNAP INC., https://parents.snapchat.com/safeguards-for-teens?lang=en-US (last accessed Apr. 5, 2025).
[169] Snapchat Safety Center, SNAP INC., https://values.snap.com/safety/safety-center (last accessed Apr. 5, 2025).
[170] Ingrid Lunden, *Snapchat Paid Reggie Brown $157.5M to Settle His 'Ousted Founder' Lawsuit*, TECHCRUNCH (Feb. 2, 2017), https://techcrunch.com/2017/02/02/snapchat-reggie-brown/.

users are lured into the false belief that there will be no record of what they send. Thus, immediately after launch, Snapchat unsurprisingly gained a reputation for being a "sexting product,"[171] widely viewed to be used "primarily by insatiable teenagers for sending explicit 'sexting' messages."[172]

184.    Numerous underage users were duped by this promise and sent nude images to other users, only to discover that Snapchat's automatic deletion premise was illusory, since users could always use their phones' screenshotting capacity to save the images. In 2013, less than two years after Snapchat was launched, prosecutors in Ridgewood, New Jersey contemplated filing charges when a high school boy screenshotted and publicly uploaded nude photos that his female classmate sent, which she thought would delete after sending.[173] Similarly, that same year, Montreal police arrested 10 teen boys on child-porn charges for passing around images of girls, ages 13-15, in sexual poses or performing sexual acts, who thought they were safe because they were using Snapchat.[174] The ephemerality of messages is dangerous not only because it gives users a false sense of security that the photos will self-delete, but also because it makes it harder for parents to know what their child is doing on the product, allowing exploitation to go undetected.

185.    The dangers of Snapchat were not limited to teens exploiting each other—adults predators too realized how easy it was to exploit underage users with Snapchat due to the defective nature of the product. Also in 2013, a 32-year-old high school teacher was sentenced to ten days

---

[171] Megan Rose Dickey, *Let's Be Real: Snapchat is Totally Used for Sexting*, BUSINESS INSIDER (Nov. 30, 2012), https://www.businessinsider.com/snapchat-growth-sexting-2012-11.

[172] Matt Warman, *Snapchat's Evan Spiegel: 'Deleting should be the default'*, THE TELEGRAPH (Nov. 16, 2013), https://www.telegraph.co.uk/technology/social-media/10452668/Snapchats-Evan-Spiegel-Deleting-should-be-the-default.html.

[173] Jeremy Tanner & James Ford, *'Snapchat' Sexting Scandal at NJ High School Could Result in Child Porn Charges*, PIX11 (Mar. 14, 2013), https://pix11.com/news/snapchat-sexting-scandal-at-nj-high-school-could-result-in-child-porn-charges/#axzz2keMS3q1h.

[174] Kaja Whitehouse, *Snapchat Sexting Scandal Could Scare Off Investors*, NEW YORK POST (Nov. 14, 2013), https://nypost.com/2013/11/14/snapchat-sexting-scandal-could-scare-off-investors/.

of jail and eighteen months of probation after he sent a photo of his crotch to an underage female student, in response to her sending photos of herself in underwear.[175] The teacher had also invited her over to his apartment via Snapchat's direct messaging.[176] And a district attorney investigator in Colorado reported to CBS that Snapchat was "being used by somebody to send inappropriate pictures to a kid, or someone is asking a kid to send their inappropriate pictures."[177]

186.    These criminal prosecutions in Snapchat's early years followed a predictable pattern: predators were teachers or coaches who often already knew the child victims in real life, and they used Snapchat to inappropriately communicate with the children. For instance, in 2014, a high school teacher in Brooklyn was arrested for sending an underage student a photo of his penis, and an investigation afterwards revealed that he had exchanged inappropriate photos and text messages with many more students, as well as had sex with two students immediately after they reached the legal age of consent.[178] In 2015, a Virginia youth hockey coach was arrested for using Snapchat to contact middle school-aged boys who played hockey, and then send them videos of child pornography.[179] That same year, a substitute teacher used Snapchat to contact underage girls, send them nude photos and videos, and then ask for nude photos and videos in exchange.[180]

---

[175] Steve Mayes, *Snapchat Sexting Sends Former Oregon City High School Teacher to Jail for 10 Days*, OREGONLIVE: THE OREGONIAN (Aug. 27, 2013), https://www.oregonlive.com/oregon-city/2013/08/snapchat_sexting_sends_former.html.

[176] *Id.*

[177] *Hidden Dangers in App Nicknamed the 'Sexting' App*, CBS NEWS COLORADO (May 5, 2013), https://www.cbsnews.com/colorado/news/hidden-dangers-in-smartphone-app-nicknamed-the-sexting-app/.

[178] Kim Barker & Kate Taylor, *Brooklyn Tech Teacher Was Known as Cool Friend, Until His Arrest*, N.Y. TIMES (Oct. 1, 2014), https://www.nytimes.com/2014/10/02/nyregion/brooklyn-teacher-accused-of-abuse-beat-a-boy-in-2005-records-show.html.

[179] Julia Carey, *Hockey Coach Tim Bodenheimer Accused of Possessing Child Porn*, 4WASHINGTON (Jan. 12, 2015), https://www.nbcwashington.com/news/local/hockey-coach-tim-bodenheimer-accused-of-possessing-child-porn/1965405/.

[180] *Sub Teacher Arrested on Sex and Child Porn Charges*, Shreveport Times (May 14, 2015), https://www.shreveporttimes.com/story/news/2015/05/14/bossier-sub-arrested-child-porn/27295373/.

In 2016, a former Louisville teacher and coach was sentenced to more than 40 years in prison for producing child pornography and confessed to using Snapchat to communicate with minors.[181]

187.    This rampant sexual exploitation of minors by predators previously known to the underage victims directly contradicts Defendant Snap's representations that it has always implemented "safety-by-design" by only facilitating communication between users who already know each other. Plainly, there is still a risk of exploitation between users who already know each other, particularly between adults and underage users. In fact, the risk of inappropriate communications between adults and children is arguably even greater when there is a preexisting relationship, as the adult can leverage their position of power over the student as a teacher or coach, to coerce the child into complying with the adult predator's demand for nude images.

188.    Predators even explicitly explain how they exploit Snapchat's ephemerality to make underage users feel more comfortable sending explicit photographs. For example, one dark web handbook describes Snapchat as ideal for sextortion because "[g]irls on Snapchat are more comfortable sending sexually explicit content since they believe that the receiver will not take a screenshot due to the risk of being discovered and blocked."[182]

---

[181] *Former Louisville Teacher Sentenced to 504 Months in Prison for Violating Child Exploitation Laws*, U.S. Attorney's Office, Western District of Kentucky (Jan. 6, 2016), https://www.justice.gov/usao-wdky/pr/former-louisville-teacher-sentenced-504-months-prison-violating-child-exploitation-laws.
[182] Plaintiffs' Amended Complaint, *New Mexico v. Snap Inc*.



*Dark web "guides" to using Snapchat to sexually exploit children.*[183]

189.    Not only does Snapchat facilitate the creation and distribution of CSAM but users also openly trade CSAM on the product. For example, countless accounts on the product have usernames indicating that the users are focused on finding minors or collecting explicit images of them. And Snapchat may recommend these accounts to add as "friends" to underage users.

---

[183] *Id.*



*Examples of accounts whose usernames demonstrate their usage of Snapchat to find minors.*[184]

190.    Other account usernames are even more explicit and openly describe that they are looking for "cp," short for child pornography, or other terms that have become proxies for selling child porn, like "pizza seller," since "cheese pizza" shares the same initials with child pornography.



*Accounts with the word "trade" in them, indicating their trade of child pornography.*[185]

---

[184] Plaintiffs' Amended Complaint, *New Mexico v. Snap Inc*.
[185] *Id.*

191.    There are also accounts with usernames that reflect crimes against children, including "r4pe_allkids," "rape_baby," and "dead_rapebaby."[186] Not only does Defendant Snap allow these phrases to be used as usernames, but it also allows users to search for them via Defendant Snap's algorithm.

192.    CSAM does not stay on the product. Rather, it is distributed widely on the dark web by predators. For example, the New Mexico Attorney General's office identified dark web marketplaces for CSAM where predators openly advertise and sell sexually explicit images.[187] Sexually explicit images taken from Snapchat are also widely found on Telegram, Reddit, and other applications.[188]



*An example of a Reddit forum where users openly sell and buy pornography.[189]*

193.    The inappropriate and exploitative content on Snapchat is not limited to direct messaging between users. Snapchat's "Discover" page, launched in early 2015, is also well-known for displaying inappropriate content to minor users, which normalizes explicit sexual content to children and thereby makes it easier for predators to exploit children. For example, one 14-year-old boy in California was shown sexually explicit content, including an article with the title, "23

---

[186] *Id.*
[187] *Id.*
[188] *Id.*
[189] *Id.*

Pictures That Are Too Real If You've Ever Had Sex with a Penis,"[190] and another with the title, "What It Is Really Like to Let People Finger You in Public."[191]



*Examples of content served to underage users in Snapchat's "Discover" page.[192]*

194.    Though Defendant Snap attempted to address the issue by implementing new rules that restricted what publishers could post on the "Discover" page, inappropriate content continues to be shown to minors.[193] For example, in 2021, Senator Mike Lee described his staff's experience creating a Snapchat account for a 15-year-old. Immediately, the Discover page, with its default settings, served an "invite to play an online sexualized video game that is marketed itself to people who are 18 and up, tips on 'why you shouldn't go to bars alone;' notices for video games that are rated for ages 17 and up, and articles about porn stores."[194]

---

[190] Casey Newton, *Snapchat Hit with Class-Action Lawsuit Over Sexual Content in Discover*, The Verge (Jul. 7, 2016), https://www.theverge.com/2016/7/7/12122998/snapchat-discover-lawsuit-sexual-content-minors.
[191] *Id.*
[192] Class Complaint for Damages, *Doe v. Snapchat, Inc.*, No. 2:16-cv-04955 (C.D. Cal. Jul. 7, 2016), https://embed.documentcloud.org/documents/3399338-Snapchat-Complaint/?embed=1.
[193] Katie Benner, *Snapchat Discover Takes a Hard Line on Misleading and Explicit Images*, N.Y. TIMES (Jan. 23, 2017), https://www.nytimes.com/2017/01/23/technology/snapchat-discover-takes-a-hard-line-on-misleading-and-explicit-images.html.
[194] Statement of Hon. Mike Lee, U.S. Senator from Utah (Oct. 26, 2021), https://www.congress.gov/event/117th-congress/senate-event/330808/text.

195.    Defendant Snap has also created a haven for predators seeking to groom, traffic, and sexually abuse minors by providing predators with endless opportunities for unmitigated interactions with children through direct messaging and video and voice calls.

196.    Defendant Snap is well aware of the features within its product that allow predators to find and exploit children. For example, in 2018, a Baltimore college student was arrested after using the "quick add" feature on Snapchat to find underage victims, whom he bribed with gift cards in exchange for photos of children performing perverted practices with pillows and teddy bears.[195] Notably, the "quick add" feature for finding users allowed predators to send friend requests to people they did not know in real life, contradicting Defendant Snap's claim that it only facilitates connection between people who know each other.

197.    Snapchat also facilitates sexual exploitation by allowing predators to pose as much younger users, since Defendant Snap refuses to verify the ages of its users. For example, in 2022, a California man was indicted for communicating with a 13-year-old girl and requesting sexually explicit content.[196] Investigators then found that he had been in contact with as many as 175 victims on Snapchat and misrepresented his age as 16 or 17 to the child victims. In 2023, a 43-year-old man was sentenced to 25 years in prison after using Snapchat to pose as an 18-year-old boy and persuading each underage victim to send him numerous sexually explicit videos depicting them masturbating.[197] Senator Marsha Blackburn, in a speech on the Senate floor, also recounted the story of an adult male who posed as a teenage girl to extort nude pictures from a middle-school aged boy via Snapchat.[198] And most recently, *The New York Times* published several articles about

---

[195] Jeff Hager, *UMBC Student Arrested on Child Porn Charges*, WMAR2 BALTIMORE (Dec. 17, 2018), https://www.wmar2news.com/news/crime-checker/baltimore-county-crime/21-year-old-arrested-for-using-snapchat-to-sexually-solicit-minors.

[196] *Modesto Man Indicted for Sexual Exploitation of Numerous Children Using Snapchat*, US ATTORNEY'S OFFICE EASTERN DISTRICT OF CALIFORNIA (Nov. 18, 2022), https://www.justice.gov/usao-edca/pr/modesto-man-indicted-sexual-exploitation-numerous-children-using-snapchat.

[197] *HSI Charleston Investigation Lands Former West Virginia Elementary School Counselor 25 Years in Prison for Child Exploitation Crimes*, US IMMIGRATION & CUSTOMS ENFORCEMENT (Dec. 20, 2022), https://www.ice.gov/news/releases/hsi-charleston-investigation-lands-former-west-virginia-elementary-school-counselor.

[198] Blackburn: Snapchat is a Child Predator's Dream, BLACKBURN.SENATE.GOV (Jul. 11, 2019), https://www.blackburn.senate.gov/index.php/2019/7/blackburn-snapchat-child-predators-dream.

a math teacher at a New York private school who posed as a teenage boy on Snapchat to solicit sexual photographs and videos from his students.[199]

198.    Snapchat's live video chat feature serves as a tool for exploitation by predators. In 2020, a 58-year old Massachusetts man was indicted on charges that he used Snapchat to video chat with children and either asked the children to watch him masturbate or asked the children to masturbate in front of him, which he sometimes recorded.[200] The next year, a 59-year-old man was sentenced to over ten years in prison for using Snapchat to solicit and receive child pornography over Snapchat, including the product's video chat feature.[201] In 2023, a 42-year-old man plead guilty to child pornography and enticement charges after he used Snapchat to engage in sexually explicit conduct via video-chat with minor victims, some as young as 9-years-old, and then screenshot images and videos of them.[202]

199.    Another common form of sexual exploitation on Snapchat is sextortion, where the predator coerces or blackmails the child into providing sexual images by threatening to expose private or sensitive material that the predator already possesses or claims to have. In 2018, a Chicago man was arrested for exploiting an underage girl on Snapchat by first collecting semi-nude photos of the victim, then threatening to post the images online unless she sent him additional, more explicit images.[203] In 2019, a 25-year-old Virginia man was arrested for communicating online via Snapchat with a 13-year-old where he threatened to kill himself if she did not send him

---

[199] Katherine Rosman, *An Elite School and the Criminal It Hired to Teach Math*, N.Y. TIMES (Dec. 9, 2024), https://www.nytimes.com/2024/12/09/nyregion/saint-anns-winston-nguyen-crime.html.
[200] Steph Solis, *Massachusetts Man Indicted by Federal Authorities on Child Pornography Charges Involving Snapchat Account*, MASSLIVE (Sep. 9, 2020), https://www.masslive.com/police-fire/2020/09/massachusetts-man-indicted-by-federal-authorities-on-child-pornography-charges-involving-snapchat-account.html.
[201] *Attleboro Man Sentenced for Child Pornography Offenses*, US ATTORNEY'S OFFICE DISTRICT OF MASSACHUSETTS (Jul. 12, 2021), https://www.justice.gov/usao-ma/pr/attleboro-man-sentenced-child-pornography-offenses.
[202] *West Los Angeles Man Pleads Guilty to Federal Charges for Using Snapchat to Entice Child into Producing Sexually Explicit Videos*, US ATTORNEY'S OFFICE CENTRAL DISTRICT OF CALIFORNIA (Jan. 6, 2023), https://www.justice.gov/usao-cdca/pr/west-los-angeles-man-pleads-guilty-federal-charges-using-snapchat-entice-child.
[203] *Chicago-area Man Faces Child Pornography, Extortion Charges*, U.S. IMMIGRATION & CUSTOMS ENFORCEMENT (Oct. 24, 2018), https://www.ice.gov/news/releases/chicago-area-man-faces-child-pornography-extortion-charges.

sexually explicit photographs.[204] That year, a 23-year-old Georgia man was also arrested after using Snapchat to contact dozens of teenage girls across the country and persuade them to send him nude photographs and videos, sometimes in exchange for money.[205] He also threatened to publicly share these photos if they refused to continue to send him sexually explicit images.

200.    Even though Defendant Snap is fully aware of the defective nature of its product, it has not made changes to Snapchat to prevent convicted sex offenders from making accounts. For example, just this past year, a 45-year-old man with two prior sex offender convictions was sentenced to 20 years in prison for using Snapchat to engage in sexually inappropriate chats where he openly admitted to being a sex offender.[206] And while Defendant Snap claims to have "zero tolerance" for users who violate its rules prohibiting CSAM materials, there are countless instances of serial offenders whose exploitation of children went unchecked by Defendant Snap for years. In 2024 alone, a 42-year-old Iowa man plead guilty to possession of child pornography after he admitted to using Snapchat to meet minors and send child pornography on at least five different occasions,[207] and a University of Florida student was arrested for soliciting sexual content from minors age 13-15 and receiving over 70 images from the minors.[208]

201.    Predators themselves even admit that Snapchat is a go-to for them to contact children. In February 2024, a non-profit based in Helsinki, Finland, released a report, *Tech Platforms Used by Online Child Sexual Abuse Offenders*, which contained survey data from anonymous individuals searching for CSAM on the dark web. That survey revealed that 23% of

---

[204] *Newport News Man Charged with Production of Child Pornography*, US ATTORNEY'S OFFICE EASTERN DISTRICT OF VIRGINIA (Sep. 12, 2019), https://www.justice.gov/usao-edva/pr/newport-news-man-charged-production-child-pornography-1.

[205] *Forsyth County Man Arrested for Soliciting Child Pornography From Teenage Girls on Snapchat*, US ATTORNEY'S OFFICE NORTHERN DISTRICT OF GEORGIA (Aug. 21, 2019), https://www.justice.gov/usao-ndga/pr/forsyth-county-man-arrested-soliciting-child-pornography-teenage-girls-snapchat.

[206] *Convicted Sex Offender Sentenced for Child Pornography*, US ATTORNEY'S OFFICE EASTERN DISTRICT OF VIRGINIA (Mar. 14, 2024), https://www.justice.gov/usao-edva/pr/convicted-sex-offender-sentenced-child-pornography.

[207] *Sioux City, Iowa, Man Pled Guilty to Possession of Child Pornography*, US ATTORNEYS' OFFICE NORTHERN DISTRICT OF IOWA (Nov. 20, 2024), https://www.justice.gov/usao-ndia/pr/sioux-city-iowa-man-pled-guilty-possession-child-pornography.

[208] Bailey Diem, *UF Student Arrested on Charges of Child Pornography*, ALLIGATOR (Nov. 8, 2024), https://www.alligator.org/article/2024/11/uf-student-arrested-on-charges-of-child-pornography.

individuals who admitted to using social media to contact children used Snapchat.[209] Additionally, 10% of those who admitted to searching, viewing, and sharing CSAM said that they used Snapchat to disseminate CSAM.[210] Similarly, the National Society for the Prevention of Cruelty to Children in the United Kingdom determined that Snapchat was the most widely used platform for online grooming, with more than 7,000 offenses reported in just the first three months of 2024.[211]

202.    In the U.S., the National Center on Missing and Exploited Children named Snapchat the #1 app where children reported receiving unwanted sexual advances from predators in 2024.[212] Parents Together also found that Snapchat was the "single most named platform where kids share sexual images of themselves," and the third most reported platform for sexually explicit requests from children.[213] According to the Human Trafficking Institute, Snapchat was the most identified platform for the recruitment of sex trafficking victims from 2021-2023.[214] As explained by the National Center on Sexual Exploitation's Director of Corporate and Strategic Initiatives:

> In my conversations with law enforcement, child safety experts, lawyers, survivors, and youth, I ask them what the most dangerous app is, and without fail, Snap is in the top two. Just in the past few months, three separate child protection agencies noted Snapchat to be the top app together with Instagram for sextortion, one of the top three places children were most likely to view pornography outside of pornography sites, and the number one online site where children were most likely to have a sexual interaction, including with someone they believe to be an adult.[215]

203.    Defendant Snap has known of these dangers for years but has done little to nothing to cure these defects in its product. In January 2018, a professor at John Jay College of Criminal

---

[209] Protect Children, *Tech Platforms Used by Online Child Sexual Abuse Offenders* (Feb. 2024), https://bd9606b6-40f8-4128-b03a-9282bdcfff0f.usrfiles.com/ugd/bd9606_0d8ae7365a8f4bfc977d8e7aeb2a1e1a.pdf.
[210] *Id.*
[211] Imran Rahman-Jones, *Snapchat Most-Used App for Grooming, Says NSPCC*, BBC (Oct. 31, 2024), https://www.bbc.com/news/articles/cze3p1j710ko.
[212] *Snapchat*, National Center on Sexual Exploitation, https://endsexualexploitation.org/snapchat/ (last accessed Apr. 5, 2025).
[213] *Afraid, Uncertain and Overwhelmed: A Survey of Parents on Online Sexual Exploitation of Children*, PARENTS TOGETHER (Mar. 2023), https://parentstogetheraction.org/wp-content/uploads/2023/03/PT_PDF_final-2.pdf.
[214] 2023 Federal Human Trafficking Report, HUMAN TRAFFICKING INSTITUTE (Jun. 2024), https://traffickinginstitute.org/wp-content/uploads/2024/06/2023-Federal-Human-Trafficking-Report-WEB-Spreads-LR.pdf.
[215] *Snap's Dangerous New AI Risks Exposing Children to Sexual Exploitation and Abuse*, NATIONAL CENTER ON SEXUAL EXPLOITATION (Mar. 20, 2023), https://endsexualexploitation.org/articles/snaps-dangerous-new-ai-risks-exposing-children-to-sexual-exploitation-and-abuse/.

Justice spoke to an outlet about the exact predatory behavior described in this Amended Complaint:

> Snapchat has become a haven for child predators to be able to both exchange child pornography with each other, and to be able to induce children to send pictures of them to the predator. And we're also seeing difficulty in law enforcement being able to investigate due to the safeguards Snapchat has in deleting both snaps and "stories" after certain amounts of time.[216]

204.    Although Defendant Snap claims to have designed its product for safety, the number of its *self-reported* reports of suspected online exploitation of children, including CSAM material and online enticement, has skyrocketed over time. In 2019, Snapchat reported a staggering 82,030 instances of suspected child exploitation.[217] In 2020, this number increased to 144,095 instances, second only to Google and Facebook among all internet service providers.[218] In 2021, Snap's reports *nearly* tripled to 512,522 instances.[219] And in the most recent year for which data is available, Defendant Snap reported more than 700,000 instances of suspected child abuse.[220] The sheer volume of suspected child abuse, which has only gone up over time, starkly contradicts Snapchat's claim that it has "zero-tolerance" for such exploitation.

205.    Defendant Snap's knowledge of this abuse is also evident from its own internal research. Defendant Snap received an astronomical 10,000 reports of sextortion a month, an amount that the company itself acknowledged to be an underreported total.[221] Internal research—whose very commission demonstrates that Defendant Snap was aware of the child sex abuse on its

---

[216] *Snapchat 'Has Become a Haven' for Child Predators, Criminal Justice Scholar Says*, WBUR (Jan. 23, 2018), https://www.wbur.org/hereandnow/2018/01/22/snapchat-child-predators.

[217] *2019 CyberTipline Reports by Electronic Service Providers (ESP)*, NATIONAL CENTER FOR MISSING & EXPLOITED CHILDREN, https://www.missingkids.org/content/dam/missingkids/pdfs/2019-reports-by-esp.pdf.

[218] *2020 CyberTipline Reports by Electronic Service Providers (ESP)*, NATIONAL CENTER FOR MISSING & EXPLOITED CHILDREN, https://www.missingkids.org/content/dam/missingkids/pdfs/2020-reports-by-esp.pdf.

[219] *2021 CyberTipline Reports by Electronic Service Providers (ESP)*, NATIONAL CENTER FOR MISSING & EXPLOITED CHILDREN, https://www.missingkids.org/content/dam/missingkids/pdfs/2021-reports-by-esp.pdf.

[220] *2023 CyberTipline Reports by Electronic Service Providers (ESP)*, NATIONAL CENTER FOR MISSING & EXPLOITED CHILDREN, https://www.missingkids.org/content/dam/missingkids/pdfs/2023-reports-by-esp.pdf.

[221] Dara Kerr, *Snapchat Brushed Aside Warnings of Child Harm*, Documents Show, NPR (Oct. 4, 2024), https://www.npr.org/2024/10/04/nx-s1-5137218/snapchat-brushed-aside-warnings-of-child-harm-documents-show; *Attorney General Raúl Torrez Files Unredacted Complaint Against Snapchat, Exposing Internal Messages that Snap Knowingly Contributed to Harm Amongst Children*, NEW MEXICO DEP'T OF JUSTICE (Oct. 2, 2024), https://nmdoj.gov/press-release/31302/.

platform—showed that roughly a third of girls and boys reported experiencing unwanted contact on the application, and a staggering 25% of Gen-Z users reported experiencing sextortion.[222]

206. Roblox and Snapchat serve as preferred products for predators seeking to identify, groom and then sexually exploit children. The tried-and-true playbook these predators follow is to misrepresent their age on Roblox to child users, pretending to be a fellow child, befriend the vulnerable young victims, and then manipulate the children to move the conversation off Roblox to Snapchat, where they coerce the children into sending sexually explicit images or into meeting in person so the predator can sexually abuse the minor.

207. Although Defendant Roblox claims to block off-platform communication, it makes it shockingly easy for predators to move the conversation off platform. Defendant Roblox itself has admitted that it monitors how users move communications outside of Roblox: Roblox CEO Dave Baszucki told investors, "When we speak about Roblox, we are an immersive 3D, metaverse platform company. There are complementary product categories…one, we might call it the social communication and community platform area. We're really interested in the way these types of products work together. We see our people who play Roblox use various apps sometimes to hop from place to place and communicate outside of those apps."[223]

208. Defendant Roblox also knows that predators use its product to find children and then move communications to Snapchat. Defendant Roblox's algorithms block the term "Snapchat." Yet predators have used countless ways to evade that limitation because Roblox's algorithms do not block other obvious references to Snapchat, including the "ghost" emoji (👻), which is widely recognized for its similarity to Snapchat's own ghost icon. There are other obvious workarounds—users can write, for example, "What's your pans (read that backwards)" or "S nap" (with a space between the "s" and the "n"), which, as highlighted above, researchers recently

---

[222] *Attorney General Raúl Torrez Files Unredacted Complaint Against Snapchat, Exposing Internal Messages that Snap Knowingly Contributed to Harm Amongst Children*.
[223] Q2 2021 Earnings Call (Aug. 17, 2021).

demonstrated allows adult users to evade Defendant Roblox's algorithms and communicate with other users as young as five-years-old.[224]



*In April 2025, a research agency demonstrated how easy it was for a 42-year-old account to find a five-year-old user on Roblox and get the child to move the conversation to Snapchat.[225]*

209.    Through numerous media reports and well publicized criminal cases, Defendants Roblox and Snap have long known that their products jointly enable predators to systematically harm children. Additionally, the Roblox-to-Snapchat pipeline, where predators target children on gaming products before moving the conversation to private message products, is well-known to child safety experts and law enforcement.[226] For example, in 2023, the Alberta police explained that they had seen an increase in the number of young children lured from Roblox to Snapchat, where predators then asked the child for nude photos or to perform sexual acts.[227]

210.    This pattern has resulted in numerous criminal investigations and convictions. Over the course of 2020, a nine-year-old girl met adult men through Roblox, who then encouraged her

---

[224] *A Digital Playground The Real Guide to Roblox*, REVEALING REALITY (Apr. 13, 2025), https://think.revealingreality.co.uk/roblox-real-guide.
[225] *Id.*
[226] Megan Kelly, *Baton Rouge Man Arrested for Allegedly Targeting Minors Through Roblox and Discord – What Experts Want Parents to Know*, Unfiltered with Kiran (Jan. 31, 2025), https://unfilteredwithkiran.com/baton-rouge-man-arrested-for-allegedly-targeting-minors-through-roblox-and-discord-what-experts-want-parents-to-know/.
[227] Sean Amato, *What is Roblox? Alberta Police Warn Parents About Predators on Online Gaming Platform*, CTV News (Apr. 24, 2023), https://www.ctvnews.ca/edmonton/article/what-is-roblox-alberta-police-warn-parents-about-predators-on-online-gaming-platform/.

to sign up for Snapchat to communicate with them, where they then proceeded to sexually exploit her.[228] In 2021, a blogger told the story of a girl who met an "11-year-old boy from Sweden" on Roblox, who then told her they should connect on Snapchat, where he then proceeded to send her nude photos of himself—a grown adult.[229] And in 2024, a 23-year-old Detroit man was arrested for meeting children on Roblox, then urging the children to continue the discussions on Snapchat, where he solicited and received sexually explicit photos of children, including one as young as 10-years-old.[230] A 27-year-old Kentucky man was arrested for using a combination of Roblox, TikTok, Snapchat, and Discord to meet an 11-year-old child, kidnap her from her home in New Jersey to his home in Delaware, where he attempted to engage in sexual acts with her.[231] And a British man, who had prior convictions for online child sex offense, was sentenced to five years for using Snapchat and Roblox to engage in sexual communications with children under the age of 13.[232]

211.    Like Roblox, Snapchat is overrun with predators because the company prioritizes growth, revenue, and eventual profits over child safety. For years, Defendant Snap has knowingly prioritized these numbers over the safety of children through the actions it has taken and decisions it has made to increase and monetize users regardless of the consequences.

212.    Although Snapchat began as a social media product for young people, particularly high schoolers, it has actively sought to add adult users despite the vulnerability of its youth users. With higher incomes, adult users are more attractive to advertisers, which increases Defendant

---

[228] Brendan Pierson, *Game Company Roblox Enabled Girl's Sexual Exploitation, Lawsuit Claims*, REUTERS (Oct. 5, 2022), https://www.reuters.com/legal/game-company-roblox-enabled-girls-sexual-exploitation-lawsuit-claims-2022-10-05/.

[229] SG Buckley, *Our Kids and the Creeps on Social Media*, MODERN PARENT (Mar. 20, 2021), https://medium.com/modern-parent/our-kids-and-the-creeps-on-social-media-f2e026db3686.

[230] Charles E. Ramirez, *Monroe Co. Man Accused of Using Roblox, Snapchat to Sexually Exploit Children*, THE DETROIT NEWS (Nov. 15, 2024), https://www.detroitnews.com/story/news/local/michigan/2024/11/15/monroe-co-man-accused-of-using-roblox-snapchat-to-sexually-exploit-children/76327994007/.

[231] Kate Linderman, *Man Used Snapchat to Sexually Abuse 11-Year-Old and Coerce Her into His Home, Feds Say*, LEXINGTON HERALD LEADER (Jan. 10, 2024), https://www.kentucky.com/news/nation-world/national/article284072998.html.

[232] Beth Cruse, *Man Used Snapchat and Roblox for Child Offenses*, BBC (Dec. 5, 2024), https://www.bbc.com/news/articles/cp8nm0d70xyo.

Snap's revenue.[233] In 2016, the L.A. Times reported that, in an effort to drive more adults to the product, Defendant Snap had put billboards on hotels in Las Vegas and in Times Square for New Year's Eve.[234]

213.    Defendant Snap's efforts to reach adult users have been extraordinarily successful. In 2014, it had 50 million daily active users; by 2016, this number had already tripled to 150 million daily active users.[235] Today, in North America, Snapchat has 100 million daily active users, for an estimated 22% penetration rate of all smartphone users.[236] For Americans aged 13-34, Defendant Snap estimates that it reaches a staggering 75% of all smartphone users.[237] And globally, Snapchat has an estimated 350 million daily active users.[238]

214.    Defendant Snap's growth enabled it to go public in 2017 at a valuation of $24 billion.[239] This valuation reached a peak of $131 billion during the height of the pandemic in September 2021. But since then, Defendant Snap's stock has struggled and is now trading at a hefty discount to its IPO valuation, worth approximately $13.6 billion dollars today. And, since going public in 2017, Defendant Snap has never earned an annual profit.[240] Without profits, Defendant Snap must convince its investors that the company will continue to grow users and thereby expand the base over which it can earn advertising revenue, reduce costs, or, alternatively, that the revenue per user will increase. The latter is why Defendant Snap has sought adult users, who are more valuable to advertisers because of their greater incomes.

---

[233] Paresh Dave, *How Snapchat is Targeting the Over-35 Crowd*, L.A. TIMES (Jan. 13, 2016), https://www.latimes.com/business/technology/la-fi-snapchat-over-35-20160113-story.html.
[234] *Id.*
[235] Snapchat S-1, SEC.GOV, https://www.sec.gov/Archives/edgar/data/1564408/000119312517029199/d270216ds1.htm.
[236] Snap Inc. 2024 Investor Presentation, SNAP INC., https://s25.q4cdn.com/442043304/files/doc_financials/2024/q4/2024-Investor-Presentation.pdf.
[237] *Id.*
[238] *Id.*
[239] Michael J. de la Merced, *Snap Prices I.P.O at $17 a Share, Valuing Company at $24 Billion*, N.Y. TIMES (Mar. 1, 2017), https://www.nytimes.com/2017/03/01/business/dealbook/snap-ipo-snapchat.html.
[240] *See, e.g.*, *2024 Snap 10-K*, SNAP INC., https://s25.q4cdn.com/442043304/files/doc_financials/2024/q4/2024-Annual-Report.pdf; *2020 10-K*, SNAP INC., https://d18rn0p25nwr6d.cloudfront.net/CIK-0001564408/799dba00-c613-4d87-b858-916aff0d832a.pdf.

215.    Defendant Snap's lack of profitability also incentivizes the company to invest little in developing safety features for its product. Indeed, Defendant Snap's own employees said as much: employees reported that their recommendations to improve child safety went unheeded by upper management, who pushed-back against adding safety mechanisms to the platform.[241] One employee on Defendant Snap's trust and safety team said in February 2021 that, from 2015 to 2020, Defendant Snap's CEO Evan Spiegel was not interested in prioritizing safety issues.[242] And internal emails reveal Snapchat's true priority: the company refused to implement systems to identify grooming because it considered protecting children from predators too expensive, dismissing such safeguards as creating "disproportionate admin costs."[243] Additionally, Defendant Snap employees stated that they wanted to add criteria for escalation of suspicious accounts, but expressed hesitation over doing so because they didn't want to "overwhelm" employees.[244]

216.    Other internal emails demonstrate that Defendant Snap explicitly rejected that it had any responsibility for protecting children, with one employee claiming that "[i]t shouldn't be a private operator's responsibility to determine what constitute grooming."[245] Indeed, employees recognized that Defendant Snap refused to actually investigate over 90% of reports of abuse, by design, and instead just prompted the reporting user to block the offending user.[246]

217.    Defendant Snap's pursuit of growth and profits over child safety is reflected in numerous actions it took and decisions it made to the design and safety of its product. Had Defendant Snap acted differently, the harm suffered by countless children would not have occurred.

218.    At the most fundamental level, Defendant Snap has refused to use age verification systems to prevent underage children from using the product and predators from misrepresenting

---

[241] Plaintiffs' Amended Complaint, *New Mexico v. Snap Inc.*
[242] Lauren Feiner, *Snap Employees Were Well Aware of the App's Child Safety Issues, Newly Unsealed Complaint Says*, The Verge (Oct. 1, 2024), https://www.theverge.com/2024/10/1/24259653/snap-new-mexico-ag-lawsuit-csam-kids-safety.
[243] Plaintiffs' Amended Complaint, *New Mexico v. Snap Inc.*
[244] *Id.*
[245] *Id.*
[246] *Id.*

their ages. Though Defendant Snap's official policy is to ban users under the age of thirteen, the lack of age verification systems has resulted in a huge population of extremely young children using the product.[247] The company itself admits in its public SEC filings that there are underage users using the product[248] and internal emails show that Defendant Snap's own Senior Director of Public Policy lamented that "[a]ge assurance, in particular, remains a real weakness" and that a second executive noted that Snap could not "say that we actually verify."[249] Particularly because other social media and communications applications ban users under the age of thirteen and have implemented various age-verification measures, predators know that they can communicate freely with young children on Snapchat. Requiring age verification would prevent the exploitation of the youngest victims. Age and identity verification would also prevent predators from misrepresenting their age on the platform, a preferred approach of abusers in targeting children and convincing them to share sexually explicit images.

219.    Defendant Snap likewise could create a separate, gated platform for children that excludes adults. If supported by age verification using facial recognition (a service that is widely commercially available), the company could create a space for children to enjoy Snapchat with very few, if any, adults present. Many digital service companies have adopted separate platforms for children of young ages, including (for example) Amazon and Netflix.

220.    Defendant Snap also could place a higher age rating on its product in the iOS App Store and other app stores, to signal to parents that the product presented risks for children. Defendant Snap likewise could provide clear warnings to parents about the presence of sexual predators on the platform, so that parents could make an informed decision about allowing their child on the platform and/or educate their child on how to stay safe on the platform. Defendant Snap could also provide clear warnings to children about the presence of sexual predators on the platform and instructed children on how to stay safe on the platform.

---

[247] KJ Dell'Antonia, *Are Your Children Using Snapchat?*, N.Y. Times (Jul. 2, 2013), https://archive.nytimes.com/parenting.blogs.nytimes.com/2013/07/02/are-your-children-using-snapchat/.
[248] Snap Inc. Annual Report (Form 10-K) (Feb. 7, 2024).
[249] Plaintiffs' Amended Complaint, *New Mexico v. Snap Inc.*

221.    Defendant Snap also could easily prevent child exploitation by blocking direct messaging for underage accounts. For example, although TikTok is no model for child safety, it does not allow direct messaging for users under the age of 16, and for teenagers aged 16-17, the direct messaging setting is set to "no one" by default.[250] TikTok also does not allow anyone to send off-platform videos, images, or links.[251] In written testimony to Congress, TikTok said it made these choices to restrict underage users' activity on the product because studies have shown that exploitative material is spread through private messaging.[252]

222.    As explained above, Defendant Snap also made underage accounts easily discoverable by predators via the "Quick Add" function, which suggests users to add as friends. This feature was not ring-fenced to prevent adults from adding minors, something Snapchat's own employees recognized.[253] While Defendant Snap announced in January 2022 that accounts of 13-17 years-old would no longer appear within "Quick Add" unless accounts had a certain number of friends in common, this change can be easily evaded by predators who are already in contact with children. And internal Snapchat emails revealed that the company was aware that minors could be added to group chat without being friends with the other people in the chats.[254]

223.    Other Snapchat features that facilitate child sex abuse include the Snap Map, which tracks users' live locations. Access to live locations allows predators to identify children's home addresses, which is information that the predator can use to coerce children into sending explicit images, or even to locate children to kidnap and sex-traffic them.

224.    Snapchat's account search tool also fails to block searches for accounts with terms like "nude" or "underage" in them, thereby facilitating predators' search of minor users. And the "My Eyes Only" feature which keeps snaps "extra private" means that problematic photos are kept hidden from parents and enables predators to retail illicit content away from Snapchat.[255]

---

[250] Prepared Statement of Michael Beckerman, Vice President and Head of Public Policy, Americas, TikTok (Oct. 26, 2021), https://www.congress.gov/event/117th-congress/senate-event/330808/text.
[251] *Id.*
[252] *Id.*
[253] Plaintiffs' Amended Complaint, *New Mexico v. Snap Inc.*
[254] *Id.*
[255] *How does My Eyes Only work?*, SNAP INC., https://bit.ly/4cJjrqS.

225.    Snapchat also did not have any parental control settings until late 2022—more than ten years after the product was launched and well after other social media platforms adopted parental controls. So, for more than a decade, parents had no ability to limit or monitor their child's Snapchat usage. When Defendant Snap did introduce parental controls, its own employees described them as "meaningless" safeguards that deliberately filtered what parents could see about their children's communications.[256] The National Center on Sexual Exploitation described Snap's new "Family Center" as "grossly inadequate—and arguably even dangerous as they give parents and the public a false sense of safety, security, care, and concern for Defendant Snap's young users."[257] Family Center is grossly inadequate because it is extremely burdensome for parents to monitor their children's Snapchat accounts. Minors themselves must approve the parent's request to monitor the account. And all Family Center does is give visibility into the accounts that the child is interacting with, but a list of usernames is meaningless if the parents are not allowed to also access messages between children and their Snapchat "friends." Additionally, Family Center does not give parents the ability to set privacy controls for their children.

226.    For example, Defendant Snap made false claims about its safety features, such as misrepresenting that teens had to "mutually accept each other" to begin communicating, while knowingly allowing inappropriate message requests.[258] Similarly, Defendant Snap claimed to only show content on the "Discover" feed that was vetted by media publishers but then showed underage accounts sexually explicit material.[259]

---

[256] Plaintiffs' Amended Complaint, *New Mexico v. Snap Inc.*
[257] *Evidence of Exploitation on Snapchat*, National Center on Sexual Exploitation (Jul. 2023), https://endsexualexploitation.org/wp-content/uploads/Snapchat-Proof-Compilation_July-2023_DDL-2023.pdf.
[258] *Id.*
[259] *Id.*

*Snap Tells Parents:*

**We require teens to mutually accept each other as friends in order to begin communicating.** By default, Snapchatters under 18 must opt-in to being friends in order to start chatting with each other—similar to real life where friendships are mutual.

*Snap Shows Child:*



*Snap Shows Child:*

*The user below is clearly an adult male and his username is common slang for an older man who provides younger women with weed in exchange for sex. His Story, which contained multiple extremely graphic videos of intercourse, appeared in teen's "Story area," but not in sender's public Stories profile (so parents would not be able to see the Story if they checked the adult account holder's public profile).*



*Snap Tells Parents:*



**Discover:** To the right of the Camera is our content platform, which only features content from ==vetted== media publishers and content creators. Across our app, we don't offer an open newsfeed, where anyone can broadcast un==vetted== content—and don't allow an opportunity for unmoderated content to 'go viral.'



**Spotlight:** To the right of Discover is Spotlight, our entertainment platform, which is proactively moderated using human review before a piece of content can reach more than 25 views.

*The National Center on Exploitation has collected examples of the inaccuracies of Snapchat's representations to parents.*[260]

---

[260] *Id.*

227.    The Family Center settings are also inadequate because parents cannot see messages sent to the child, but rather only have access to messages that children send to others. Thus, parents are unable to identify potential predators until after a child has already communicated with them.

228.    Defendant Snap also chose not to implement technology that would have detected and limited CSAM on the product. In 2020, Parents Together, a non-profit organization, delivered a petition to Defendant Snap, calling on the company to use PhotoDNA to proactively look for and report CSAM.[261] But Defendant Snap consciously decided not to store child sex abuse images so that it could avoid having to report incidents to law enforcement. In fact, CEO Spiegel revealed a shocking glibness to this possibility, shooting down the possibility of storing the offending material: "Yeah, except we don't want to be responsible for storing that stuff. Better if they screenshot and email ghostbusters to report."[262] While Defendant Snap did eventually implement PhotoDNA, it did not sync its database of CSAM images with known illegal content for *two years*; upon discovering this oversight, employees were directed to delete any record of matching content.[263]

229.    Moreover, Defendant Snap has implemented no technology to identify *new CSAM material*, which is especially problematic given the proliferation of predators who solicit new explicit photographs from children. In fact, Snapchat's Global Head of Public Policy, in written testimony to Senator Blumenthal's questions on preventing child sexual exploitation, admitted as much, explaining that Defendant Snap was still exploring "technologies to detect novel child sexual abuse imagery on Snapchat."

230.    Defendant Snap's failure to implement even the most basic child safety features is even more egregious because it actively profits from the vulnerable child demographic, with Pew Research Center estimating that 60% of teens aged 13-17 used the application.[264]

---

[261] *Snapchat: Prevent Pedophiles from Sharing Abuse Videos*, Parents Together, https://parents-together.org/snapchat-petition/.
[262] Plaintiffs' Amended Complaint, *New Mexico v. Snap Inc.*
[263] *Id.*
[264] *Teens and Social Media Fact Sheet*, Pew Research Center (Jan. 5, 2024),

231.    In sum, Defendants Snap and Roblox have designed, developed, programmed, manufactured, marketed, sold, supplied, distributed, operated, and/or managed defective products intended for children that substantially increase the risk of sexual exploitation of minor children and facilitate the generation and distribution of CSAM and/or sexually explicit images and videos of children.

232.    Defendants had knowledge of, and were in possession of evidence demonstrating that, their products were defective and unreasonably dangerous and had a substantially higher risk of harm than did other alternative products on the market. Despite their knowledge, Defendants failed to, among other purposeful acts, inform or warn Plaintiff or Plaintiff's parents of the dangers and risks of sexual exploitations and establish and maintain adequate safety controls to protect against the increased risk of sexual exploitation.

## PLAINTIFF SPECIFIC ALLEGATIONS

233.    Plaintiff is a twelve (12) year-old girl who was horrifically and traumatically sexually exploited by a predator through Defendants' deliberately dangerous products, which were specifically designed to enable and facilitate the perpetrator's criminal activity.  As the direct result of Defendants' calculated and reckless disregard for child safety, Plaintiff has suffered devastating psychological trauma. Her life will never be the same.

234.    In 2022, when Plaintiff was approximately nine (9) years-old, she first started playing Roblox.  Plaintiff utilized the Roblox gaming product on both her smartphone and her iPad.  Plaintiff learned of Roblox from her school and was encouraged to play by several of her friends.

235.    Plaintiff's parents were aware that Plaintiff was using Roblox for entertainment and

---

https://www.pewresearch.org/internet/fact-sheet/teens-and-social-media-fact-sheet/.

to socialize with friends. Plaintiff's parents permitted Plaintiff to use Roblox because she believed Defendant Roblox's deceptive representations that the product was a safe product for children.

236.   Plaintiff's parents' first impression was that Roblox appeared to be designed for children. The company's website showed innocent-looking colorful avatars playing games for children. Unbeknownst to her at the time, this was nothing more than a false facade of safety.

237.   Plaintiff's parents relied on the safety statements put in place by Defendant Roblox and Defendant Snapchat that the respective products were age-appropriate products that would not expose her daughter to danger.

238.   Plaintiff's parents reviewed materials on Defendant Roblox's website dedicated to assuring parents of the supposed safety of the product for children.

239.   In 2022, Defendant Roblox's "For Parents" and "FAQ" sections on its website contained numerous representations about the purported safety of its product for children, including the following:

    a.   "All chat on Roblox is filtered to prevent inappropriate content and personally identifiable information from being visible on the site. Players have different safety settings and experiences based on their age";[265]

    b.   "Roblox uses a combination of chat filters, both human and software moderation, to proactively remove inappropriate content from the platform";[266]

    c.   "Roblox's state-of-the-art filtering system is actively monitored and dynamically adjusted to create a safe chat experience everywhere on the site and in-game";[267]

    d.   "Players age 12 and younger have their posts and chats filtered both for inappropriate content and to prevent personal information from being posted. Players age 13 and older have the ability to say more words and phrases than younger players. This filtering system covers all areas of communication on

---

[265] Roblox, *Safety Features: Chat, Privacy, & Filtering,* https://web.archive.org/web/20210319081717/https://en.help.roblox.com/hc/en-us/articles/203313120-Safety-Features-Chat-Privacy-Filtering (archived January 23, 2022).
[266] Roblox, *For Parents*, https://web.archive.org/web/20210418182755/https://corp.roblox.com/parents/ (archived January 23, 2022).
[267] Roblox, *Roblox FAQ – How does the chat system work on Roblox,* https://web.archive.org/web/20210316183843/https://corp.roblox.com/faq/ (archived January 21, 2022).

Roblox, public and private";[268] and

  e.  "We continually develop cutting-edge technologies to ensure the Roblox platform remains a safe and fun space for players all over the world".[269]

240.  The "Trust & Safety" page on Defendant Roblox's website also contained numerous representations about the purported safety of its product for children, including the following:

  a.  "We are dedicated to working together with parents and digital safety experts to promote a family-friendly environment that allows all people to imagine, create, and play online";[270]

  b.  "We continually develop new and innovative technologies to ensure the Roblox platform remains a safe and fun space for players all over the world";[271] and

  c.  "Roblox uses a combination of chat filters, both human and software moderation, to proactively remove inappropriate content from the platform."[272]

241.  In or around the same time as creating a Roblox account, Plaintiff was encouraged to download Snapchat to message with her school friends.

242.  Plaintiff's parents were also aware of Defendant Snapchat's assurances of the supposed safety of the product for children. They believed that the colorful design and emphasis on humorous photograph filters indicated that it was a safe product for children.

243.  Based on these false, misleading, and dangerously inadequate assurances from Defendant Roblox and Defendant Snapchat, Plaintiff's parents were misled into believing that Roblox and Snapchat were safe products for Plaintiff to use and therefore allowed Plaintiff to use

---

[268] Roblox, *Safety Features: Chat, Privacy, & Filtering,*
https://web.archive.org/web/20210319081717/https://en.help.roblox.com/hc/en-us/articles/203313120-Safety-Features-Chat-Privacy-Filtering (archived January 23, 2022).
[269] Roblox, *For Parents*, https://web.archive.org/web/20210418182755/https://corp.roblox.com/parents/ (archived January 23, 2022).
[270] Roblox, *Trust & Safety*, https://web.archive.org/web/20190610044903/https://corp.roblox.com/trust-safety/ (January 23, 2022).
[271] *Id*.
[272] *Id.*

Roblox and Snapchat. They trusted Defendant Roblox's and Defendant Snapchat's deceptive representations that it used state-of-the-art technology and other safety measures to ensure that Plaintiff would be safe using its product. In reality, Defendant Roblox and Defendant Snapchat deliberately misled parents, including Plaintiff's parents, while knowing its products facilitated predatory behavior and was a breeding ground for the generation of CSAM and sexually inappropriate images and videos of children.

244.    Among the many Roblox experiences, Plaintiff played many games that were identified as "All Ages" in which she could freely communicate with other players in-game via group chat. Despite Defendant Roblox clearly displaying that a player was a minor, it deliberately allowed adults to freely contact children without meaningful safeguards.

245.    While playing one of Defendant Roblox's experiences, Plaintiff was exposed to and targeted by an adult predator. The predator befriended and groomed Plaintiff while playing these open-to-all experiences. Defendant Roblox knowingly allowed this deception by refusing to implement age verification systems despite having the technological capability to do so.

246.    The predator sent a friend request to Plaintiff, which she accepted, allowing him to use Defendant Roblox's Message tool to communicate with Plaintiff. For weeks, the predator used Defendant Roblox's messaging system to groom Plaintiff, employing tactics that Defendant Roblox has documented internally but deliberately failed to prevent, prioritizing user engagement over child safety. Defendant Roblox was aware of these predatory language patterns but intentionally designed its product to overlook them.

247.    The predator would frequently message Plaintiff on the Defendant Roblox's platform where she told him she was 11 years old. After several weeks, the predator convinced Plaintiff to share her Snapchat username.

248.    In or around January 2024, Plaintiff started communicating with the predator over Snapchat, creating the cross-platform connection that both Defendant Roblox and Defendant Snapchat profit from while refusing to disrupt, despite internal research documenting this exact exploitation pathway.

249.    Utilizing the same Snapchat account, two predators frequently messaged Plaintiff on the Defendant Snapchat's platform, which she set up as a minor.  They messaged her to send sexually explicit images and videos, providing her specific guidance on what sexual acts to perform.  Defendant Snapchat knew or should have known through its online monitoring that Plaintiff, a minor, was being solicited by and adult to generate and distribute CSAM, and sexually explicit images and videos.

250.    The predators utilized Defendants' products to sexually extort and manipulate Plaintiff for several weeks in February 2024. After coercing Plaintiff to send a sexually explicit photo over Snapchat, one of the predators used that to threaten and extort her to send more photos and videos.  If Plaintiff did not wish to send explicit images or videos, the predator threatened her by telling her that her prior images would be shared online. Furthermore, he threatened to harm himself should Plaintiff fail to send additional images of herself. Plaintiff was then stuck in an endless cycle of abuse – one she could not stop out of fear her life would be left in shambles. Defendant Snapchat's disappearing message feature was specifically designed to facilitate this exact type of exploitation.

251.    Over the course of several weeks the predator coerced Plaintiff into sending increasingly explicit content through Snapchat, including numerous sexually explicit photos and videos of herself exposing herself and engaging in sexual acts by herself. Plaintiff was spurred on by the predator's manipulation and threats communicated to Plaintiff over Defendants' online

products.  At one point, the predator convinced Plaintiff to share her home address. Both Defendant have the technological capability to detect and prevent this abuse but deliberately choose not to implement such measures.

252.  In February 2024, Plaintiff's mother discovered a series of sexual images and messages exchanged between Plaintiff and what appeared to be an adult male on Plaintiff's phone. Plaintiff's mother observed a video of an adult male masturbating and asking Plaintiff if she "liked it." The male also requested for Plaintiff to send images of herself.  As messages appeared deleted, Plaintiff's mother also examined Plaintiff's iPad. There, she observed a video of another adult male masturbating to images of Plaintiff. It was at that juncture Plaintiff disclosed that these images were shared because at least one male threatened not only to harm himself but would expose the images online. At that juncture, Plaintiff's parents contacted the police.

253.  As a result of the sexual exploitation and abuse Plaintiff experienced because of Defendants' unsafe and defectively designed products, Plaintiff has suffered, and continues to suffer, from mental health issues and significant emotional turmoil manifesting as anxiety and distrust. Plaintiff continues to require psychological intervention to help process the trauma she experienced.

254.  The physical and psychological impact on Plaintiff has been devastating—severe depression, anxiety, PTSD, emotional trauma, deep suspicion of others, difficulty in school, isolation and requiring ongoing counseling and treatment. Plaintiff's family relocated out of fear that Plaintiff's predators would locate her and exact additional harm on her or their family. These consequences were the foreseeable result of Defendants Roblox and Snapchat's deliberate business decisions to prioritize profits over child safety.

255. Plaintiff has suffered and continues to suffer life-altering psychological and emotional injuries as the direct result of Defendants Snapchat and Roblox's conscious decision to sacrifice child safety for corporate profits.

256. Plaintiff was a foreseeable user of each Defendant's products.

257. Each Defendant knew and intended that minors such as Plaintiff would use its products.

258. Each Defendant invited, solicited, encouraged, or reasonably should have foreseen the fact, extent, and manner of Plaintiff's use of their products.

259. Each Defendant knew or, by the exercise of reasonable care, should have known, that the intended or reasonably foreseeable use of their respective products (as designed, developed, set up, managed, maintained, supervised, and operated by that Defendant) was dangerous, harmful, and injurious when used by youth such as Plaintiff.

260. At all relevant times, each Defendant knew or, by the exercise of reasonable care, should have known that their respective products (as designed, developed, set up, managed, maintained, supervised, and operated by that Defendant) posed unreasonable risks of harm to youth such as Plaintiff, which risks were known and knowable, including in light of the internal data and knowledge each Defendant had regarding its products.

261. Each Defendant knew, or by the exercise of reasonable care, should have known, that ordinary child users of their respective products, such as Plaintiff, would not have realized the potential risks and dangers of using the products, including a risk of grooming, sexual abuse, and sexual exploitation, which foreseeably can lead to a cascade of negative effects, including but not limited to physical injury, damage to self-worth, stigma and social isolation, reduced academic performance, increased risky behavior, susceptibility to future sexual exploitation, attachment

issues, identity confusion, and profound mental health issues for young consumers, including but not limited to depression, anxiety, suicidal ideation, self-harm, post-traumatic stress disorder, insomnia, eating disorders, death, and other harmful effects.

262.  Each Defendant's conduct was closely connected to Plaintiff's injuries, which were highly certain to occur, as evidenced by the significance of Plaintiff's injuries.

263.  Each Defendant could have avoided Plaintiff's injuries with minimal cost, including, for example, utilizing age and identity verification software, adequate warnings, effective monitoring, effective and adequate parental controls for minor's accounts, flagging accounts that solicit CSAM, and flagging the distribution and exchange of CSAM.

264.  Plaintiff does not seek to hold the Defendants liable as the speaker or publisher of third-party content and instead intends to hold each Defendant responsible for their own independent conduct as the designers, programmers, manufacturers, sellers, and/or distributors of their dangerously defective products and for their own independent acts of negligence, gross negligence, carelessness, recklessness, and willful and wanton conduct as further described herein. Thus, Plaintiff's claims fall outside of any potential protections afforded by Section 230(c) of the Communications Decency Act.

## CAUSES OF ACTION

## COUNT I - FRAUDULENT CONCEALMENT AND MISREPRESENTATION

265.  Plaintiff hereby incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

266.  As set forth in more detail above, each Defendant knew about the defective conditions of its products and that the products posed serious safety risks to child users.

267. Each Defendant was under a duty to tell the public the truth and to disclose the defective conditions of its products and that the products posed serious safety risks to child users. Instead of disclosing the truth, each Defendant engaged in a widespread public campaign to tout the safety of its products in the media, and in the materials provided to potential users of the products, as described above.

268. Each Defendant was under a duty to tell the public, users, and their parents the truth and to disclose the defective conditions of its products and that the products posed serious safety risks to child users because each Defendant possessed superior knowledge about the dangers of its products through internal reviews, external studies and data known to each Defendant, and parent and police reports made to each Defendant.

269. Each Defendant breached its duty to the public, users, and their parents by concealing, failing to disclose, and making misstatements about the serious safety risks presented by its products. Even though each Defendant knew of those risks based on each Defendant's internal reviews, external studies and data known to each Defendant, and parent and police reports made to each Defendant, each Defendant intentionally concealed those risks to not lose users and revenue, and to induce parents to allow their children to use each Defendant's products.

270. Each Defendant made numerous false, material representations in 2024 and prior as described above downplaying any potential harm associated with its products and reassuring the public, users, and parents, including Plaintiff's parents, that its products were safe. Plaintiff's parents and the public at large relied on each Defendant's false representations in deciding to allow children, including Plaintiff, to play on the products. Each Defendant's representations regarding the safety of its products were false, and each Defendant knew that its representations about the safety of its products were false when the statements were made.

271.  Each Defendant intentionally failed to disclose the serious safety risks posed by the design of its products to the public, users, and their parents, including Plaintiff and Plaintiff's parents. Such risks were known only to Defendants through their internal reviews and external studies and data known to each Defendant. The public, child users, and their parents, including Plaintiff and Plaintiff's parents, could not have discovered such serious safety risks.

272.  The public, child users, and their parents, including Plaintiff and Plaintiff's parents, did not know of the serious safety risks posed by the design of each Defendant's products, which were known by each Defendant.

273.  By intentionally concealing and failing to disclose defects inherent in the design of their products, each Defendant knowingly and recklessly misled the public, child users, and their parents, including Plaintiff and Plaintiff's parents, into believing its products were safe for children to use.

274.  By intentionally making numerous material representations, downplaying any potential harm associated with their products, and reassuring the public, child users, and parents, including Plaintiff and Plaintiff's parents, that their products were safe, each Defendant fraudulently misled the public, child users, and their parents, including Plaintiff and Plaintiff's parents, into believing their products were safe for children to use.

275.  Each Defendant intended for the public, child users, and their parents, including Plaintiff and Plaintiff's parents, to rely on its representations about the safety of its products.

276.  Each Defendant knew that its concealment, misstatements, and omissions were material. A reasonable person, including Plaintiff and Plaintiff's parents, would find information about the risk of grooming, sexual abuse, sexual exploitation, and other serious risks associated

with the use of each Defendant's products, as described herein, to be important when deciding whether to allow children to use the products.

277.  The public, child users, and their parents, including Plaintiff and Plaintiff's parents, reasonably relied on the representations made by each Defendant about the safety of its products for use by children.

278.  Each Defendant intended to deceive the public, child users, and their parents, including Plaintiff and Plaintiff's parents, by concealing the defects in the design of its products, which made the products unsafe.

279.  As a direct and proximate result of each Defendant's material omissions, misrepresentations, and concealment of material information, Plaintiff and Plaintiff's parents were not aware and could not have been aware of the facts that each Defendant concealed or misstated, and therefore justifiably and reasonably believed that each Defendant's products were safe for children to use.

280.  If the serious safety risks presented by the design of each Defendant's products had been disclosed, the public, child users, and their parents, including Plaintiff and Plaintiff's parents, reasonably would have acted differently and/or would have not permitted children to use the products.

281.  Each Defendant's concealment and Plaintiff's parents' reliance on each Defendant's representations about the safety of their products were substantial factors in causing harm to Plaintiff.

282.  As a direct and proximate result of each Defendant's material omissions, misrepresentations, and concealment of material information, Plaintiff sustained serious injuries and harm.

283. As a direct and proximate result of each Defendant's material omissions, misrepresentations, and concealment of material information, as described herein, Plaintiff has suffered permanent and continuous injuries, including but not limited to severe depression, anxiety, PTSD, emotional trauma, deep suspicion of others, difficulty in school, and ongoing counseling and treatment, as described herein. Plaintiff and her family had to free their home due to safety concerns. Plaintiff has suffered emotional and physical trauma, harm, and injuries that will continue into the future. Plaintiff has lost the ability to live a normal life and will continue to be so diminished into the future. Furthermore, Plaintiff has medical bills both past and future related to care because of the harm caused by Defendants.

284. Each Defendant's conduct, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of said conduct, including to the health, safety, and welfare of its consumers, and warrants an award of punitive damages in an amount sufficient to punish each Defendant and deter others from like conduct.

**WHEREFORE**, Plaintiff, Jane P.H. Doe, a minor, by and through her parents and natural guardians, John K.H. Doe and Jane J.H. Doe, claims of Defendants, Roblox Corporation and Snap, Inc., jointly and severally, sums in excess of the jurisdictional threshold in compensatory damages, punitive damages, delay damages, interest, and allowable costs of suit and brings this action to recover same.

## COUNT II - NEGLIGENT MISREPRESENTATION

285. Plaintiff hereby incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

286. As set forth in more detail above, each Defendant knew about the defective conditions of its products and that the products posed serious safety risks to child users, including Plaintiff. Instead of disclosing the truth, each Defendant engaged in a widespread public campaign to tout the safety of their products for children in the media and in the materials provided to potential users of the products, as described above.

287. Each Defendant was under a duty to tell the public the truth and to disclose the defective conditions of its product and that the product posed serious safety risks to child users.

288. Each Defendant breached its duty to the public, users, and their parents, including Plaintiff and Plaintiff's parents, by concealing, failing to disclose, and making misstatements about the serious safety risks presented by its products. Even though each Defendant knew of those risks based on each Defendant's internal reviews, external studies and data known to each Defendant, and parent and police reports made to each Defendant, each Defendant intentionally concealed those risks to not lose users and revenue, and to induce parents, including Plaintiff's parents, to allow their children to use each Defendant's products.

289. Each Defendant made numerous false representations about the safety of its product, as described above, which were specific and widespread. Plaintiff's parents and the public at large relied on each Defendant's false representations in deciding to allow children to use the products, including Plaintiff.

290. At all times relevant to this cause of action, and as detailed herein, each Defendant negligently provided Plaintiff, Plaintiff's parents, and the general public with false or incorrect information or omitted or failed to disclose material information concerning its product; including, but not limited to, misrepresentations relating to the safety, risk of harm, and approved uses of the products. Each Defendant negligently made numerous material representations, as described

above, downplaying any potential harm associated with its product and reassuring the public, users, and parents, including Plaintiff's parents that its product was safe and would not harm its child users, including Plaintiff. Plaintiff's parents and the public at large relied on each Defendant's false representations in deciding to allow children, including Plaintiff, to play on the products.

291. Each Defendant's representations that their products were safe for use by children such as Plaintiff, including but not limited to reports, press releases, advertising campaigns, labeling materials, print and online advertisements, videos, commercial media containing material representations, were false and misleading, and contained omissions and concealment of truth about the dangers of the use of products. Defendants made the foregoing misrepresentations knowing that they were false and/or without reasonable basis in fact, and each Defendant had no reasonable grounds for believing that its misrepresentations that its products were safe for children to use were true.

292. By making numerous material representations downplaying any potential harm associated with its products and reassuring the public, users, and their parents, including Plaintiff, that its products were safe, Defendants negligently misled the public, users, and their parents, including Plaintiff's parents, into believing their products were safe for children to use.

293. Each Defendant's intent and purpose in making these misrepresentations was to deceive and defraud the public and the youth gaming community, including Plaintiff and Plaintiff's parents; to gain the confidence of the public, parents, and the youth gaming community, including Plaintiff and Plaintiff's parents; to falsely assure them of the quality of the products' fitness for use; and to induce the public, parents, and the youth gaming community, including Plaintiff and

Plaintiff's parents to request, recommend, advise, solicit, purchase, procure, and continue to use Defendants' products.

294.  The foregoing representations and omissions by each Defendant were in fact false. Defendants' products are not safe, fit, and effective for use in their intended and reasonably foreseeable manner. Use of Defendants' products is hazardous to the user's health and welfare, and Defendants' products have a serious propensity to cause users to suffer serious injuries, including without limitation, the injuries Plaintiff has suffered. Further, Defendants' products are significantly more unsafe than other comparable products.

295.  By concealing and failing to disclose or failing to take reasonable care to disclose the defects, each Defendant negligently misled the public, child users, and their parents, including Plaintiff and Plaintiff's parents, into believing Defendants' products were safe for children to use.

296.  By making numerous material representations downplaying any potential harm associated with their products and reassuring the public, child users, and their parents, including Plaintiff and Plaintiff's parents, that their products were safe, Defendants negligently misled the public, child users, and their parents, including Plaintiff and Plaintiff's parents, into believing their products were safe for children to use.

297.  As a direct and proximate result of each Defendant's material omissions, misrepresentations, and concealment of material information, Plaintiff's parents was not aware and could not have been aware of the fact that each Defendant concealed or made misrepresentations, and therefore justifiably and reasonably believed that Defendants' products were safe for use by Plaintiff.

298.  Each Defendant knew and had reason to know that Plaintiff, Plaintiff's parents, and the general public did not have the ability to determine the true facts intentionally and/or

negligently concealed and misrepresented by each Defendant, and would not have used the same or permitted Plaintiff to use the same, if the true facts regarding the products had not been concealed and misrepresented by each Defendant.

299. Defendants had sole access to material facts concerning the defective nature of their products and the propensity for harm to minors in the form of dangerous injuries and damages to persons who used their products, including Plaintiff.

300. As a direct and proximate result of each Defendant's material omissions, misrepresentations, and concealment of material information, Plaintiff sustained serious injuries and harm.

301. In reliance upon the false and negligent misrepresentations and omissions made by each Defendant, Plaintiff was induced to, and did use the products, thereby causing Plaintiff to sustain severe and permanent personal injuries.

302. Each Defendant's concealment and Plaintiff's parents' reliance on each Defendant's representations about the safety of their products were substantial factors in causing harm to Plaintiff, including where the concealed and misrepresented facts were critical to understanding the true dangers inherent in the use of the products.

303. As a direct and proximate result of each Defendant's material omissions, misrepresentations, and concealment of material information, as described herein, Plaintiff has suffered permanent and continuous injuries, including but not limited to severe depression, anxiety, PTSD, emotional trauma, deep suspicion of others, difficulty in school, and ongoing counseling and treatment, as described herein. Plaintiff and her family had to free their home due to safety concerns. Plaintiff has suffered emotional and physical trauma, harm, and injuries that will continue into the future. Plaintiff has lost the ability to live a normal life and will continue to

be so diminished into the future. Furthermore, Plaintiff has medical bills both past and future related to care because of the harm caused by Defendants.

304.  Each Defendant's conduct, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of their consumers, and warrants an award of punitive damages in an amount sufficient to punish them and deter others from like conduct.

**WHEREFORE**, Plaintiff, Jane P.H. Doe, a minor, by and through her parents and natural guardians, John K.H. Doe and Jane J.H. Doe, claims of Defendants, Roblox Corporation and Snap, Inc., jointly and severally, sums in excess of the jurisdictional threshold in compensatory damages, punitive damages, delay damages, interest and allowable costs of suit and brings this action to recover same.

## COUNT III – NEGLIGENCE

305.  Plaintiff hereby incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

306.  Each Defendant develops, designs, programs, manufactures, distributes, sells, supplies, markets, advertises and/or operates their respective products that are intended for use by children.

307.  At all relevant times, each Defendant had a duty to exercise reasonable care in the design, development, programming, maintenance, manufacturing, distributing, supervision, selling, supplying, operation, marketing, promotion, and/or advertising of their products such that their products did not expose users, including Plaintiff, to harm, injury, abuse, sexual abuse, and/or sexual exploitation.

308.  Each Defendant had a duty to monitor, take down, flag, and warn of the content, images, and messages shared, posted, and/or circulated on their products to ensure that child users, including Plaintiff, were not exposed to or groomed by predators and were not sexually exploited.

309.  Each Defendant had a duty to monitor their products and design their products to ensure child users, including Plaintiff, were not solicited for CSAM or sent sexually explicit images or videos of children.

310.  Each Defendant had a duty to employ and train personnel to appropriately and reasonably respond to notice or signals that child users, such as Plaintiff, were being solicited, groomed, targeted and exploited by adult users for the purpose of sexual exploitation and/or the generation of CSAM.

311.  Roblox had a duty to not direct, supervise, support, encourage, finance or permit the creation of harmful Roblox experiences by those creators or developers over which it had control.

312.  Each Defendant had a duty to protect vulnerable users of their product, specifically children like Plaintiff.

313.  Each Defendant had a duty to design, develop, program, manufacture, distribute, sell, supply, and/or operate their products such that it did not manipulate or exploit child users, including Plaintiff, and/or otherwise encourage them to engage in sexually exploitive behavior.

314.  Each Defendant had a duty to design, develop, program, manufacture, distribute, sell, supply, and/or operate their product such that it did not create an environment where predators had easy access to target and groom child users, including Plaintiff, for the purpose of creating and generating CSAM.

315. Each Defendant owed Plaintiff a duty to exercise reasonable care in the development, setup, management, maintenance, operation, marketing, advertising, promotion,

distribution, supervision, and control of its products and not to create an unreasonable risk of harm from and in the use of its products (including an unreasonable risk of grooming, sexual abuse, and sexual exploitation, and other conduct associated with physical or mental injuries); to protect Plaintiff from unreasonable risk of injury from and in the use of its products; and not to invite, encourage, or facilitate youth, such as Plaintiff, to foreseeably engage in dangerous or risky behavior through, on, or as a reasonably foreseeable result of using its products. These duties govern each Defendant's own specific actions and are based on direct actions each Defendant took in developing, setting up, managing, maintaining, operating, marketing, advertising, promoting, distributing, supervising and controlling their products.

316.  Each Defendant owed a heightened duty of care to youth users of its products, such as Plaintiff, because children's brains are not fully developed, meaning children are more neurologically vulnerable than adults to abusive contact facilitated by Defendants' products because they have a hard time distinguishing between patterns of genuine friendship and grooming relationships.

317.  In addition, each Defendant owed a special relationship duty to Plaintiff to protect Plaintiff against harm caused by its products and employees or by other users. This special relationship duty is based on the following:

   a.  As businesses, Defendants owed a duty to protect customers, including Plaintiff, against reasonably foreseeable criminal acts of third parties and other dangers known to Defendants relating to its products;

   b.  Plaintiff, as a minor, was vulnerable and dependent on Defendants to provide a safe environment through their products, and Defendants have superior ability and control to provide that safety with respect to activities that they sponsor or control;

   c.  Plaintiff relied upon Defendants for protection against third-party misuse or misconduct;

d.   The special relationship Plaintiff had with Defendants substantially benefited Defendants through profits and growth in users and user activity. Defendants could not successfully operate without the growth in users and user activity generated by children like Plaintiff;

e.   Defendants were far more to Plaintiff than a business. Defendants provided Plaintiff with opportunities for social interaction and a discrete community of other users. Plaintiff was dependent on Defendants to provide structure, guidance, and a safe environment;

f.   Defendants have superior control over their products and the ability to protect their users. Defendants impose a variety of rules and restrictions to maintain a safe and orderly environment. Defendants employ internal staff to enforce these rules and restrictions and can monitor and discipline users when necessary. Defendants have the power to influence Plaintiff's values, consciousness, relationships, and behaviors; and

g.   Defendants have voluntarily undertaken a responsibility to keep children safe when using their products. As alleged above, Defendants have publicly stated that they take steps to keep children safe when using their products and therefore have undertaken a duty to act reasonably in taking such steps.

318.  Each Defendant breached these aforementioned duties, and as a result Plaintiff was targeted, groomed and coerced and threatened into creating and generating CSAM.

319.  The injuries, damages, and losses suffered by Plaintiff, as more fully set forth herein, were caused by the negligence, gross negligence, carelessness, recklessness, and willful and wanton conduct of the Defendants, by and through their agents, servants, workers, contractors, designers, developers, programmers, manufacturers, sellers, marketers, suppliers, distributors, subsidiaries, sister corporations, parent companies, and successor corporations and/or predecessor corporations.

320.  Each Defendant breached its duties of care owed to Plaintiff through its affirmative malfeasance, actions, business decisions, and policies in the development, set up, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its product. These breaches are based on Defendants' own actions in managing their own product

made available to the public, independent of any actions taken by a third party, and Defendants

breached their duties by:

a.  Including features in their products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of grooming, sexual abuse, and sexual exploitation of youth, including Plaintiff;

b.  Allowing child users, including Plaintiff, to receive and accept requests to communicate from adult users;

c.  Allowing users to create multiple accounts under different ages;

d.  Failing to implement and/or employ age and identity verification for new users creating new accounts;

e.  Failing to require that all new accounts for minors are created and approved by a parent and guardian by employing and utilizing age and identity verification;

f.  Failing to require that any and all changes to settings for accounts issued to minors are only done by a parents after going through an age and identity verification process;

g.  Failing to ensure that minors cannot accept requests to communicate or chat from strangers without the approval of a parents;

h.  Failing to effectively monitor and flag communication in the products that indicates the solicitation of CSAM or sexual images or videos from minors;

i.  Failing to effectively monitor and flag communication in the products that are highly sexualized;

j.  Failing to effectively monitor and flag communication soliciting minors to move to a different platform despite knowing that this is a known tactic used by predators to target, groom, manipulate, and coerce minors into generating and distributing CSAM or sexual images or videos of minors;

k.  Failing to effectively monitor, flag, or prevent the sharing and distribution of CSAM or sexual images or videos from minors on the product;

l.  Failing to restrict minors from viewing, reviewing, interacting with or engaging with sexualized content that is not age appropriate;

m.  Failing to restrict minors from viewing, reviewing, interacting with or engaging with content that is highly sexualized;

n.    Creating and designing products that permit highly sexualized content, actions, images, and environments that are intended for young children, despite knowing that adult users are utilizing such products to target, groom, manipulate, and coerce child users to create and distribute inappropriate sexual images of themselves;

o.    Failing to implement any product safeguards or restrictions to prevent solicitation of CSAM or sexual images or videos from child users;

p.    Failing to warn child users, including Plaintiff and Plaintiff's parents, of the known dangers of predators using the products to facilitate the generation, creation, solicitation and distribution of CSAM or sexual images or videos of minors;

q.    Failing to warn parents/guardians, including Plaintiff's parents, that the default settings allow adult strangers to "friend" request and communicate with child users;

r.    Failing to warn parents/guardians, including Plaintiff's parents, that Defendants do not block the IP and MAC addresses of known abusers;

s.    Failing to warn child users, including Plaintiff and Plaintiff's parents, of the known dangers of predators using the products to target children for sexual exploitation, sextortion, and CSAM;

t.    Failing to warn child users, including Plaintiff and Plaintiff's parents, that Defendants' products expose child users to an increased risk of contact with predators who will groom, sexually abuse, and sexually exploit child users such as Plaintiff, resulting in physical and mental injuries;

u.    Failing to warn child users, including Plaintiff and Plaintiff's parents, that sexual predators use Robux to coerce children into sending them nude photos or engaging in other types of sexually explicit behavior;

v.    Failing to warn child users, including Plaintiff and Plaintiff's parents, that Defendants' products can increase risky and uninhibited behavior in children, making them easier targets to adult predators for sexual exploitation, sextortion, and CSAM;

w.    Failing to warn child users, including Plaintiff and Plaintiff's parents, that use of Defendants' products can normalize abuse and pornography, leading children to abuse other children either contemporaneously or later when the children are older;

x.    Failing to warn child users, including Plaintiff and Plaintiff's parents, that Defendants do not verify ages, allowing adult predators to pose as children on Defendants' products;

y.    Negligently, knowingly, or recklessly creating and designing products that facilitate the generation and distribution of CSAM or sexual images or videos of children;

z.    Intentionally permitting the products to be used to facilitate the generation and distribution of CSAM or sexual images or videos of children for the goal of increasing corporate revenues and profits;

aa.    Failing to design and create a safe environment for children, including Plaintiff;

bb.    Creating a digital environment in which the risks and dangers of abuse, sexual abuse, and sexual exploitation are hidden and/or downplayed;

cc.    Failing to ban and/or timely remove known adult predators using the products to target, groom, manipulate and solicit child users for sexually inappropriate images and videos of minors;

dd.    Hiring and/or employing personnel who were unfit, untrained, and/or incapable of operating and/or managing Defendants' products to ensure child users were not targeted, groomed, manipulated, and solicited for sexually inappropriate images and videos of minors;

ee.    Failing to adequately train, educate, and/or supervise their employees, contractors, agents, and/or servants such that they were capable of operating and/or managing the products to ensure the products were not being used to target, groom, manipulate, and solicit child users for CSAM or sexually inappropriate images and videos of minors;

ff.    Developing, enacting, promulgating, and enforcing policies and procedures which allowed child users to be targeted, groomed, manipulated, and solicited child users resulting in sexual abuse and sexual exploitation;

gg.    Developing enacting, promulgating, and enforcing policies and procedures which prevented the discovery of child users being targeted, groomed, manipulated, and solicited by predators for the purpose of generating and distributing CSAM or sexual images and videos of children;

hh.    Developing, enacting, promulgating, and enforcing policies and procedures which prevented the discovery of predators targeting, grooming, manipulating, and soliciting child users and delayed disabling the accounts of predators;

ii. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing products in a defective condition;

jj. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing products without adequate warnings;

kk. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing products that were not equipped, programmed with, or developed with the necessary safeguards to protect child users against sexual abuse, sexual exploitation, and being targeted, groomed, manipulated, and coerced into generating and distributing CSAM, and sexually inappropriate images and videos of minors;

ll. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing products that were not equipped, programmed with, or developed with the necessary safeguards to protect child users against sexual abuse, sexual exploitation and being targeted, groomed, manipulated, and coerced into generating and distributing CSAM, and sexually inappropriate images and videos of minors despite knowing that a failure to equip, program, or develop the products with such safeguards would result in severe injury to child users, including Plaintiff;

mm. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing products that preyed upon the vulnerability of children;

nn. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing products that expose children to highly sexualized content and roleplaying;

oo. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing products which lacked the necessary safety features to protect child users, including Plaintiff;

pp. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing products for which the risks of use far outweighed the utility thereof;

qq. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing products that were unreasonably dangerous for their intended and foreseeable uses and/or misuses and to their intended and foreseeable users, including Plaintiff;

rr. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing products that were not safe for their intended and represented purposes;

ss.  Failing to adopt available, reasonable and feasible alternative product designs, despite having actual knowledge of the dangers child users were exposed to, including sexual abuse, sexual exploitation, and being targeted, groomed, manipulated, solicited, and coerced into generating CSAM;

tt.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing products that lacked the necessary safety features to protect child users, including Plaintiff;

uu.  Failing to warn users of the risks associated with the products;

vv.  Including features in their products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of harm to the physical and mental health and well-being of youth users, including Plaintiff, including but not limited to physical injury, damage to self-worth, stigma and social isolation, reduced academic performance, increased risky behavior, susceptibility to future sexual exploitation, attachment issues, identity confusion, and profound mental health issues for young consumers, including but not limited to depression, anxiety, suicidal ideation, self-harm, post-traumatic stress disorder, insomnia, eating disorders, death, and other harmful effects;

ww.  Maintaining unreasonably dangerous features in their products after notice that such features, as structured and operated, posed a foreseeable risk of harm to the physical and mental health and well-being of child users;

xx.  Failing to use reasonable care to warn or instruct, including pre-and post-distribution, Plaintiff and Plaintiff's parents, and/or the general public about the products' substantially dangerous condition and/or about facts making the products likely to be dangerous;

yy.  Failing to provide adequate instructions, guidelines, and safety precautions, including pre-and post-transaction, to those persons to whom it was foreseeable would reasonably use or encourage use of the product, including Plaintiff and Plaintiff's parents;

zz.  Representing that their the products were safe for their intended use when, in fact, Defendants knew or should have known the products were not safe for their intended purpose; and

aaa.  Continuing the development, setup, management, maintenance, operation, marketing, advertising, promotion, distribution, supervision, and control of the products knowing that the products are dangerous and not reasonably safe

321.  A reasonable company under the same or similar circumstances as Defendants would have developed, designed, set up, managed, maintained, supervised, and operated their products in a manner that is safe for the child users who it was intended for, like Plaintiff.

322.  By conducting themselves as set forth above, Defendants' acts and/or omissions were a substantial factor in, a factual cause of, and/or increased the risk of harm that caused Plaintiff's injuries and harm.

323.  By reason of the Defendants' carelessness, negligence, gross negligence, recklessness, and willful and wanton conduct, by and through their agents, servants, workers, contractors, designers, developers, programmers, manufacturers, sellers, marketers, suppliers, distributors, subsidiaries, sister corporations, parent companies, successor corporations, and/or predecessor corporations, Plaintiff was caused to sustain severe, permanent, and disabling injuries as set forth above.

324.  The safety of the public and the users of the products, particularly children, must come first and be the paramount concern and consideration in the design, development, programming, supply, maintenance and distribution of Defendants' products as well as in the operation, oversight, supervision, and management of the products and the manner in which they are being used by predators to target, groom, manipulate, solicit, and coerce children.

325.  Outrageously, Defendants knowingly exposed the public and innocent children, including Plaintiff, to sexual content, sexual abuse, and sexual exploitation causing her to be vulnerable to being targeted, groomed, manipulated, solicited, and coerced by predators for the generation and distribution of CSAM or inappropriate sexual images and videos of minors.

326.  Each Defendant knew that predators were using their products for the purpose of facilitating the generation and distribution of CSAM and each and every child user, including

Plaintiff, was at risk of being targeted, groomed, manipulated, solicited, and coerced, but Defendants failed to take appropriate, reasonable, timely, and necessary remedial actions.

327.  Each Defendant knew that children were at an increased risk of being sexually abused and/or sexually exploited by predators using their product to gain unsupervised access to children but Defendants failed to take appropriate, reasonable, timely, and necessary remedial actions.

328.  Each Defendant outrageously prioritized revenues and profits over the health and safety of its users, particularly children like Plaintiff.

329.  As a direct and proximate result of the Defendants' negligent conduct, as described herein, Plaintiff has suffered permanent and continuous injuries, including but not limited to severe depression, anxiety, PTSD, emotional trauma, deep suspicion of others, difficulty in school, and ongoing counseling and treatment, as described herein. Plaintiff and her family had to free their home due to safety concerns. Plaintiff has suffered emotional and physical trauma, harm, and injuries that will continue into the future. Plaintiff has lost the ability to live a normal life and will continue to be so diminished into the future. Furthermore, Plaintiff has medical bills both past and future related to care because of the harm caused by Defendants.

330.  Each Defendant's conduct, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of their customers, and warrants an award of punitive damages in an amount sufficient to punish them and deter others from like conduct.

**WHEREFORE**, Plaintiff, Jane P.H. Doe, a minor, by and through her parents and natural guardians, John K.H. Doe and Jane J.H. Doe, claims of Defendants, Roblox Corporation and Snap, Inc., jointly and severally, sums in excess of the jurisdictional threshold in compensatory damages,

punitive damages, delay damages, interest and allowable costs of suit and brings this action to recover same.

## COUNT IV - NEGLIGENT UNDERTAKING

331.  Plaintiff hereby incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

332.  Each Defendant develops, designs, programs, manufactures, distributes, sells, supplies, markets, advertises and/or operates their respective products that are intended for use by children.

333.  Each Defendant undertook the duty of monitoring interactions with child users on their products and employed certain codes of conduct whereby if violated the account user could lose all or some of their privileges when using Defendant's products.

334.  Each Defendant knew, or reasonably should have known, that effective monitoring of communications within the products was necessary for the protection of minor users.

335.  Each Defendant undertook the duty of implementing and employing a code of conduct.

336.  Each Defendant knew, or reasonably should have known, that implementing and enforcing that code of conduct among its users was necessary for the protection of minor users, including Plaintiff.

337.  Each Defendant rendered parental control services and account safety services for parents, including Plaintiff's parents.

338.  Each Defendant made numerous statements, as outlined above, claiming in substance that their parental controls and account safety services were highly effective at protecting users from the type of harm Plaintiff suffered.

339.  Each Defendant knew, or reasonably should have known, that effective parental control and account safety services were necessary for the protection of minor users.

340.  Each Defendant's conduct was closely connected to Plaintiff's injuries, which were highly certain to occur, as evidenced by the significance of Plaintiff's injuries.

341.  Each Defendant could have avoided Plaintiff's injuries with minimal cost, including, for example, by implementing parental control and account safety services that were effective and that would prevent child users from being contacted by adult accounts or strangers' accounts generally.

342.  Each Defendant could have avoided Plaintiff's injuries with minimal cost, including, for example, by implementing parental control and account safety services that were effective and that would prevent child users from being targeted, groomed, solicited and manipulated by predators.

343.  Each Defendant could have avoided Plaintiff's injuries with minimal cost, including, for example, by implementing parental control and account safety services that were effective and that would prevent the generation and distribution of CSAM, sexually explicit images and videos of minors over their respective products.

344.  Imposing a duty on Defendants would benefit the community at large.

345.  Imposing a duty on Defendants would not be burdensome to them because they have the technological and financial means to avoid the risks of harm to children.

346.  Each Defendant owed a heightened duty of care to minor users and their parents, including Plaintiff and Plaintiff's parents, to implement parental control and account safety services that were effective and that would prevent child users from being contacted by adult accounts or strangers' accounts generally.

347.  Plaintiff's parents relied on each Defendant exercising reasonable care in undertaking to render parental controls and account safety services monitoring and enforcing the code of conduct.

348.  Each Defendant breached its duty of undertaking by failing to use reasonable care in rendering its parental controls, account safety services, and monitoring and enforcement of the code of conduct to prevent child users from being contacted by adult accounts or strangers' accounts generally.

349.  Each Defendant failed to exercise reasonable care in rendering these parental controls, account safety services, and monitoring and enforcing the code of conduct.

350.  Each Defendant's failure to exercise reasonable care increased the risk of, and was a substantial factor in causing, harm to Plaintiff.

351.  Plaintiff's parents relied on Defendants to provide effective parental controls, account safety services, monitoring and enforcement of the code of conduct, and account safety services.

352.   Each Defendant's breach of one or more of its duties was a substantial factor in causing harm and injury to Plaintiff.

353.  Plaintiff was injured as a result of her use of Defendants' defective products through no fault of her own.

354.  The nature of the fraudulent and unlawful acts that created safety concerns for Plaintiff are not the type of risks that are immediately apparent from using Defendants' products.

355. As a direct and proximate result of the Defendants' material omissions, misrepresentations, and concealment of material information, as described herein, as described herein, Plaintiff has suffered permanent and continuous injuries, including but not limited to severe

depression, anxiety, PTSD, emotional trauma, deep suspicion of others, difficulty in school, and ongoing counseling and treatment, as described herein. Plaintiff and her family had to free their home due to safety concerns. Plaintiff has suffered emotional and physical trauma, harm, and injuries that will continue into the future. Plaintiff has lost the ability to live a normal life and will continue to be so diminished into the future. Furthermore, Plaintiff has medical bills both past and future related to care because of the harm caused by Defendants.

356.  Each Defendant's conduct, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of their customers, and warrants an award of punitive damages in an amount sufficient to punish them and deter others from like conduct.

**WHEREFORE**, Plaintiff, Jane P.H. Doe, a minor, by and through her parents and natural guardians, John K.H. Doe and Jane J.H. Doe, claims of Defendants, Roblox Corporation and Snap, Inc., jointly and severally, sums in excess of the jurisdictional threshold in compensatory damages, punitive damages, delay damages, interest and allowable costs of suit and brings this action to recover same.

## COUNT V - STRICT PRODUCTS LIABILITY

357.  Plaintiff hereby incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

358.  Each of Defendants' respective products are designed, developed, programmed, manufactured, marketed, sold, supplied, distributed, operated, and/or managed by Defendants.

359.  At all relevant times, each Defendant designed, developed, programmed, manufactured, managed, operated, tested, produced, labeled, promoted, marketed, controlled,

supplied, and distributed the product into the stream of commerce and in the course of the same, directly advertised and marketed the product to consumers or persons responsible for consumers, including Plaintiff and Plaintiff's parents.

360. Each Defendant's product was designed and intended to be a gaming and/or communication product intended for children, such as Plaintiff. The software and architecture of the products is the same for every user that logs on or signs up for an account. These products are defective and pose the same danger to each minor user, including Plaintiff.

361. Each Defendant's product is distributed and sold to the public through retail channels (*e.g.*, the Apple App "Store" and the Google Play "Store").

362. Each Defendant's product is marketed and advertised to the public for the personal use of the end-user/consumer.

363. Each Defendant defectively designed its product to allow children to come into contact with child predators. Children are particularly unable to appreciate the risks posed by the products.

364. The defects in the design of each Defendant's product existed prior to the release of these products to Plaintiff and the public, and there was no substantial change to Defendants' products between the time of the upload by each Defendant to public or retail channels (*e.g.*, the App Store or Google Play) and the time of distribution to Plaintiff via download or URL access. In the alternative, any changes that were made to the product used by Plaintiff was reasonably foreseeable to Defendants.

365. Plaintiff used this product as intended or in a reasonably foreseeable manner, and each Defendant knew or, by the exercise of reasonable care, should have known that Plaintiff would use this product without inspection for its dangerous nature.

366. Each Defendant defectively designed its product to appeal to adult predators by making it easy to find children and enabled their contact, grooming, sexual exploitation, and sexual abuse of children, including Plaintiff.

367. Each Defendant failed to test the safety of the features it developed and implemented for use on its product. When each Defendant did perform some product testing and had knowledge of ongoing harm, it failed to adequately remedy its product's defects or warn Plaintiff thereof.

368. Each Defendant's product is defective in design and poses a substantial likelihood of harm for the reasons set forth herein, because the products fail to meet the safety expectations of ordinary consumers when used in an intended or reasonably foreseeable manner, and because the products are less safe than an ordinary consumer would expect when used in such a manner. Children and teenagers are among the ordinary consumers of Defendants' products. Indeed, each Defendant markets, promotes, and advertises its product to child consumers. Child consumers, and their parents and guardians, do not expect Defendants' product to expose them to predators when the product is used in the intended manner by the intended audience. They do not expect the features embedded by Defendants in their products to make it easy for child predators to sign-up for accounts and find children, groom children, and sexually exploit children. They do not expect Defendants' revenue and profits to be directly tied to predators' extortion of children and utilizing each Defendant's product to facilitate the generation and distribution of CSAM, or sexual images or videos of children.

369. Each Defendant's product is likewise defectively designed in that it creates an inherent risk of danger; specifically, a risk of grooming, sexual abuse, and sexual exploitation, which can lead to a cascade of harms. Those harms include but are not limited to physical injury, damage to self-worth, stigma and social isolation, reduced academic performance, increased risky

behavior, susceptibility to future sexual exploitation, attachment issues, identity confusion, and profound mental health issues for young consumers, including but not limited to depression, anxiety, suicidal ideation, self-harm, post-traumatic stress disorder, insomnia, death, and other harmful effects.

370.  The risks inherent in the design of each Defendant's product significantly outweigh any benefits of such design.

371. Each Defendant, by and through their agents, servants, workers, contractors, designers, developers, programmers, manufacturers, sellers, marketers, suppliers, distributors, subsidiaries, sister corporations, parent companies, successor corporations and/or predecessor corporations, are strictly liable under § 402A of the Restatement (Second) of Torts because:

   a.  Each Defendant is engaged in the business of designing, developing, programming, manufacturing, selling, marketing, supplying, and/or distributing online products intended for children, Roblox and Snapchat;

   b.  The products that caused Plaintiff's injuries were designed, created, programmed, developed, marketed, and placed in the general stream of commerce by Defendants;

   c.  The products were expected to and did reach users such as Plaintiff without substantial change in the condition in which they were designed, developed, programmed, manufactured, marketed, distributed and/or sold; and

   d.  The products were designed, developed, programmed, manufactured, marketed, distributed and/or sold in the defective condition(s) for the reasons set forth herein.

372.  The products were in a defective condition as: (1) the danger contained therein is unknowable and unacceptable to the average or ordinary consumer; and/or (2) a reasonable person would conclude that the probability and seriousness of the harm caused by the subject product outweighs the burden or costs of taking precautions.

373. Each Defendant, by and through their agents, servants, workers, contractors, designers, developers, programmers, manufacturers, sellers, marketers, suppliers, distributors,

subsidiaries, sister corporations, parent companies, successor corporations, and/or predecessor corporations, are strictly liable under § 402A of the Restatement (Second) of Torts, by:

    a. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (Roblox and Snapchat) in a defective condition;

    b. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (Roblox and Snapchat) without adequate warnings;

    c. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (Roblox and Snapchat) without adequate parental control features;

    d. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (Roblox and Snapchat) that was not equipped, programmed with, or developed with the necessary safeguards required to prevent the facilitation of the generation and distribution of CSAM, sexual abuse of children, and sexual exploitation of children;

    e. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (Roblox and Snapchat) that was not equipped, programmed with, or developed with the necessary safeguards required to prevent the facilitation of the generation and distribution of CSAM, sexual abuse of children, and sexual exploitation of children, despite knowing that a failure to equip, program, or develop the product with such safeguards would result in severe injury to users, including children such as Plaintiff;

    f. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (Roblox and Snapchat) that knowingly exposed child users, including Plaintiff to predators using the product to target children for the purpose of generating and distributing of CSAM, sexual abuse of children, and sexual exploitation of children;

    g. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (Roblox and Snapchat) that was knowingly used to facilitate the generation and distribution of CSAM, sexually abuse children and sexually exploit children despite knowing that this would lead to severe injuries to users, including to children such as Plaintiff;

    h. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (Roblox and Snapchat) that was intended to exploit children;

    i. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (Roblox and Snapchat) that preyed upon the vulnerability of children;

j.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (Roblox and Snapchat) that was intended to manipulate and deceive child users into believing they were socializing and participating in games in a safe environment;

k.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (Roblox and Snapchat) that recommended for child users to interact with and engage in roleplaying with adults despite knowing that predators used the products to facilitate the generation and distribution of CSAM, sexually abuse children, and sexually exploit children;

l.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (Roblox and Snapchat) which lacked all the necessary safety features to protect child users, including Plaintiff;

m.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (Roblox and Snapchat) for which the risks of use far outweighed the utility thereof;

n.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (Roblox and Snapchat) that was unreasonably dangerous for its intended and foreseeable uses and/or misuses and to its intended and foreseeable users, including Plaintiff;

o.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (Roblox and Snapchat) that was incapable of preventing its product from being used by predators to facilitate the generation and distribution of CSAM, to sexually abuse children and to sexually exploit children;

p.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (Roblox and Snapchat) that recommended child users, including Plaintiff, interact with and engage with adult predators;

q.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (Roblox and Snapchat) that recommended child users, including Plaintiff, interact with and engage with adult predators; despite knowing predators were using the product to facilitate the generation and distribution of CSAM, to sexually abuse children, and to sexually exploit children;

r.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (Roblox and Snapchat) that was not safe for its intended and represented purposes;

s.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (Roblox and Snapchat) that knowingly exposed child users to predators without any warnings;

t.  Despite having actual knowledge of predators using the products to facilitate the generation and distribution of CSAM, to sexually abuse children and to sexually exploit children causing serious injuries and/or deaths, failing to assess the risks of the product and adopt available, reasonable and feasible alternatives;

u.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (Roblox and Snapchat) that lacked all the necessary safety features to protect child users, including Plaintiff;

v.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (Roblox and Snapchat) that malfunctioned by recommending for child users, including Plaintiff, to interact with and engage in roleplaying with adult predators who targeted, groomed, manipulated, solicited, coerced, and sexually exploited Plaintiff;

w.  Failing to warn users, including Plaintiff and Plaintiff's parents, of the risks associated with the product (Roblox and Snapchat);

x.  Failing to warn users of the risks associated with predators using the products to target, groom, manipulate, solicit, and coerce children, including Plaintiff, to generate and distribute CSAM and sexually inappropriate images and videos of minors;

y.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (Roblox and Snapchat) the risks and hazards of which far outweigh any utility or benefit of the product (*i.e.* in violation of the risk-utility test);

z.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (Roblox and Snapchat) that lacked reasonable, available, and feasible alternative designs that would have made the product safer for users, including Plaintiff; and

aa. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (Roblox and Snapchat) the risks of which were unknown or unknowable to the consumer (*i.e.*, in violation of the consumer expectations test).

374.  Alternative designs were available that would prevent child predators from finding, grooming, and exploiting children, and which would have served effectively the same purpose of Defendants' products while reducing the gravity and severity of danger posed by the products' defects.

375. By conducting themselves as set forth above, each of Defendants' acts and/or omissions were a substantial factor in, a factual cause of, and/or increased the risk of harm that caused Plaintiff's injuries.

376. By reason of the breach of duties, pursuant to § 402A of the Restatement (Second) of Torts, by each Defendant, by and through their agents, servants, workers, contractors, designers, developers, programmers, manufacturers, sellers, marketers, suppliers, distributors, subsidiaries, sister corporations, parent companies, successor corporations, and/or predecessor corporations, Plaintiff was caused to sustain severe, permanent, and disabling injuries as set forth in detail above.

377. Each Defendant designed, developed, programmed, manufactured, sold, marketed, supplied, and/or distributed a product (Roblox and Snapchat), the risks and hazards of which far outweighed its utility or benefit, thus violating the risk-utility test set forth in *Tincher v. Omega Flex, Inc.*, 104 A.3d 328 (Pa. 2014) and its progeny, as well as Restatement (Second) of Torts § 402A.

378. Each Defendant designed, developed, programmed, manufactured, sold, marketed, supplied, and/or distributed a product (Roblox and Snapchat) the risks of which were unknown or unknowable to the consumer and for which the consumer would not reasonably anticipate or appreciate the dangerous condition in violation of the consumer expectations test set forth in *Tincher*, 104 A.3d 328 and its progeny, as well Restatement (Second) of Torts § 402A.

379. The safety of the public and the users of each Defendants' products, particularly children, including Plaintiff, must come first and be the paramount concern and consideration in the design, development, programming, supply, and distribution of Defendants' products.

380. Outrageously, each Defendant knowingly exposed the public and innocent children, including Plaintiff, to predators who targeted, groomed, manipulated, solicited, and coerced

children causing them to be subjected to sexual abuse, sexual exploitation, and the generation and distribution of CSAM, all in the name of greater corporate profits.

381.  Each Defendant knew that dangerous predators targeting and grooming children were utilizing its products for the facilitation of the generation and distribution of CSAM and to sexually abuse and exploit children, including Plaintiff.

382.  Each Defendant knew that children were being targeted, groomed, manipulated, solicited, and coerced by predators for the purpose of generating and distributing CSAM and to sexually abuse and exploit children; and that their products facilitated and recommended child users to interact and engage with the predators.

383.  Each Defendant outrageously prioritized revenues and profits over the health and safety of its child users, including Plaintiff.

384.  As a direct and proximate result of the Defendants' conduct, as described herein, Plaintiff has suffered permanent and continuous injuries, including but not limited to severe depression, anxiety, PTSD, emotional trauma, deep suspicion of others, difficulty in school, and ongoing counseling and treatment, as described herein. Plaintiff and her family had to free their home due to safety concerns. Plaintiff has suffered emotional and physical trauma, harm, and injuries that will continue into the future. Plaintiff has lost the ability to live a normal life and will continue to be so diminished into the future. Furthermore, Plaintiff has medical bills both past and future related to care because of the harm caused by Defendants.

385.  Each Defendant's conduct, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct,

including to the health, safety, and welfare of their customers, and warrants an award of punitive damages in an amount sufficient to punish them and deter others from like conduct.

**WHEREFORE**, Plaintiff, Jane P.H. Doe, a minor, by and through her parents and natural guardians, John K.H. Doe and Jane J.H. Doe, claims of Defendants, Roblox Corporation and Snap, Inc., jointly and severally, sums in excess of the jurisdictional threshold in compensatory damages, punitive damages, delay damages, interest and allowable costs of suit and brings this action to recover same.

## COUNT VI - BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

386. Plaintiff hereby incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

387. At all times relevant to this action, each Defendant designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, sold, supplied, distributed, into the stream of commerce the product, for use as a gaming product intended for children.

388. At the time and place distribution and supply of each Defendant's products to Plaintiff, each Defendant expressly represented and warranted, by labeling materials submitted with the product, that the product was safe and effective for the products' intended and reasonably foreseeable use.

389. Each Defendant knew of the intended and reasonably foreseeable use of the product, at the time they marketed and distributed the product for use by Plaintiff and impliedly warranted the products to be of merchantable quality, and safe and fit for the product's intended use.

390. Each Defendant impliedly represented and warranted to the gaming community, child advocacy groups, Plaintiff, and Plaintiff's parents, that the product was safe and of

merchantable quality and fit for the ordinary purpose for which the product was intended and marketed to be used.

391. The representations and implied warranties made by each Defendant were false, misleading, and inaccurate because the products were defective, unsafe, unreasonably dangerous, and not of merchantable quality, when used in the product's intended and/or reasonably foreseeable manner. Specifically, at the time of Plaintiff's receipt of the products, the products were not in a merchantable condition in that:

      a.  The products were designed in such a manner so as to be prone to use by sexual predators seeking to exploit minor users, creating an unreasonably high rate of danger, including but not limited to depression, anxiety, suicidal ideation, self-harm, post-traumatic stress disorder, insomnia, death, and other harmful effects; and

      b.  The products were designed in such a manner so as to result in an unreasonably high rate of injury and abuse, especially for minor users.

392. Plaintiff and Plaintiff's parents reasonably relied on the superior skill and judgment of each Defendant as the designer, researcher, creator, manufacturer, and distributor of each's respective product, as to whether the product was of merchantable quality and safe and fit for its intended use, and also relied on the implied warranty of merchantability and fitness for the particular use and purpose for which the product was manufactured and distributed.

393. Each Defendant placed the product into the stream of commerce in a defective, unsafe, and unreasonably dangerous condition, and the product was expected to and did reach Plaintiff without substantial change in the condition in which the product was developed and distributed. Each Defendant breached their implied warranty because their products were not fit for their intended use and purpose.

394. As a direct and proximate result of the Defendants' breaches of their implied warranties, as described herein, Plaintiff has suffered permanent and continuous injuries, including

but not limited to severe depression, anxiety, PTSD, emotional trauma, deep suspicion of others, difficulty in school, and ongoing counseling and treatment, as described herein. Plaintiff and her family had to free their home due to safety concerns. Plaintiff has suffered emotional and physical trauma, harm, and injuries that will continue into the future. Plaintiff has lost the ability to live a normal life and will continue to be so diminished into the future. Furthermore, Plaintiff has medical bills both past and future related to care because of the harm caused by Defendants.

395.  Each Defendant's conduct, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of their customers, and warrants an award of punitive damages in an amount sufficient to punish them and deter others from like conduct.

**WHEREFORE**, Plaintiff, Jane P.H. Doe, a minor, by and through her parents and natural guardians, John K.H. Doe and Jane J.H. Doe, claims of Defendants, Roblox Corporation and Snap, Inc., jointly and severally, sums in excess of the jurisdictional threshold in compensatory damages, punitive damages, delay damages, interest and allowable costs of suit and brings this action to recover same.

## COUNT VII - BREACH OF EXPRESS WARRANTY

396.  Plaintiff hereby incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

397.  At all times relevant to this cause of action, each Defendant designed, researched, developed, programmed, manufactured, tested, labeled, inspected, advertised, promoted, marketed, sold, and distributed into the stream of commerce, and were merchants of goods of the kind including gaming and networking products intended for children.

398.  At the time and place of distribution and supply of Defendants' products to Plaintiff and Plaintiff's parents, each Defendant expressly represented and warranted in its marketing materials, both written and orally, and in the instructions or directions for use and product labeling, that the product was safe, fit for a child, and fit for their intended purpose and was of marketable quality, that they did not produce any unwarned-of dangerous effects, and that the product was adequately tested.

399.  At the time of Plaintiff's purchase/transaction with each Defendant, the products were not in a merchantable condition, and each Defendant breached its expressed warranties, in that:

  a.  The product was designed in such a manner so as to permit the targeting, grooming, manipulation, solicitation, and coercion of minors to facilitate the generation and distribution of CSAM and child sexual abuse and exploitation, creating an unreasonably high rate of danger and injuries, including but not limited to depression, anxiety, suicidal ideation, self-harm, post-traumatic stress disorder, insomnia, death, and other harmful effects;

  b.  The product was designed in such a manner so as to result in an unreasonably high rate of injury, exploitation, and abuse, especially for minor users; and

  c.  The product was designed in such a manner as to prevent users from safely engaging in and using the features of the product.

400.  As a direct and proximate result of the Defendants' breaches of their respective warranties, as described herein, Plaintiff has suffered permanent and continuous injuries, including but not limited to severe depression, anxiety, PTSD, emotional trauma, deep suspicion of others, difficulty in school, and ongoing counseling and treatment, as described herein. Plaintiff and her family had to free their home due to safety concerns. Plaintiff has suffered emotional and physical trauma, harm, and injuries that will continue into the future. Plaintiff has lost the ability to live a normal life and will continue to be so diminished into the future. Furthermore, Plaintiff has medical bills both past and future related to care because of the harm caused by Defendants.

401. Each Defendant's conduct, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of their customers, and warrants an award of punitive damages in an amount sufficient to punish them and deter others from like conduct.

**WHEREFORE**, Plaintiff, Jane P.H. Doe, a minor, by and through her parents and natural guardians, John K.H. Doe and Jane J.H. Doe, claims of Defendants, Roblox Corporation and Snap, Inc., jointly and severally, sums in excess of the jurisdictional threshold in compensatory damages, punitive damages, delay damages, interest and allowable costs of suit and brings this action to recover same.

### COUNT VIII – VIOLATION OF THE PENNSYLVANIA'S UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW, 73 P.S. §§ 201-1, *et seq.*

402. Plaintiff hereby incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

403. At all times relevant hereto, each Defendant intended and expected the respective product to be deployed, marketed, sold, and used in the Commonwealth of Pennsylvania.

404. At all times relevant hereto, Defendants were persons within the meaning of 73 P.S. § 201-2(2).

405. The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") at § 201-9.2(a) provides that "[a]ny person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real and personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 [(73 P.S. § 201-3)] of this act, may bring a private action to recover actual damages[.]" 73 P.S. § 201-9.2(a).

406. The UTPCPL makes unlawful "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." 73 P.S. § 201-3.

407. Each Defendant had a statutory duty to refrain from unfair or deceptive acts or practices in the promotion, distribution, and sale/transaction to Plaintiff and Plaintiff's parents.

408. At all times relevant hereto, each Defendant had both constructive and actual knowledge that when Defendants' products were used in a manner that was intended or directed by or reasonably foreseeable to, and was known to or foreseen by Defendants they were used by consumers, including children, to engage in risky and dangerous activities that were promoted and disseminated by Defendants' products which sought to encourage such engagement and it was likely that significant injuries would occur.

409. At all times relevant hereto, each Defendant had both constructive and actual knowledge that their products resulted in communication and engagement with dangerous predators targeting and grooming children, and that the products were encouraging child users to engage, communicate, and interact with predators targeting and grooming children to engage in risky and dangerous activities such as sexual exploitation and the generation and distribution of CSAM that were likely to cause significant injuries, despite these dangers being concealed from said consumers and despite the Defendants' products being marketed, sold, and distributed as safe.

410. From the first date on which each Defendant placed their products (Roblox and Snapchat) into the stream of commerce for use in the Commonwealth of Pennsylvania through the date of Plaintiff's injuries, Defendants engaged in unfair or deceptive acts or practices, in violation of the UTPCPL, including but not limited to deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression, or omission of material facts, in designing,

developing, programming, manufacturing, selling, marketing, supplying, and/or distributing

Defendants' products for use in the Commonwealth of Pennsylvania in that Defendants:

a. concealed, suppressed, or omitted to disclose that Defendants' products were designed and intended to facilitate the generation and distribution of CSAM and sexual exploitation of children;

b. concealed, suppressed, or omitted to disclose that Defendants' products were used by predators to target, groom, manipulate, solicit, and coerce children for the purpose of sexual exploitation and the generation and distribution of CSAM;

c. concealed, suppressed, or omitted to disclose that Defendants' products were designed and intended to urge and/or compel child users to interact, communicate, and engage with adult strangers despite knowing that the products were being used by predators who were sexually exploiting minors;

d. concealed, suppressed, or omitted to disclose that Defendants' products would expose child users to predators who use the products to target, groom, manipulate, solicit, and coerce children to engage in risky and dangerous sexual acts resulting in sexual exploitation;

e. concealed, suppressed, or omitted to disclose that Defendants' products were not safe or suitable for use by children;

f. concealed, suppressed, or omitted to disclose that the use of Defendants' products would result in exposure to predators and cause severe injury;

g. concealed, suppressed, or omitted to disclose that Defendants' products, had not been adequately developed, refined, and/or tested to ensure that predators would not have access to child users, such as Plaintiff;

h. concealed, suppressed, or omitted to disclose that Defendants' products, had not been adequately developed, refined, and/or tested to ensure that predators would not use the products to target, groom, manipulate, solicit, and coerce children into performing sexual acts;

i. concealed, suppressed, or omitted to disclose that Defendants' products, had not been adequately developed, refined, and/or tested to ensure that predators would not use the products to facilitate the generation and distribution of CSAM or sexually inappropriate images or videos of minors;

j. concealed, suppressed, or omitted to disclose that Defendants' products, had not been adequately developed, refined, and/or tested to ensure that children and other vulnerable users were not targeted by predators and the products were not being used to facilitate the generation and distribution of CSAM and other inappropriate sexual images and videos of children; and

k. concealed, suppressed, or omitted to disclose that Defendants' corporate profits depended on maximum number of users and maximizing a user's time spent on and engaging in the Defendants' products.

411. Each Defendant engaged in unfair, unconscionable, deceptive, fraudulent, and misleading acts or practices in violation of Pennsylvania's Consumer Protection Law. Specifically, each Defendant engaged in unfair competition or deceptive acts or practices in violation of the UTPCPL.

412. These acts and practices of each Defendant in designing, developing, programming, manufacturing, distributing, selling, supplying, and/or operating their products for sale and use in the Commonwealth of Pennsylvania were unfair because they offended the clearly stated public policy, were immoral, unethical, oppressive, and unscrupulous, and caused substantial injury to consumers, including Plaintiff.

413. The above and below mentioned acts and practices of each Defendant in designing, developing, programming, manufacturing, distributing, selling, supplying, and/or operating the products for sale and use in the Commonwealth of Pennsylvania offended the clearly stated public policy of the Commonwealth of Pennsylvania.

414. The above and below mentioned acts and practices of each Defendant in designing, developing, programming, manufacturing, distributing, selling, supplying, and/or operating the products for sale and use in the Commonwealth of Pennsylvania were immoral and unethical, as they served only to financially benefit Defendants at the expense of the health and safety of users of Defendants' products, including Plaintiff.

415. The above and below mentioned acts and practices of each Defendant in designing, developing, programming, manufacturing, distributing, selling, supplying, and/or operating the products for sale and use in the Commonwealth of Pennsylvania were likely to cause substantial

injury to users, including Plaintiff, by exposing them to unnecessary and unreasonable risks to their health and safety.

416.  The above and below mentioned acts and practices of each Defendant in designing, developing, programming, manufacturing, distributing, selling, supplying, and/or operating the products for sale and use in the Commonwealth of Pennsylvania were likely to cause substantial injury to users, including Plaintiff, in that but for these acts and practices, Defendants' products would not have been downloaded, purchased, and/or used in Pennsylvania and persons who used them, including Plaintiff, would not have been injured by said use.

417.  The above and below mentioned acts and practices of each Defendant in designing, developing, programming, manufacturing, distributing, selling, supplying, and/or operating the products for sale and use in the Commonwealth of Pennsylvania committed these acts and engaged in these practices in conscious disregard of the safety of others and their users, including Plaintiff.

418.  The injuries caused by Defendants' acts and practices in designing, developing, programming, manufacturing, distributing, selling, supplying, and/or operating the products for sale and use in the Commonwealth of Pennsylvania—namely, users' injuries and damages (including monetary losses)—are not outweighed by any countervailing benefit to consumers or competition.

419.  Each Defendant's conduct was willful, outrageous, immoral, unethical, oppressive, unscrupulous, unconscionable, and substantially injurious to Plaintiff and offends the public conscience.

420.  Plaintiff or Plaintiff's parents purchased, paid for, or furnished consideration for Defendants' products primarily for personal, family, or household purposes.

421. Each Defendant intended that purchasers and/or users of their products use them in reliance on these unfair and deceptive acts and practices.

422. The facts that Defendants concealed, suppressed, and/or omitted to disclose were material to the decisions to use Defendants' products, and Plaintiff would not have used said products had these facts been disclosed.

423. As a result of each Defendant's violative conduct in Pennsylvania, Plaintiff or Plaintiff's parents purchased, paid for, or furnished consideration of the products which was not made for resale, and were thereby harmed.

424. Each Defendant's unfair and deceptive acts and practices occurred in connection with their conduct of trade and commerce in the Commonwealth of Pennsylvania.

425. The Defendants' unfair and deceptive acts and practices of each Defendant violated the UTPCPL.

426. To the extent required, all conditions precedent have been or will be performed.

427. As a direct and proximate result of the Defendants' violations of the UTPCPL, as described herein, Plaintiff has suffered permanent and continuous injuries, including but not limited to severe depression, anxiety, PTSD, emotional trauma, deep suspicion of others, difficulty in school, and ongoing counseling and treatment, as described herein. Plaintiff and her family had to free their home due to safety concerns. Plaintiff has suffered emotional and physical trauma, harm, and injuries that will continue into the future. Plaintiff has lost the ability to live a normal life and will continue to be so diminished into the future. Furthermore, Plaintiff has medical bills both past and future related to care because of the harm caused by Defendants.

428. Each Defendant's conduct, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an

entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of their customers, and warrants an award of punitive damages in an amount sufficient to punish them and deter others from like conduct.

**WHEREFORE**, Plaintiff, Jane P.H. Doe, a minor, by and through her parent and natural guardian, John K.H. Doe, claims of Defendants, Roblox Corporation and Snap, Inc., jointly and severally, sums in excess of the jurisdictional threshold in compensatory damages, punitive damages, delay damages, interest and allowable costs of suit and brings this action to recover same.

### COUNT IX - KNOWING BENEFICIARY IN A SEX-TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS' PROTECTION ACT, 18 U.S.C. §§ 1591(a)(2), 1595

429.  Plaintiff hereby incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

430.  At all relevant times, Plaintiff was and is a victim within the meaning of 18 U.S.C. §1591 and 1595(a).

431.  Defendants are liable as perpetrators within the meaning of 18 U.S.C. § 1595(a) because in the ways described above:

    a.  Each Defendant knowingly or recklessly participated in harboring, maintenance, and/or other acts in further of sex trafficking, including the sex trafficking of Plaintiff; and

    b.  Each Defendant knowingly benefitted, by receiving financial and other compensation, through their participation in a venture that they knew or were reckless in not knowing involved involving the trafficking, harboring, and maintenance of sex trafficking victims in exchange for financial benefits. 18 U.S.C. §§ 1590(a), 1591(a)(2), 1593A.

432.  Each Defendant is liable as a beneficiary within the meaning of 18 U.S.C. § 1595(a) because, as described above, each and every Defendant knowingly benefitted, by receiving

financial compensation, for their participation in a venture they knew or should have known was engaged in sex trafficking, in violation of the TVPRA, 18 U.S.C. § 1591, *et seq.*

433.  Despite knowledge of Plaintiff's sex trafficking by each Defendant, Plaintiff's trafficker was able to continue to use each Defendants' products for the sexual exploitation of and trafficking of Plaintiff.

434.  Each Defendant participated in a venture together and with, among others, Plaintiff's trafficker. Defendants had an ongoing business relationship and association in fact with Plaintiff's trafficker. Despite the fact that Defendants knew or should have known that Plaintiff was being sex trafficked in violation of the TVPRA, Plaintiff's trafficker was able to continue to communicate with Plaintiff and threaten her for the purpose of sexual exploitation and trafficking using Defendants' products. Plaintiff's sex traffickers frequently used Defendants' products because they knew that Defendants employees, actors, agents, and monitors looked the other way despite obvious signs of trafficking.  Each of the venturers shared a common purpose – increasing the number of users on their product platforms and the making of profits.  Each Defendant profited while Plaintiff's trafficker was able to access Plaintiff on Defendants' unsupervised online venue where Defendants earned profits through the trafficking of Plaintiff.  Each Defendant participated in the venture by continually providing an online venue to Plaintiff's trafficker for him to sexually exploit and traffic Plaintiff, failing to properly implement anti-trafficking rules and policies, and assisting traffickers to continue their sexual exploitation with minimal risk of detection and disturbance, all the while ignoring the obvious signs of Plaintiff's trafficking.

435.  Each Defendant took many concrete steps to aid pedophiles and abusive users in their sex-trafficking venture, as outlined herein. Among the concrete steps that Defendants took to aid abusive users was providing anonymity to users and an unsupervised platform with unfettered

access young users, which made the sex-trafficking venture possible. Providing abusive users with a means of access to children caused Defendants to receive financial benefits. Defendants' willingness to provide complete access to its products, a magnet for underage and vulnerable users, was the *quid pro quo* for each receiving financial benefits from abusive users, including traffic and purchases within the products.

436.  Each of Defendant's products were a necessary part of the trafficking venture used to coerce Plaintiff as well as others to engage in commercial sex acts. The products directly formed part of the commercial nature of the sex acts. The products were also a necessary and required part of abusive users' recruitment of Plaintiff and other victims of a sex-trafficking venture. By providing the products that each Defendant knew would provide the infrastructure, means, and opportunity for the sex trafficking venture, each Defendant actively participated in the recruitment of victims of the venture.

437.  Each Defendant actively concealed the presence of abusive users on its products with the knowledge that those users intended to and did engage in commercial sexual acts with minors, so as to preserve its total user count, paying users, and therefore its financial benefits.

438.  Each Defendant knowingly and intentionally benefited financially from, and received value for, its participation in the sex-trafficking venture, in which abusive users, with each Defendant's knowledge, or its reckless disregard of the fact, that abusive users would use means of force, threats of force, fraud, coercion, and a combination of such means to cause Plaintiff, as well as other minor users, to engage in commercial sex acts.

439.  Each Defendant actually knew that it was participating in a particular sex-trafficking venture—*i.e.*, the abusive user sex-trafficking venture outlined above. Each Defendant's knowledge went far beyond having an abstract awareness of sex trafficking in general. Indeed,

Defendants discussed internally abusive users' trafficking and the large amounts of online traffic and purchases that Defendant received from such users. Thus, each Defendant did not simply fail to adequately detect signs of sex trafficking by and through their products; each did detect multiple signs of abusive users' sex-trafficking venture and continued to participate in the venture. Each Defendant knew that the venture was ongoing, which was why abusive users required continued access to the products.

440. Each Defendant's actions extend well beyond a situation of failing to train its staff about recognizing the warning signs of sex trafficking. Defendants' employees did recognize the signs of sex trafficking by and through their products. Indeed, Defendants' employees knew about abusive users' sex-trafficking ventures, including one involving Plaintiff. But each Defendant made a conscious decision to continue facilitating the sex-trafficking venture rather than ending its participation in the venture.

441. Each Defendant received substantial financial benefits as a result of these acts and/or omissions.

442. The facts alleged establish that each Defendant knowingly benefitted, financially or by receiving anything of value, from participating in a venture that Defendants knew or should have known constituted an act in violation of the TVPRA.

443. Each Defendant's actual knowledge extended to the fact that specific individual boys and girls were being coercively sex trafficked by abusive users because of their use of Defendants' products. Even if Defendants did not know all the names of their minor victims, each was on notice, and knew, that such victims were being coercively trafficked by abusive users' sex-trafficking venture.

444. Each Defendant helped to conceal the names of abusive users' victims from the public and from law enforcement and prosecuting agencies by helping to conceal the existence of the sex-trafficking venture.

445. Each Defendant's concealment included failing to follow through on enhanced monitoring of abusive users' accounts recommended. Defendants failed to implement that enhanced monitoring specifically to help conceal abusive users' ongoing sex-trafficking. Each Defendant knew that if it implemented that enhanced monitoring, it would have to stop providing abusive users with the product needed to run the sex-trafficking venture.

446. In addition to having actual knowledge that it was participating in a sex trafficking venture, each Defendant had constructive knowledge that it was participating in a sex trafficking venture. Each Defendant also had constructive knowledge that Plaintiff, as well as other minors, were being coercively sex trafficked by abusive users enabled by its product.

447. Each Defendant had constructive knowledge of abusive users' sex-trafficking venture because of specific acts by those users that put it on notice of a particular and ongoing sex trafficking venture, as set forth in detail herein.

448. Among the financial benefits that each Defendant received for participating in and facilitating abusive users' sex-trafficking venture were the continued traffic and revenue from traffickers use of Defendants' products, as well as the purchase of in-game currency, such as Robux in the case of Roblox, used to proposition minors to engage in commercial sex acts and on which Defendants made a direct profit.

449. Among the financial benefits that each Defendant received for participating in abusive users' sex-trafficking venture was referral of other abusive users by becoming known as a haven for sex abuse activity, thereby increasing its user count and total revenues.

450. Each Defendant knowingly received financial benefits in return for its assistance, support, and facilitation of abusive users' sex-trafficking venture. Each Defendant knew that if it stopped providing assistance, support, and facilitation of the sex-trafficking venture, it would no longer receive those benefits.

451. Each Defendant knew, and recklessly disregarded the fact, that it was certain abusive users' pattern and practice to use the channels and instrumentalities of interstate and foreign commerce, to entice, recruit, solicit, harbor, provide, obtain, and transport underage girls and boys, including Plaintiff, for purposes of causing commercial sex acts, in violation of 18 U.S.C. § 1591(a).

452. Each Defendant and its employees had actual knowledge that they were facilitating sexual abuse and sex trafficking conspiracy to recruit, solicit, entice, coerce, harbor, transport, obtain, and provide Plaintiff, into commercial sex acts, through the means of force, threats of force, fraud, abuse of process, and coercion.

453. Each Defendant's affirmative conduct was committed knowing, and in reckless disregard of the fact, that abusive users would use the access, means, and opportunity provided by each's product and lack of oversight as a means of defrauding, forcing, and coercing sex acts from Plaintiff as well as other minor users. Each Defendant's conduct was outrageous and intentional.

454. In addition to actual knowledge that it was participating in and facilitating the abusive users' sex-trafficking venture, each Defendant also should have known that (and was willfully blind to the fact that) it was participating in and facilitating a venture that had engaged in coercive sex trafficking, as covered by 18 U.S.C. § 1595(a).

455. Defendants actions were in and affecting interstate and foreign commerce.

456. Each Defendant's TVPRA violations were a direct, producing, and proximate cause of the injuries and damages to Plaintiff.

457. Each Defendant's knowing and intentional conduct has caused Plaintiff and other minors harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity, in order to avoid incurring that harm.

458. This case does not involve mere fraud. Instead, each Defendant's criminal conduct in violating the TVPA was outrageous and intentional, because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization. Each Defendant's criminal conduct also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. Each Defendant's criminal conduct was directed specifically at Plaintiff and other child users, who were the victims of sexual abuse, sexual exploitation and sex trafficking organization.

459. Defendants' outrageous and intentional conduct in this case is part of a pattern and practice of Defendants profiting by undertaking illegal high risk, high reward business activities.

460. Because of these knowing and intentional violations of 18 U.S.C. §§ 1591(a) and 1595, each Defendant is liable to Plaintiff for the damages they sustained and reasonable attorneys' fees.

461. Because of these intentional and outrageous violations of 18 U.S.C. §§ 1591(a) and 1595, each Defendant is liable to Plaintiff for punitive damages.

**WHEREFORE**, Plaintiff, Jane P.H. Doe, a minor, by and through her parents and natural guardians, John K.H. Doe and Jane J.H. Doe, claims of Defendants, Roblox Corporation and Snap, Inc., jointly and severally, sums in excess of the jurisdictional threshold in compensatory damages,

punitive damages, delay damages, interest and allowable costs of suit and brings this action to recover same.

## PUNITIVE DAMAGES ALLEGATIONS

462. Defendants had knowledge of, and were in possession of evidence demonstrating that, their products were defective and unreasonably dangerous and had a substantially higher risk of harm than did other alternative products on the market. Despite their knowledge, Defendants failed to, among other purposeful acts, inform or warn Plaintiff or Plaintiff's parents of the dangers, establish and maintain an adequate quality and post-market surveillance system, promote and market the products according to their safe use, and recalling their products from the market.

## PLAINTIFF'S PRAYERS FOR RELIEF

Plaintiff, Jane P.H. Doe, a minor, by and through her parents and natural guardians John K.H. Doe and Jane J.H. Doe, prays that this Court enter judgment in her favor and against Defendants, Roblox Corporation and Snap, Inc., jointly and severally compensatory damages in an amount greater than the jurisdictional threshold plus costs of suit, severally as to each Defendant for punitive damages in an amount sufficient to punish it and encourage it and others from similar conduct, for delay damages, reasonable attorney's fees, and for such further relief as is just and appropriate under the circumstances.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury of all claims in this Amended Complaint so triable.

Date: <u>October 3, 2025</u>

<u>/s/ Melissa Fry Hague</u>
Melissa Fry Hague (PA ID 202850)

Teresa Jauregui (PA ID 321931)
**THE JOEL BIEBER FIRM**
Two Liberty Place
50 S 16th Street, Suite 1700
Philadelphia, PA 19102
Tel: 267-554-2414
Mhague@joelbieber.com
Tjauregui@joelbieber.com

*Counsel for Plaintiff*